# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE THE BANCORP INC. SECURITIES LITIGATION | Case No. 14 Civ. 0952 (SLR)<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Joel Friedlander (Bar ID No. 3163)
**FRIEDLANDER & GORRIS, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

John Rizio-Hamilton
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
(212) 554-1400

Robert M. Roseman
**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
(215) 496-0300

*Attorneys for Lead Plaintiffs Arkansas Teacher
Retirement System and Arkansas Public
Employees Retirement System*

DATED: October 26, 2015

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................ 2

II.   JURISDICTION AND VENUE ................................................ 10

II.   THE PARTIES ................................................................. 11

      A.   Lead Plaintiffs ....................................................... 11

      B.   Defendants ............................................................ 11

III.  OVERVIEW OF THE FRAUD PERPETRATED BY DEFENDANTS ......... 15

      A.   Defendants Cohen, Frenkiel, And Mastrangelo Concealed
           Approximately $112.5 Million of Losses In The Bank's
           Commercial Loan Portfolio ............................................ 15

           1.   Bancorp Reported Strong Financial Results And Assured
                Investors It Was Properly Disclosing Any Loan Losses .......... 15

           2.   Bancorp Has Admitted That Its Publicly Reported Profits
                and "Earnings Growth" Were False .............................. 22

           3.   Bancorp Engaged In "Extend-And-Pretend" Tactics To
                Conceal Losses ................................................ 25

      B.   Bancorp Falsely Represents That It Has A "Rock Solid"
           Compliance System In Its Prepaid Business That Provides A
           "Major Competitive Advantage" ........................................ 31

           1.   Bancorp Emphasizes That Its Prepaid Business Is The Key
                Driver Of Its Growth .......................................... 32

           2.   Bancorp Represents That It Has Established A BSA
                Compliance System In Accordance With Legal
                Requirements .................................................. 33

           3.   Contrary To The Bank's Public Statements, The FDIC
                Determines That Bancorp Is Committing Systemic And
                Severe BSA Violations ......................................... 38

           4.   Defendants Were Previously Informed Of The Bank's BSA
                Violations .................................................... 44

IV.   THE TRUTH EMERGES .......................................................... 46

      A.   The Bank Belatedly Discloses Significant Losses In The Loan
           Portfolio That, In Reality, Were Incurred Years Earlier ............. 46

i

B.     The Bank Is Forced To Disclose The Consent Order, Revealing That The Bank's BSA Compliance System Was Woefully Inadequate ............................................................. 51

C.     The Bank Belatedly Discloses Additional, Massive Loan Losses That, In Reality, Were Incurred Years Earlier ....................................... 54

D.     In Response To The SEC's Request For Information, The Bank Is Forced To Admit That Its Class Period Financial Statements Were Materially Misstated ......................................................... 58

V.     BANCORP'S GAAP VIOLATIONS ............................................... 64

VI.    ADDITIONAL SCIENTER ALLEGATIONS ..................................... 71

A.     Additional Scienter Allegations Concerning Misstatements Related To The Bank's Financial Statements And Loan Portfolio ................... 71

B.     Additional Scienter Allegations Concerning Misstatements Related To BSA Compliance And The Bank's Prepaid Business ..................... 75

VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................... 79

A.     Materially False And Misleading Statements And Omissions Concerning The Fiscal Fourth Quarter 2010 And The Fiscal Year 2010 ......................................................................... 81

B.     Materially False And Misleading Statements And Omissions Concerning The First Quarter 2011 ........................................... 88

C.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2011 ....................................... 91

D.     Materially False And Misleading Statements Concerning The Third Quarter 2011 ...................................................... 94

E.     Materially False And Misleading Statements And Omissions Concerning The Fiscal Fourth Quarter 2011 And The Fiscal Year 2011 ......................................................................... 96

F.     Materially False And Misleading Statements And Omissions Concerning The First Quarter of 2012 ...................................... 102

G.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2012 ..................................... 106

H.     Materially False And Misleading Statements Concerning The Third Quarter 2012 .................................................... 108

I.     Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter 2012 And Year End 2012 ............... 112

J.     Materially False And Misleading Statements And Omissions Concerning The First Quarter 2013 ..................................................... 117

K.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2013................................................. 122

L.     Materially False And Misleading Statements And Omissions Concerning The Third Quarter 2013.................................................. 126

M.    Materially False And Misleading Statements And Omissions Concerning The Fiscal Fourth Quarter 2013 And The Fiscal Year 2013............................................................................................................ 133

N.    Materially False And Misleading Statements And Omissions Concerning The Fiscal First Quarter 2014........................................... 140

O.    Materially False And Misleading Statements And Omissions Concerning The Fiscal Second Quarter 2014 ..................................... 144

P.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter of 2015 ......................................... 146

VIII.   LOSS CAUSATION.................................................................................. 147

IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR......................... 152

X.     THE PRESUMPTION OF RELIANCE .................................................................. 153

XI.    CLASS ACTION ALLEGATIONS ........................................................................... 154

XII.   CAUSES OF ACTION ................................................................................................. 156

COUNT I ............................................................................................................................. 156

VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (Against Defendant Bancorp And The Executive Defendants)...................................................................... 156

COUNT II ............................................................................................................................ 160

FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT  (Against Defendants Cohen, Frenkiel, Mastrangelo, And Kuiper) ............................................... 160

XIII.  PRAYER FOR RELIEF ............................................................................................. 162

XIV.  JURY DEMAND ......................................................................................................... 162

1.     Lead Plaintiffs Arkansas Teacher Retirement System and the Arkansas Public Employees Retirement System (collectively, "Lead Plaintiffs"), by their undersigned counsel, hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of The Bancorp, Inc. ("Bancorp," the "Bank" or "TBBK") during the period from January 26, 2011 through June 26, 2015, inclusive (the "Class Period"), and were damaged thereby.

2.     Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of their counsel.  This investigation included a review and analysis of: (i) Bancorp's public filings with the United States Securities and Exchange Commission ("SEC"), including the restatement of Bancorp's financial results from year-end 2010 through the third quarter of 2014 filed on Form 10-K after the close of market on September 25, 2015 (the "Restatement"); (ii) research reports by securities and financial analysts; (iii) transcripts of Bancorp's earnings conference calls; (iv) publicly available presentations by Bancorp; (v) Bancorp's press releases and media reports; (vi) economic analyses of the movement and pricing data associated with Bancorp's common stock; (vii) consultations with relevant consultants and experts; (viii) information obtained from former Bancorp employees throughout the course of counsel's investigation; and (ix) other publicly available material and data identified herein.  Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

3.      This case concerns the concealment of approximately $112.5 million of losses in Bancorp's largest revenue-generating asset—its commercial loan portfolio—by the Bank's most senior officers, including former Chief Executive Officer Betsy Z. Cohen, Chief Financial Officer Paul Frenkiel, and former President and Chief Operating Officer Frank M. Mastrangelo. While concealing these losses, these Defendants portrayed Bancorp as a prosperous company, reporting in dozens of earnings releases, SEC filings and other public statements issued during the Class Period that it had earned significant and increasing profits.  In public statements accompanying these financial results, Defendant Cohen repeatedly praised the Bank's supposed "earnings growth," fueled by the "significant increases in … net interest income" generated by the loan portfolio.  Defendant Cohen also routinely emphasized the supposedly improving credit quality of the portfolio, pointing to the "very significant decrease in non-accrual[]" loans and "important advances in [] credit metrics," and stating that "[a]sset quality improved significantly."

4.      Additionally, on those occasions when the loan portfolio experienced an uptick in delinquencies or defaults, raising questions among investors about credit quality, Defendant Cohen assuaged investors' concerns by blaming market conditions, as opposed to the underlying creditworthiness of Bancorp's borrowers.  She further assured investors that Bancorp was preemptively and fully disclosing any losses in the portfolio, so investors could rely on its publicly reported financial results as an accurate picture of its financial performance and health. For instance, Defendant Cohen stated that "we've been very aggressive in the charge-offs," Bancorp was "very diligent in identifying [problem loans] and identifying [them] early," and investors should not be alarmed because "loan quality remains steady."

5.      Analysts took note of the Bank's seemingly strong financial results and Defendant Cohen's positive statements, issuing "buy" ratings and raising their stock price targets for Bancorp, while reporting that the Bank's "growth and profitability improvement story remains firmly intact," and remarking on the apparent "improvement in [Bancorp's] credit metrics."  In response to Defendants' statements, the Bank's stock price steadily increased over the Class Period, climbing from $9.61 when the Class Period began on January 26, 2011, to reach a high of $20.05 on March 20, 2014, just before the corrective disclosures—an increase of more than 100%.

6.      Unfortunately for investors, the Bank's publicly reported profits and supposed "earnings growth" were fictitious.  The Bank has now admitted that, in reality, its financial results were artificially inflated to an enormous degree, and Defendant Cohen's statements about the Bank's supposed "proactive" disclosure of problem loans and "stable" credit quality were false when made.  On September 25, 2015, the Bank restated its financial results from 2010 through the first three quarters of 2014—a period of <u>more than four years</u>.  In the Restatement, the Bank admitted that, from 2010 through 2013, it had concealed approximately $112.5 million of losses in its loan portfolio—an amount that was twice as much as all the profit that the Bank had reported since its inception as a public company in 2004.  By concealing these losses, the Bank was able to report substantial—but illusory—profits of approximately $55.9 million from 2010 through the end of 2013.  In truth, far from earning the $55.9 million of net income that the Bank publicly reported, the Bank had suffered $56.6 million of undisclosed net losses during that time.

7.      Defendants' misconduct had a profound impact on the Bank's publicly reported annual and quarterly financial statements.  The Restatement revealed that, during the Class

Period, the Bank had severely misstated more than a dozen different critical financial metrics that investors relied on in assessing the Bank's worth as an investment. For example, as the Bank admitted in the Restatement, it overstated its annual net income by as much as 360% during the Class Period. As another example, the Bank misstated its provision for loan losses—a key metric for investors that represented the amount of money the Bank set aside each reporting period to cover probable losses in its loan portfolio—by as much as 403%. And the Bank misstated its shareholders' equity—a metric that reflects the Bank's net worth to its shareholders—by approximately one third.

8. As egregious as those misstatements were, Defendants also made multiple misstatements about another important aspect of the Bank's business during the Class Period— its "prepaid" business. In this line of business, the Bank issued prepaid debit cards to consumers—*i.e.*, debit cards whose balance has been paid in advance with cash—and reaped fees as the cards were used. Defendant Cohen repeatedly emphasized the extraordinary growth of the prepaid business, stating that it was the Bank's "primary vector of growth." Defendants publicly represented that, to safeguard the business from abuse or adverse regulatory action, they had "established" a "best in class" "compliance program" in accordance with all the "key requirements" of the Bank Secrecy Act ("BSA"), a federal statute that requires banks to implement specific measures designed to guard against money laundering and similar illicit activity. The Bank not only represented that it complied with the "key" requirements of the BSA, but also touted its compliance as a critical differentiating factor between it and its competitors, highlighting that its purported "rigor of rock-solid compliance" in its prepaid business provided "a major competitive advantage for our partners."

9.     These statements were important to investors.  The Bank's prepaid business was its fastest-growing business line, and in 2013 generated approximately 27% of its revenue. Based on Defendants' representations, analysts repeatedly reported that the Bank's prepaid business was vibrant, and a key driver of shareholder value, reporting that the Bank's "biggest positive…was strength well above our expectations on prepaid fee growth," and that the prepaid growth was "[t]he most important and impressive metric at TBBK."

10.     However, unbeknownst to investors, the Bank was not in compliance with the BSA, and its prepaid business was in serious jeopardy as a result.  Contrary to Defendants' assurances that the Bank had established a "rock-solid compliance" system for the prepaid business, the Bank's principal federal regulator, the Federal Deposit Insurance Corporation (the "FDIC"), determined that Bancorp was violating every single one of the "key [BSA] requirements" to which it claimed to adhere.  These violations were so severe that, on June 5, 2014, the FDIC took the rare and extreme step of forcing the Bank to agree to a Stipulation and Consent to the Issuance of a Consent Order (the "Consent Order") describing a litany of BSA violations committed by Bancorp.

11.     As reflected in the Consent Order, the FDIC found that Bancorp was violating every BSA requirement that the FDIC had identified as a "cornerstone" and "pillar" of BSA compliance in its regulations and related guidance, including requirements as fundamental as: reporting potential money laundering promptly and accurately to the federal government; performing customer due diligence so that the Bank could identify suspicious activity; having a qualified BSA Officer to monitor the Bank's compliance; establishing a system of internal controls adequate to ensure that BSA requirements are being satisfied; and independently testing the Bank's BSA compliance, so that any deficiencies could be repaired.  The Bank's BSA

violations were so severe that the FDIC determined they posed an "<u>abnormal risk of loss or damage</u>" to the Bank and its shareholders. In short, far from adhering to the "rigor" of compliance, as the Bank told investors, the FDIC determined that the Bank was engaged in myriad "violations of law or regulation relating to weaknesses in the Bank's Bank Secrecy Act ('BSA') Compliance Program," as stated in the Consent Order.

12.     Investors did not begin to learn the truth until April 23, 2014, when the Bank started to make a series of stunning partial disclosures about its toxic commercial loan portfolio, materially misstated financial statements, and severe BSA violations. On that day, the Bank reported results for the first quarter of 2014 that badly missed expectations. The Bank disclosed that it had recorded a $17.3 million provision for bad loans—an amount that wiped out its income for the quarter, and was 200% greater than the prior period. On a conference call with analysts to discuss these results, Defendant Cohen attempted to blame the failed loans on the faltering local economy, asserting that the loans became delinquent only because "the Philadelphia market, which is where these loans are, has been unrelenting in its [un]willingness to improve."

13.     Analysts immediately reacted with surprise and dismay, reporting that these disclosures contradicted Defendants' prior statements, and pointedly noting that "there seemed to be no warning that this level of adversity was still to come." Significantly, analysts rejected Defendant Cohen's excuse that the local economy was to blame for the losses, and instead pointed to the toxic nature of Bancorp's loans as the true cause: "[w]e believe the company underwrote weak credits and do not accept management's view that problems are primarily to blame on the health of the Mid-Atlantic markets," as "the community banks that we track in this region have seen a steady improvement in problem assets levels and credit costs over the last

several years." Analysts also reported that Cohen's assertions that the Bank "aggressively" disclosed problem loans were suspect, stating that "[w]e suspect there were poor classification and grading of problem assets in these categories in earlier periods," and thus, "credibility is a bit of an issue for some."

14.     In response to Defendants' unexpected disclosures, Bancorp's stock price plummeted 15% on April 24, falling from $18.60 per share to $15.84 per share on extremely high volume.  Unknown to investors at the time, Defendants' April 23 disclosures triggered scrutiny by the SEC, which requested that the Bank provide detailed information concerning whether it had properly reported the amount and timing of losses disclosed that day.  As noted below, the SEC's request ultimately forced the Bank to admit that its previously issued financial statements were, in fact, materially misstated.

15.     Then, on June 10, 2014, Defendants again shocked the market by disclosing that the Bank had been forced to enter into the Consent Order with the FDIC.  As noted above and detailed further herein, the Consent Order revealed that, contrary to the Bank's representations that it had a system of "rock-solid compliance," in reality, the FDIC determined that the Bank was violating a host of basic BSA requirements.  Significantly, as the Consent Order provided, the Bank's BSA violations were so severe and widespread that the FDIC took the extraordinary step of freezing the heart of the Bank's prepaid business, directing in the Consent Order that the Bank "shall not establish any new prepaid card program or issue any new prepaid card product" until its BSA violations had been remedied—thus hobbling the Bank's engine of growth.

16.     The market reacted with astonishment at this stunning revelation concerning Bancorp's "primary vector of growth," and analysts immediately acknowledged that the Consent Order materially changed their assessment of the Bank's value.  Analysts reported that, "insofar

as our bullish thesis on TBBK was based in large part on growth generated by the launch of new prepaid card programs, we are moving to the sidelines." The Bank's stock price suffered an enormous loss on June 11, falling 28% in a single trading day on its highest volume of the year, declining from $16.20 per share to $11.54 per share.

17. Just weeks later, on July 23, 2014, investors were blindsided again. That day, Bancorp announced that it had suffered an unexpected loss for the second quarter of 2014, which it principally attributed to another $15.5 million provision for losses in the loan portfolio. Analysts reported that the loss provision was twice as high as expected, and signaled that the decay in the Bank's loan portfolio was worse than understood—so bad that the Bank would likely be forced to sell "the troubled community bank loan portfolio" to stop the hemorrhaging, a transaction that would likely lead to further losses.

18. On this news, the Bank's stock price nosedived another 14%, declining from $10.87 per share to $9.31 per share, again on extremely high trading volume.

19. The Bank's commercial loan portfolio was so toxic that the Bank could no longer hold it. On October 30, 2014, the Bank announced that it was selling its commercial loan portfolio, thus discontinuing one of its core businesses. Soon thereafter, on December 1, 2014, the Bank's most senior officer, Defendant Cohen—who founded Bancorp in 2000 and then took it public in 2004—announced that she was stepping down as CEO. The Bank also announced that Defendant Mastrangelo was taking Defendant Cohen's place as CEO.

20. Then, on March 16, 2015, the Bank announced that it could not file its annual financial statements for 2014 on time because it "need[ed] additional time to complete its assessment" of its "discontinued [] commercial lending operations." The financial press reported that the Bank's concession that it could not timely file its 2014 financial statements raised

questions about the accuracy of the Bank's publicly reported results, stating that the delay "can signal the existence of a major accounting debate between management and its auditors. It can also signal a last minute capitulation and reversal internally over how a company reported for a prior event."

21.     Indeed, on April 1, 2015, the Bank finally admitted that its previously reported financial results were false, announcing that its "previously issued financial statements" for 2012, 2013 and the first three quarters of 2014 "should no longer be relied upon" and had to be restated. The Bank explained that the Restatement was required because the Bank had improperly reported its "provisions for loan losses"—in other words, the Bank had failed to properly report losses in its loan portfolio when they had been incurred. The Bank, however, assured investors that the impact of the Restatement was limited to only $18.5 million of belatedly recorded loss provisions.

22.     On June 26, 2015, however, the Bank surprised investors yet again when it admitted that the Restatement was going to be larger than previously reported—and would include the disclosure of tens of millions of dollars in additional losses that had never before been reported to investors. Specifically, that day, the Bank announced that "management identified approximately $24 million of additional losses, related to discontinued operations, that were not previously reported and that will be recognized in our restated financial statements." In response to this surprise announcement, the Bank's stock price again fell significantly, from $10.50 to $9.29 per share—a decline of nearly 12%, again on high volume.

23.     After the close of market on September 25, 2015, the Bank filed the Restatement with the SEC. Under accounting rules, a restatement is a term of art, and constitutes an admission by the Bank that its Class Period financial statements were materially misstated when

issued. As noted above, and detailed further herein, the Restatement revealed that the Bank had concealed a total of $112.5 million in losses in its commercial loan portfolio from 2010 through 2013, and materially misstated a host of its key financial metrics during the Class Period. In the Restatement, the Bank also acknowledged that its decision to restate its financial results was triggered by the SEC's scrutiny of the Bank's belated disclosures. In explaining how the Restatement came to be issued, the Bank stated that "[a]s a result of" the SEC's request for "detailed information concerning the amount and timing of our recognition of impairment losses originally reported in the first quarter of 2014," the Bank had "analyzed" its loans and "determined that certain of our financial statements could not be relied upon." In other words, the SEC's scrutiny had effectively forced the Bank to come clean.

24.    Defendants' misconduct has destroyed hundreds of millions of dollars' worth of Bancorp's market capitalization. As of today, the Consent Order, and the restrictions on the Bank's prepaid business, remain in place. The Bank's stock price has never recovered from the misconduct alleged herein, and currently trades at approximately $7.42 per share, a fraction of its Class Period high price of $20.05.

## II.    <u>JURISDICTION AND VENUE</u>

25.    This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

26.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

27.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the

alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## II.     **THE PARTIES**

### A.     **Lead Plaintiffs**

29.     Plaintiff Arkansas Teachers Retirement System ("ATRS") is a public pension system that has been providing retirement benefits to Arkansas's public school and education employees since 1937.  As of October 6, 2014, ATRS managed approximately $14.7 billion in assets for the benefit of its members.  ATRS purchased Bancorp common stock during the Class Period and suffered damages as a result of the violations alleged herein.  On September 16, 2014, this Court appointed ATRS as a Lead Plaintiff in this litigation.

30.     Plaintiff Arkansas Public Employees Retirement System ("APERS") is a public pension fund that provides retirement benefits for qualified public employees of the State of Arkansas.  APERS was established in 1957 and, as of June 30, 2014, managed assets totaling over $7.53 billion for approximately 90,000 members.  APERS purchased Bancorp common stock during the Class Period and suffered damages as a result of the violation of the federal securities laws alleged herein.  On September 16, 2014, this Court appointed APERS as a Lead Plaintiff in this litigation.

### B.     **Defendants**

31.     Defendant Bancorp is an FDIC-insured commercial bank that is incorporated in the state of Delaware. Its principal executive offices are located at 409 Silverside Road,

Wilmington, DE 19809. Bancorp's common stock trades on the NASDAQ under the ticker symbol "TBBK."

32.     Defendant Betsy Z. Cohen ("Cohen") founded Bancorp in 2000 and served as Bancorp's CEO from that time until December 31, 2014. She also served as a member of the Board of Directors during the Class Period, and as chair and a member of the Bank's Loan Committee. During the Class Period, Defendant Cohen reviewed, approved, and signed Bancorp's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certification"). Specifically, Defendant Cohen signed: (1) the Forms 10-Q that the Bank filed with the SEC on May 9, 2011, August 9, 2011, November 9, 2011, May 10, 2012, August 9, 2012, November 9, 2012, May 10, 2013, August 9, 2013, November 6, 2013, May 12, 2014, and August 11, 2014; and (2) the Forms 10-K filed with the SEC on February 23, 2011, March 23, 2012, March 18, 2013, and March 17, 2014. Defendant Cohen also participated in conference calls with securities analysts, during which Bancorp's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Cohen made false and misleading statements on the Bank's earnings conference calls held on January 27, 2011, July 21, 2011, January 24, 2012, April 25, 2012, October 24, 2012, January 24, 2013, April 25, 2013, July 25, 2013, October 25, 2013, January 24, 2014, and April 24, 2014. On December 1, 2014, Defendant Cohen announced her resignation as CEO and as a Director of Bancorp effective December 31, 2014.

33.     Defendant Paul Frenkiel ("Frenkiel") served as Bancorp's Chief Financial Officer from September 2009 to the present. During the Class Period, Defendant Frenkiel reviewed, approved, and signed Bancorp's false and misleading SEC filings and SOX Certifications. Defendant Frenkiel also reviewed, approved, and signed false and misleading press releases and

Forms 8-K issued during the Class Period. Specifically, he signed: (1) the Forms 8-K that the Bank filed with the SEC on January 26, 2011, April 26, 2011, July 21, 2011, October 20, 2011, January 23, 2012, April 24, 2012, July 23, 2012, October 23, 2012, January 23, 2012, April 24, 2013, July 24, 2013, October 24, 2013, January 23, 2014, April 23, 2014, July 23, 2014, and April 1, 2015; (2) Forms 10-Q that the Bank filed with the SEC on May 9, 2011, August 9, 2011, November 9, 2011, May 10, 2012, August 9, 2012, November 9, 2012, May 10, 2013, August 9, 2013, November 6, 2013, May 12, 2014, and August 11, 2014; and (3) the Forms 10-K filed with the SEC on February 23, 2011, March 23, 2012, March 18, 2013, and March 17, 2014. Defendant Frenkiel also frequently participated in conference calls with securities analysts, during which Bancorp's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Frenkiel participated in the Bank's earnings conference calls held on January 27, 2011, July 21, 2011, January 24, 2012, April 25, 2012, October 24, 2012, January 24, 2013, April 25, 2013, July 25, 2013, October 25, 2013, January 24, 2014, and April 24, 2014.

34.     Defendant Frank M. Mastrangelo ("Mastrangelo") served as President and Chief Operating Officer of Bancorp beginning in 2000 and at all relevant times during the Class Period. He also served as a Director from 2000 through the present. In addition, Defendant Mastrangelo served on Bancorp's Loan Committee during the Class Period. He also participated in conference calls with securities analysts, during which Bancorp's false and misleading SEC filings and press releases were presented and discussed. Specifically, Defendant Mastrangelo made false and misleading statements on the Bank's earnings conference calls held on April 25, 2013, July 25, 2013, and October 25, 2013. Defendant Mastrangelo became the CEO of Bancorp on December 31, 2014.

35.     Defendant Jeremy Kuiper ("Kuiper") served as the Managing Director of Bancorp's Payment Solutions group beginning in 2007 and at all relevant times during the Class Period.  In this role, Defendant Kuiper was responsible for the strategic direction and overall management of the Bank's prepaid division, including its operations.  Defendant Kuiper made materially false and misleading statements regarding the Bank's purported "rigor of rock-solid compliance" during the Class Period, which were published on the Bank's website.

36.     Defendants Cohen, Frenkiel, Mastrangelo, and Kuiper are collectively referred to as the "Executive Defendants."  The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Bank, directly participated in the management of Bancorp's operations, including its public reporting functions, had the ability to, and did control, Bancorp's conduct, and were privy to confidential information concerning Bancorp and its business, operations and financial statements, as alleged herein.  The Executive Defendants were directly involved in controlling the content of, and in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein.  Moreover, the Executive Defendants were aware of, or recklessly disregarded, the false and misleading statements and omissions, and approved or ratified these misstatements and omissions in violation of the federal securities laws.

37.     Bancorp and the Executive Defendants are sometimes collectively referred to herein as the "Defendants."

III. **OVERVIEW OF THE FRAUD PERPETRATED BY DEFENDANTS**

A. **Defendants Cohen, Frenkiel, And Mastrangelo Concealed Approximately $112.5 Million of Losses In The Bank's Commercial Loan Portfolio**

1. **Bancorp Reported Strong Financial Results And Assured Investors It Was Properly Disclosing Any Loan Losses**

38.     One of Bancorp's principal lines of business was making commercial loans to businesses in the Philadelphia metropolitan area, including mortgage loans, lines of credit, construction loans, and commercial acquisition and development loans.  The Bank's approximate $1.34 billion portfolio of commercial loans was the largest asset on its balance sheet, and often exceeded 35% of all Bancorp's reported assets from 2010 through 2013.  Throughout the Class Period, Bancorp repeatedly reported substantial and growing profits, and stated that the commercial loan portfolio was supposedly a key driver of this profit.  As noted above, in the earnings releases announcing these purportedly strong financial results, Defendant Cohen repeatedly praised the Bank's "earnings growth" and the "significant increases in … net interest income" generated by the loan portfolio.

39.     At times during the Class Period, the Bank's loan portfolio experienced an uptick in loan loss provisions and other loan charges, creating investor concern over the portfolio's credit quality.  As noted above, the loan loss provision represented the amount of money the Bank set aside each reporting period to cover probable losses in the loan portfolio.  The loss provision was a critical financial metric for investors because it reflected the health of the Bank's key commercial loan portfolio, and because any provisions were charged against pre-tax net income, directly reducing the Bank's profits for that reporting period.

40.     In a calculated move to assuage investor concern whenever the loan loss provision increased, Defendant Cohen repeatedly blamed any credit quality issues on a "weak economy,"

rather than the Bank's loan quality. Further, Defendant Cohen consistently assured investors that Bancorp was "proactively" and "aggressively" disclosing losses on any problem loans, and taking the loan loss provisions required by accounting rules. Accordingly, investors could be confident that the Bank's financial statements accurately reflected its true performance.

41.    For instance, on January 26, 2011, the first day of the Class Period, Bancorp announced positive financial results for the fourth quarter of 2010 and the year-end 2010 that reflected significant increases in income over the prior-year periods. For year-end 2010, the Bank reported net income of more than $5.2 million, compared with net income of $4.1 million in 2009. In a press release issued that day, Defendant Cohen praised the "meaningful increases" in the Bank's net income, and underscored the improving credit quality of its loan portfolio. Defendant Cohen stated that the "improvement in several key asset quality indicators is reflected in the decrease in total non-performing assets and loans over 90 days past due still accruing," which had fallen nearly 35% when measured as a percentage of total loans. Similarly, on a conference call the following day, Defendant Cohen reiterated the Bank's "vibrant" "core earnings" and "significant growth on a year-to-year basis," highlighting "important advances in [] credit metrics," and noting that "[a]sset quality improved significantly," as evidenced by the substantial decrease in non-performing assets and loans over 90 days past due still accruing.

42.    Throughout the rest of 2011, Defendants continued to emphasize the Bank's purported earnings growth. They also assured investors that any increase in loan charges was the result of a weak economy, and the Bank was proactively disclosing any problem loans. For example, on a July 21, 2011 conference call to discuss the Bank's second quarter 2011 financial results, Defendant Cohen stated that the uptick in "write-offs during this quarter" was due to headwinds in the economy, and the Bank had aggressively identified and disclosed potential

losses as a proactive move. Specifically, Defendant Cohen stated that, "[w]e did not have the economy at our back, so to speak, in terms of win[d]s and so we were proactive in identifying loans that we thought may be the subject of recoveries at some future time," and had therefore gotten "out ahead of it and recognize[d] loss[es]." Cohen further stated that credit quality remained strong, and that nonperforming loans were significantly decreased over prior periods: "[W]hen you look back to 2010, June of 2010, nonperforming loans were, at that time, 1.82% and they have been reduced even in this quarter to 1.43%. So although they [are] up on a linked-quarter basis, if you look across the last four quarters, except for the first quarter of 2011…the number for the second quarter is the lowest that it has been in three or four quarters."

43.     Analysts relied on Defendants' representations and absorbed them throughout 2011 and 2012. On April 26, 2011, Sterne Agee reported that "[w]e remain positive on the shares and believe the growth and profitability improvement story remains firmly intact." On October 21, 2011, JMP Securities highlighted the improvement in the Bank's "credit metrics," reporting that the Bank "experienced declining NPAs [non-performing assets] and annualized net charge-offs in 2Q11." Likewise, on January 24, 2012, Sterne Agree reported that the Bank's "total nonperforming loans" at the end of 2011 were "down from the third quarter," and "[t]otal reserve coverage remains strong," while JPM Securities reported on January 25 that the Bank's loss reserve provision was "lower than anticipated due to improvement in TBBK's credit metrics."

44.     For part of 2012, the Bank's loan portfolio experienced increased credit issues, leading to higher loan loss provisions and creating investor anxiety about the quality of the portfolio. To calm investors' concerns, Defendants continued to falsely report solid earnings growth. Defendant Cohen also continued to assure investors that any issues with the loan

portfolio were limited, were caused by a "difficult lending environment," and the credit quality of the portfolio was stable.

45.　　For example, on April 24, 2012, the Bank reported net income for the first quarter of $4 million—an increase of nearly 50% over the prior quarter.　In a press release announcing these results, Defendant Cohen emphasized that "first quarter 2012 saw a continuation in our earnings growth." On an April 25, 2012 conference call to discuss these results, Defendant Cohen noted a quarterly "increase in nonperforming assets," but stated that "I would remind you that it was a small increase and it was off a relatively low base for our peers and for this time in the economy. We remain at a low level in terms of loans, both 90 days past due, which were around the $4.5 million level, and loans 30 to 89 days, which were at about $4 million. Those numbers have remained consistent over several quarters."

46.　　In a January 23, 2013 press release announcing the Bank's purportedly positive fourth quarter 2012 and year-end 2012 earnings, Defendant Cohen underscored the Bank's "significant earnings increase," noting that "[n]otwithstanding increased loan loss provisions, our net income and earnings per share increased 59% and 50%, respectively."　On a January 24, 2013 conference call to discuss these ostensibly strong results, Defendant Cohen stated that "loan quality remains steady," and "[n]onperforming assets as a percentage of assets actually decreased."　The impact of Defendants' false statements and nondisclosures on Bancorp's stock price during fiscal 2012 was marked: shares traded at under $8 at the beginning of January 2012, and by the end of January 2013, shares traded at approximately $12.20, an increase of more than 50%.

47.　　As the Bank entered fiscal year 2013, Defendants continued to emphasize that the health of the loan portfolio was solid and improving and the Bank's earnings were continuing to

grow. For example, on April 24, 2013, the Bank issued a press release reporting net income of $7.4 million for the first quarter of 2013, compared to net income of $4 million in the prior-year period. Defendant Cohen again emphasized the Bank's "growth of 86% in net income." On an April 25, 2013 conference call to discuss the Bank's 2013 first quarter results, Defendant Cohen stated that "total past dues [loans] were down" and "net charge-offs were also down." She also underscored that loans "30 days and greater past due ha[ve] been very stable and continue[] to go down" and that, while the Bank had seen an increase in nonaccrual loans during the quarter, this was solely related to "legacy loans from a prior economy."

48. Analysts continued to rely on and trumpet Defendants' message. A Sterne Agee report indicated that its takeaway from Bancorp's first quarter 2013 results was that net charge offs were "manageable" and "the company continues to maintain solid reserves" to cover any likely losses in the portfolio. Sandler O'Neill also issued a report stating that "management noted that inclusive of loans at all stages of delinquency, delinquents and non-performers fell by 5%."

49. On a July 25, 2013 conference call to discuss Bancorp's second quarter results, Defendant Cohen again represented that Bancorp had actively disclosed problem loans at an early stage, stating that Bancorp had been "very diligent in identifying [problem loans] and identifying [them] early." Similarly, during Bancorp's October 25, 2013 conference call to discuss its third quarter results, Defendant Cohen emphasized yet again that Bancorp continued to be aggressive in identifying, and writing off, "troubled loans," and that the health of the portfolio continued to improve, as evidenced by a sharp decrease in loans that were delinquent between 30-89 days:

> [T]he good news in terms of credit is that the inbound indicator of troubled loans, which is the 30-to 89-day category, was reduced from $18.5 million at the end of

the second quarter to $5.4 million at the end of the third quarter. We've been very aggressive in trying to move these troubled loan situations through the system [in] a very proactive way.

50.    In response to analysts' questions about the credit quality of the portfolio, Defendant Cohen repeated that the Bank was "proactively, vigorously, and aggressively" disclosing any problem loans, and underscored that "[w]e've been very proactive in this area." When an analyst from Sterling Capital Management questioned whether Bancorp's reserves were adequate to cover any credit issues in the portfolio, Defendant Cohen assured investors that the Bank's reserves were adequate because of its purportedly "aggressive" identification of problem loans, stating, "[y]es, remember that we've been very aggressive in the charge-offs and additions."

51.    Analysts reacted positively to Bancorp's purportedly "aggressive" stance on identifying problem loans and Defendants' representations as to the health of the Bank's loan portfolio. For example, on November 7, 2013, Sandler O'Neill reported that total loans classified as "substandard" and "special mention" fell over 50%, that there was "a significant decrease in the level of shorter term delinquencies," and that these results constituted a "significant positive development on credit" quality.

52.    On January 23, 2014, Bancorp announced financial results for the fourth quarter of 2013 that exceeded expectations, including net income of $25.1 million, a 51% increase from the Bank's 2012 net income. In the press release announcing these results, Defendant Cohen again underscored the Bank's substantial "earnings growth." On a conference call the next day, Defendant Cohen further assured investors that the Bank's purportedly "aggressive" and "proactive" approach to disclosing problem loans had paid off. Specifically, Defendant Cohen emphasized on the January 24 conference call that non-accruing loans had fallen by nearly 17%, and that loans that were delinquent more than 90 days had dropped to the "bare minimum:"

On the loans delinquency side, <u>non-accruals were down from $48 million to $40 million. 90-days-plus is down to a bare minimum $110,000</u>. We had a loan transition into the 30 to 60-day category as a result in a change in manager and a missed income payment, which meant that the totals did not reflect <u>the very significant decrease in non-accruals</u>—$48 million to $40 million.

53.     Similarly, when an analyst highlighted that the Bank's loan loss provision had decreased more than 30% from the second quarter—falling "from $9.5 million to $8 million to $6.5 million"—Defendant Cohen stated that this was a sign of the portfolio's improving health, stating that "<u>we have been aggressive in identifying credit issues, and so we think that we are getting ahead of the game</u>."

54.     Defendants' statements created the impression that Bancorp's credit issues were behind it.   On January 24, 2014, BTIG reported that "the company's earnings release, which features not only <u>an earnings beat</u> versus consensus estimates (EPS of $0.19 versus consensus of $0.17) but a <u>lower-than-anticipated provision should help to alleviate credit-related concerns about TBBK while refocusing investors on its core prepaid issuance growth story</u>."

55.     Defendants' positive statements about the Bank's 2013 results also sparked an increase in the Bank's stock price.   The Bank's stock price rose from $17.62 on January 23, the day before its earnings release, to $19.25 on January 27, an increase of more than 9%.   On January 27, 2014, Sandler O'Neill reported that the surge in Bancorp's stock price since the earnings release was the result of "overhangs being potentially removed from the story with a resulting short squeeze/relief rally … credit has been a concern for investors.   Results in 4Q were promising on that front and <u>we get the sense we have reached a tipping point on credit</u>."

56.     Unfortunately for investors, the Bank's supposedly strong financial results—and Defendant Cohen's statements that Bancorp took a "proactive" and "aggressive" approach to identifying and writing off problem loans—were materially false and misleading when issued.

In reality, contrary to these public statements, Defendants were concealing massive losses in the Bank's commercial loan portfolio, which ultimately lead to the Restatement.

### 2. Bancorp Has Admitted That Its Publicly Reported Profits and "Earnings Growth" Were False

57.     As noted above—and as Bancorp ultimately admitted in its Restatement—the supposedly strong financial results the Bank issued from year-end 2010 through year-end 2013 were a mirage.  Specifically, the Bank admitted in the Restatement that, from 2010 through 2013, it concealed approximately $112.5 million in losses in its toxic commercial loan portfolio, thereby artificially inflating its publicly reported financial results to a massive degree.  Indeed, as noted above, the $112.5 million in losses that Defendants concealed was twice as much as all the combined net income the Bank had reported from its inception as a publicly traded company in February 2004 through the end of 2013.

58.     Bancorp admitted that the $112.5 million in unreported losses consisted of: (1) "[a]pproximately $28.5 million of losses that were not previously reported," and (2) approximately $84 million worth of "provisions for loan losses and loan charge-offs" that were "originally recognized in 2014, primarily the third quarter," but which should have been taken years earlier, when the losses were actually incurred.  As disclosed in the Restatement, of the $112.5 million in total undisclosed losses through December 31, 2013, the Bank concealed approximately $39.5 million of losses in 2013, $59.8 million of losses in 2012, $4.1 million of losses in 2011, and $9.1 million of losses in 2010.  As the Bank further admitted in the Restatement, "[s]ubstantially all of the losses and corresponding restatement adjustments resulted from the discontinued loan operations"—*i.e.*, the very commercial loan portfolio that dominated the Bank's balance sheet, and which Defendants had represented was one of the Bank's key engines of growth.

59.     The Restatement was an admission by Bancorp that its Class Period financial statements were false at the time they were issued.  Under generally accepted accounting principles ("GAAP"), "restatement" is a term of art.  In contrast with a post-period adjustment, a restatement is reserved for those situations in which a company's previously issued financial statements were materially false as of the time of issuance.  As GAAP explains, a restatement is necessary only when "[a]n error in recognition, measurement, presentation, or disclosure in financial statements result[s] from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." Accounting Standards Codification ("ASC") 250-10-20 and ASC 250-10-45-23.  As further explained at ASC 250-10-45-17, a mere "change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods...."

60.     As revealed in the Restatement, Defendants' misconduct had a severe and widespread impact on the Bank's publicly reported financial statements from 2010 through the third quarter of 2014.  As the Bank stated in the Restatement, the concealment of the losses "affected the financial statements contained in our Annual Reports on Form 10-K for the years ended December 31, 2010, 2011, 2012 and 2013, in our Quarterly Reports on Form 10-Q for the interim periods included within such years, and in our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014."  Defendants caused the Bank to materially misstate more than a dozen key financial metrics in these financial statements, including the most important metrics relied upon by investors in assessing the Bank's value, such as net income, earnings per share, the provision and allowance for loan losses, and shareholders' equity.

61. Defendants' misconduct transformed Bancorp's large losses into illusory profits over an extended period of time. Specifically, as revealed in the Restatement, the Bank actually suffered approximately $56.6 million in unreported net losses from 2010 through 2013—yet by concealing the $112.5 million in losses the Bank had suffered in its commercial loan portfolio, Defendants were able to report approximately $55.9 million in fictitious profits for that cumulative four-year period.

62. The impact of the fraud on the Bank's annual financial statements was extraordinary. For example, for 2010, the Bank originally reported net income of more than $5.2 million. In reality, however, the Restatement revealed that the Bank had suffered an approximate $3.8 million loss for that fiscal year, meaning that Defendants overstated the Bank's 2010 net income by nearly 174%. In 2012, the Bank reported net income of $16.6 million when, unbeknownst to investors at the time, it had actually suffered a net <u>loss</u> of more than $43.2 million—meaning that Defendants overstated the Bank's 2012 net income by an astonishing 360%. And in 2013, the Bank reported net income of more than $25.1 million but, in truth, it had suffered a loss of more than $14.4 million—for an overstatement of 157%.

63. The Bank's loan loss provisions were also misstated to an enormous degree. As revealed by the Restatement, Defendants understated the Bank's provisions for loan and lease losses by a staggering 403% in 2012, reporting that it was just $22 million when, in truth, it was actually $112.9 million. Likewise, in 2013—the year when Defendants convinced the market that the Bank's credit issues were finally behind it—Defendants underreported the Bank's provisions for loan and lease losses by 98%, reporting that it was $29.5 million when, in reality, it was $58.4 million.

64.     Defendants' misconduct also had a substantial negative impact on the Bank's publicly reported total shareholders' equity.  Total shareholders' equity is an important financial metric because it represents the company's equity value after subtracting the company's liabilities from its assets.   In essence, it provides an indication of Bancorp's net worth.   Because Defendants' concealment of the losses had such a substantial impact on the Bank's financial performance, it also caused its shareholders' equity to be significantly overstated.  In 2013, for example, Defendants' fraud caused the Bank to overstate total shareholders' equity by 31%.

65.     A detailed recitation of the financial metrics that Defendants misstated for each reporting period, along with the specific degree of misstatement for each metric (when available), is set forth below in Section VII.

### 3.     Bancorp Engaged In "Extend-And-Pretend" Tactics To Conceal Losses

66.     Lead Plaintiffs' investigation has uncovered some of the particular deceptive tactics that the Bank employed to conceal its losses.  Contrary to Defendant Cohen's statements that the Bank "proactively" disclosed its loan losses to investors, or "aggressively" wrote off its problem loans, Bancorp regularly concealed its delinquent loans.   In particular, Bancorp made the delinquent loans appear current by modifying their terms in order to reduce the borrowers' payments, and extending delinquent borrowers additional credit that they used to pay their delinquent loans.

67.     Such modifications allowed Bancorp to perpetuate the fiction that its problem loans were "performing."   As a result, the Bank did not include the loans in its periodic delinquency reporting, provision for them adequately, or write them off in a timely manner.  This improper practice—which is known in the banking industry as "extend-and-pretend" (*i.e.*, extend

the payment terms of a loan and pretend it is current) or "kicking the can down the road"—disguised the true credit quality and value of Bancorp's loan portfolio.

68.     Numerous former senior Bank employees with responsibility for overseeing the commercial loan portfolio confirmed that Bancorp repeatedly engaged in the "extend-and-pretend" practices outlined above.  Confidential Witness ("CW") 1, a commercial loan portfolio manager and credit analyst who worked at Bancorp from March 2013 until November 2013, reported that modifying the terms of delinquent loans was a common practice at Bancorp.  As a portfolio manager, CW1 was responsible for monitoring loans in the commercial portfolio; indeed, as Bancorp stated in its SEC filings during the Class Period, "all loans are subject to ongoing monitoring by portfolio managers and loan officers."  As CW1 stated, the Bank had "a bunch of troubled loans," and its goal at the end of each reporting period was, "[b]asically, how do we get this delinquency as close to zero as we can?  That was our goal at quarter end."  CW1 further reported that the Bank's management modified the terms of delinquent loans in the "hope" that the loan would be paid, even when it was clear it would not be, stating that the Bank "had a lot of bad loans from the recession that they were kicking the can down the road. They figured 'hey, maybe we can come out of this in a better place.'  The problem was: they didn't write off enough when [it] became known that [these loans] weren't going to be paid."

69.     Similarly, CW2, who worked as a portfolio manager in the commercial lending division at Bancorp from May 2010 to December 2013, stated that modifying the terms of an existing loan after the borrower stopped paying, or extending additional credit for the borrower to use to fund the loan, was a "common practice at Bancorp."  CW2 was not comfortable with decisions to extend credit because she felt that there was an unrealistic belief that "down the road, something would happen to put [the borrowers] in a position to pay."

70. CW3, a portfolio manager in commercial lending at Bancorp from September 2010 until June 2013, confirmed that the Bank regularly altered loan terms for non-performing loans or extended new credit to borrowers who were delinquent, in order to disguise the souring credit. As CW3 reported, the Bank would "modify the loan so that it becomes performing. So they would try to turn non-performing [loans] into performing [loans]." There were multiple ways the Bank accomplished this. For instance, CW3 stated, "rather than actually calling the loan or forcing a liquidation or calling it what it is, sometimes the action that was taken was funding new money to pay the existing loan down, that was delinquent." CW3 stated that another technique Bancorp used to "try to turn nonperforming loans into performing ones" was to "switch up" a loan's amortization, which changed the cash flow and decreased required payments. CW3 summarized the inherent risk of extending a borrower an additional loan or more favorable terms when the initial loan is not paying: "There are problem loans that eventually could go even further south if they're handled in that regard. If it doesn't turn out, you're kicking the can down the road." CW3 added, "I think that was not a good practice, and certainly not fair to shareholders."

71. One striking example of Bancorp's improper practices that CW1 and CW2 both cited related to Bancorp's loans to convicted fraudster Michael Pouls. Pouls was a local real estate developer who lived an extravagant lifestyle, including owning a 15,000-square-foot home in Gladwyne, Pennsylvania. In or about 2007, the real estate development market declined, and Mr. Pouls needed money to continue funding his lavish lifestyle. He borrowed $3,500,000 from National Penn Bank and $10,000,000 from Wilmington Trust (now M&T Bank). To obtain the loans, he fraudulently represented that his TD Ameritrade account held securities valued at over $20 million when, in reality, the account had just over $3,000. In 2010, Pouls borrowed $2.5

million from Bancorp through one of his companies, VBEW, LLC ("VBEW"), and used the proceeds to pay off the outstanding balance on the fraudulent National Penn loan.

72.    On October 18, 2012, the United States Attorney for the Eastern District of Pennsylvania charged Pouls with one count of wire fraud, two counts of loan fraud, and one count of bank fraud related to the fraudulent scheme.  On December 10, 2012, pursuant to a plea agreement, Pouls pleaded guilty.  The government later stated that Pouls "engaged in an extremely large and audacious fraud, not because he needed money to survive or address a medical issue but to maintain his lavish life style."

73.    CW2 was the portfolio manager for Pouls' Bancorp loans and stated that, in addition to the $2.5 million VBEW loan, Pouls had at least two other loans with Bancorp.  One was a $3.8 million loan related to one of Pouls' companies, Kidz-Idz.  CW2 also stated that Pouls had approximately $14 million in loans collateralized by the Gladwyne property.

74.    CW2 stated that trouble with Pouls' loans "had already begun" when CW2 started at Bancorp in 2010.  According to CW2, by September 2012, Pouls completely stopped making payments because he had "no income."  Rather than declare him in default, or mark his loans as non-accruing and take an appropriate write-off, Bancorp extended him new credit—which it designated as an "interest reserve"—for him to pay down his delinquent loans, thus making his delinquent loans appear as if they were current.  CW2 confirmed that the interest reserve "basically increased existing loans to [Pouls]," and "set aside a line of credit he used for payments" on his otherwise delinquent loans.  CW2 also believed that Pouls' interest reserve was increased more than once.  CW1, who reported to CW2, confirmed that the modifications to Pouls' loans occurred, and stated that CW1 was "surprised" that Bancorp would allow the modifications given Pouls' legal issues.

75.     Documents from Pouls' criminal case indicate that, consistent with CW2's account, Pouls owed Bancorp over $20,500,000 as of June 2013.  *See* United States' Sentencing Memorandum, 12-cr-00582, ECF No. 29, at 19.  According to the Government's sentencing memorandum, the monthly payment on the debt was $71,936.20.  Rather than make the payment with his own funds, however, Pouls drew the exact amount owed every month—$71,936.20— from his newly established Bancorp line of credit.  In addition to the $20 million he owed Bancorp, Pouls owed: (1) over $9.5 million to M&T Bank (the successor to Wilmington Bank) related to the fraudulent loan; (2) over $1 million to three other banks; and (3) over $13 million in tax liens going back as far as 2001.  *Id.* at 19, 20, 26.

76.     Notwithstanding all of the above, as of November 2013 and December 2013 when CWs 1 and 2 left Bancorp, Pouls' loans were still designated as "accruing."  CW1 remarked that Poul's loan should have been written off long before then, stating that the loan "should have been—all of it—written off when they found out the guy was being indicted."

77.     The Bank's own statements in its SEC filings confirm that top Bancorp management was intimately familiar with the state of the Bank's loan portfolio and, in fact, was responsible for reviewing and approving every commercial loan.  As set forth in Bancorp's Class Period SEC filings, Bancorp maintained a Loan Committee that included Defendant Cohen; Defendant Mastrangelo; Executive Vice President and Chief Lending Officer, Scott R. Megargee; Executive Vice President of Commercial Lending Arthur Birenbaum; and Executive Vice President and Chief Credit Officer, Donald F. McGraw, Jr.  The Bank stated that "[a]ll of the commercial loans in our portfolio go through our loan committee for approval."  Bancorp further stated that all key members of the Loan Committee had "lengthy experience and certain of them have had similar positions at substantially larger institutions."

78.     CW3 confirmed that Bancorp's Loan Committee met weekly to discuss credit issues.   According to CW3, Bancorp was "a very flat organization, so management was involved in every credit meeting, on a weekly basis.  Everybody was involved on the commercial side." Bancorp's Loan Committee discussed all aspects of the Bank's loan portfolio, including whether to approve, deny, or modify the terms of individual loans.  CW2 reported that Bancorp also held delinquency meetings every quarter, which the commercial loan officers and senior management attended.

79.     CW3 stated that, for new loans, a "credit-approval presentation" or "memo" would be prepared in advance of a Loan Committee meeting.   CW3 stated that the presentation/memo was "basically a request" that a loan be approved and it included "everything you'd possibly want to know about an individual and ability to repay."   CW3 confirmed that Defendant Cohen received a copy of "every single credit approval memo."   CW3 stated that the Loan Committee meeting itself was held in a board room and that part of the meeting would consist of the authors of the credit-approval presentation getting "a bunch of questions fired" at them from the Loan Committee members.  Ultimately, the Loan Committee was responsible for deciding whether to approve, deny, or modify, a loan's terms.  CW2 commented that sometimes the decisions to approve or to modify a loan did not make sense from a loan-quality perspective: "All I can say is there were some times where loans were approved and I just didn't think they made sense" and that "there were times when I wouldn't feel comfortable signing off" on a loan decision.

80.     CWs 1 and 2 attended the weekly Loan Committee meetings and stated that often, following the meetings, numerous executives would attend an additional private conference regarding Bancorp's loan portfolio.   CWs 1 and 2 stated that regular attendees at the private

conference included Defendant Cohen; Executive Vice President and Chief Lending Officer Scott R. Megargee; Executive Vice President of Real Estate and Construction Lending Dan Sacho; Executive Vice President of Commercial Lending Arthur Birenbaum; Chief Credit Officer Donald F. McGraw; and Senior Vice President and Chief Risk Officer James D. Hilty. At the private conferences, according to CW2, senior management would discuss various issues, including "real problem loans" and would decide whether the loans should be modified, or whether they should be sent to Bancorp's workout group. The workout group, which was also known as the "special assets" group, was overseen by executives James Hilty (Chief Risk Officer), Scott Megargee (Chief Lending Officer) and Donald McGraw (Chief Credit Officer), and was responsible for pursuing recoveries once a loan was designated as nonperforming. CW2 stated that decisions about what loans to send to the workout group "all would have been handled by senior management." CW3 confirmed that a loan would not be sent to the workout group until "upper management decided it was time."

81. CW1 noted that during CW1's tenure, Bancorp had "a bunch of troubled loans," including a "high concentration" of borrowers who were consistently 60-90 days past due. CW1 noted that the poor performance of the loan portfolio "wasn't even the pink elephant in the room—just everyone knew." Despite these pervasive credit issues, however, CW1 stated that Bancorp delayed declaring loans in default and sending loans to its workout group: "[p]ut it this way: there should have been a lot more loans that were put into the workout group than what was."

### B. Bancorp Falsely Represents That It Has A "Rock Solid" Compliance System In Its Prepaid Business That Provides A "Major Competitive Advantage"

82. As set forth below, throughout the Class Period, Defendants also made materially false and misleading statements concerning Bancorp's prepaid card business. Specifically,

Defendants stated that Bancorp had supposedly established a "rock-solid" and "best in class" "compliance program" in accordance with all the "key requirements" of the BSA—a compliance program that was essential to the Bank's ability to operate and grow the business in accordance with federal law.  Contrary to these representations, the FDIC determined that, throughout the Class Period, the Bank was violating every single one of the "key [BSA] requirements" to which it claimed to adhere, thereby placing its critical prepaid business in severe jeopardy.

### 1. Bancorp Emphasizes That Its Prepaid Business Is The Key Driver Of Its Growth

83.     The Bank was the largest issuer of prepaid cards in the U.S. during the Class Period.  The most popular type of prepaid card—and the Bank's fastest-growing prepaid card product—is known as a general purpose reloadable card, which can be purchased online and at large retailers like Target and Wal-Mart.  A consumer purchases the card and "loads" it with money by paying cash.  The consumer then uses the card to purchase goods or services from vendors.

84.     Bancorp's prepaid cards are offered to consumers through third parties known as "affinity partners." The Bank's affinity partners included large retail chains, insurers, benefits administrators, rebate fulfillment organizations, and payroll administrators.  Through contracts with its affinity partners, Bancorp earns fees that are computed on a per transaction basis.

85.     The Bank's prepaid card business was critical to its financial performance.  The fees associated with the cards constituted over half of the Bank's non-interest income in 2013, and nearly 27% of the Bank's overall revenue in 2013. In its earnings releases during the Class Period, the Bank underscored that the prepaid business was its "primary vector of growth," and consistently stated that the prepaid business was a key driver of big increases in non-interest income and overall net income.  For instance, on April 24, 2013, Defendant Cohen largely

attributed "growth of 86% in net income" to the Bank's "leadership position in the prepaid card industry." Likewise, on an October 25, 2013 conference call to discuss results for the 2013 third quarter, Defendant Cohen again largely attributed an approximate 35% increase in net income to the Bank's prepaid business, stating that "[p]repaid, which has always driven the institution very strongly within the noninterest category, increased what we consider on our current base an impressive 36%." Defendants also assured investors that the prepaid business would continue to grow at a rapid pace. On October 25, for example, Mastrangelo stated that the prepaid business "would … continue to outperform market growth."

86.    Based on Defendants' statements, analysts repeatedly issued reports underscoring that the Bank's prepaid business was central to Bancorp's success. For example, on July 25, 2013, Sandler O'Neill & Partners noted that TBBK's "biggest positive…was strength well above our expectations on prepaid fee growth" and that the growth in prepaid card fees continued to be "[t]he most important and impressive metric at TBBK." BTIG likewise reported on October 25, 2013 that Bancorp's "prepaid card fees continue[] to buoy the company's non-interest income, growing 36%," and subsequently reported that the Bank's prepaid business was one of "its primary valuation drivers" that "should benefit its share price." On January 27, 2014, Sterne Agee reported that Bancorp's "[p]repaid fees are firmly on track and growing at mid-to-high teens rate," and thus, "we continue to believe the company has a compelling growth opportunity longer term."

### 2.    Bancorp Represents That It Has Established A BSA Compliance System In Accordance With Legal Requirements

87.    The prepaid card business is subject to strict regulatory scrutiny because of the widespread use of general purpose reloadable prepaid cards to commit crimes such as money laundering and fraud. Criminals use prepaid cards to launder money by loading a prepaid card

with the ill-gotten money and then withdrawing "clean" cash from an ATM. Criminals can also file fraudulent tax returns using another person's social security number and load the tax refund onto a prepaid card, leaving the refund untraceable.

88. The Currency and Foreign Transactions Reporting Act of 1970, more commonly referred to as the Bank Secrecy Act (defined above as the "BSA"), requires that financial institutions operating in the U.S. implement policies and procedures to detect and prevent money laundering. Federal regulators, including the FDIC, which regulated Bancorp during the Class Period, promulgated and enforced regulations requiring compliance with the BSA. As set forth in the FDIC's Rules and Regulations, and its publication entitled "Supervisory Insights," the five "pillars" of a BSA compliance program—which constitute the "minimum requirements"—are as follows: (i) a system of internal controls to ensure ongoing compliance; (ii) independent review of the system; (iii) a qualified BSA officer to oversee compliance; (iv) training for employees; and (v) a customer identification program. *See also* Part 326.8 of FDIC Rules and Regulations.

89. The FDIC has provided guidance to banks to enable them to understand their BSA obligations and ensure that they are satisfied. For instance, in a 2014 FDIC presentation titled Bank Secrecy Act, Anti-Money Laundering and Office of Foreign Assets Controls ("BSA Presentation"), the FDIC explained that a system of internal controls "ensures compliance with BSA regulations," and includes policies and procedures to "manage, monitor and control" risks associated with the Bank's prepaid activities. A critical aspect of the system of internal controls is a bank's procedures for "suspicious activity reporting" or "SAR." When a bank detects suspicious activity, it is required to report that information within 30 days to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). The reporting ensures that the government is able to monitor and act when alerted of suspicious activity.

90.     The FDIC and the other federal banking regulators, including the Federal Reserve and Office of the Comptroller of the Currency, formed an interagency organization known as Federal Financial Institutions Examination Council ("FFIEC"). To provide further guidance to banks on what BSA compliance requires, FFIEC published a Bank Secrecy Act/Anti-Money Laundering Examination Manual ("BSA Manual").  As explained in the BSA Manual, an effective SAR program is essential:

Suspicious activity reporting forms the <u>cornerstone of the BSA reporting system</u>.  It is <u>critical</u> to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering and other financial crimes.  Examiners and banks should recognize that the quality of SAR content is critical to the adequacy and effectiveness of the suspicious activity reporting system.

91.     The BSA Manual also makes clear that the responsibility for ensuring an effective system of internal controls rests firmly with a bank's Board of Directors and senior management, stating:

The board of directors, acting through senior management, is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting.  The board of directors and management should create a culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes.

92.     Another essential aspect of BSA compliance is a customer identification program, also known as a comprehensive customer due diligence ("CDD") program.  As stated in the BSA Manual:

The cornerstone of a strong BSA/AML compliance program is the adoption and implementation of comprehensive CDD policies, procedures, and processes for all customers, particularly those that present a higher risk for money laundering and terrorist financing.  The objective of CDD should be to enable the bank to predict with relative certainty the types of transactions in which a customer is likely to engage. These processes assist the bank in determining when transactions are potentially suspicious.

As the FDIC explained in the BSA Presentation, specific elements of CDD include conducting due diligence when an account is opened to "understand[] the purpose and intended nature of the account and expected activity," identify the beneficial ownership of all accounts, and "conduct[] ongoing monitoring of the customer relationship."

93.     The FDIC has also provided guidance on what banks must do to satisfy the other three key elements of BSA compliance.  For instance, the BSA Presentation provides that the BSA officer is "responsible for ensuring overall BSA compliance," and must be a qualified individual, approved by the Board of Directors, who has "sufficient authority, knowledge and resources" to make sure the Bank is complying with its BSA obligations.  The "independent review" of the internal control system must be undertaken by a qualified party, and should be done every 12-18 months to ensure that the system is functioning properly.  The "training program" mandated by the BSA and related regulations "must be documented and should be tailored to specific job duties [within the Bank], address regulatory requirements [for BSA compliance], [and] be performed on an ongoing basis."

94.     Compliance with the BSA requirements summarized above is a primary concern for bank regulators, such as the FDIC, and shareholders, because any involvement in a money laundering or terrorist financing scheme could jeopardize the safety and soundness of a bank, and expose it to severe reputational, legal, and financial risk.  Thus, in order to ensure that institutions comply with BSA-related regulations, FDIC examiners conduct regular on-site examinations of all FDIC-supervised depository institutions.  Banks that are found to be in violation of the above-noted requirements are subject to penalties—including sanctions as severe as freezing their ability to continue or grow their business operations.

95. Defendants understood that Bancorp's compliance with the BSA and related regulations was essential to the Bank's financial success, and that any failure to comply with its obligations would have a severe negative impact on its prepaid card business, a major revenue generating segment of the Bank. Indeed, Bancorp's primary prepaid card competitor, MetaBank, had recently had its prepaid business effectively shut down by regulators for committing BSA violations. In July 2011, MetaBank received a cease and desist order from the Office of Thrift Supervision, which cited MetaBank for failing to comply with its obligations to properly supervise its third-party "affinity partners" after it was revealed that its prepaid cards were used to launder money out of the United States by terrorists. As Defendants knew, MetaBank's regulatory compliance failures sidelined the growth of MetaBank's business for years. In fact, Defendant Mastrangelo stated on an October 2011 Bancorp conference call that the crippling impact of the regulatory violations on MetaBank had been a boon to Bancorp, noting that "regulatory issues at other competitors of ours…certainly kicked a fair amount of business into play [and] [w]e have a significant pipeline related to that."

96. Given that regulatory compliance was paramount to Bancorp's success and its appeal as an investment, Defendants publicly represented that the Bank was in "rock-solid" compliance with the BSA and related regulations. For instance, as noted above, on Bancorp's website, Defendant Kuiper, managing director of Bancorp's prepaid business, stated that the Bank's "rigor of rock-solid compliance serves as a major competitive advantage for our partners." Further, in its 2013 Form 10-K, Bancorp represented that it had implemented a "risk-based compliance program" in accordance with the BSA. In particular, the Bank stated that, under the BSA and related regulations, it was required to adopt a BSA compliance program that satisfied the "key requirements" of (1) having a qualified "BSA Officer"; (2) ongoing training of

all appropriate Bank Staff and management on BSA/AML compliance; (3) developing a system of internal controls (including appropriate policies, procedures and processes); (4) requiring independent testing to ensure effective implementation of the program and appropriate compliance"; and (5) "monitor[ing] customer activity and transactions and fil[ing] a suspicious activity report (SAR) when suspicious activity is observed." The Bank assured investors that it had established a compliance program in accordance with these requirements, representing that, "[t]he Bank has evaluated the impact of these rules on its operations and its third-party relationships, and has established internal processes accordingly."

97. Unfortunately for investors, the Bank's representations that it complied with the BSA were materially false and misleading. Contrary to the Bank's statements that it had implemented a system of "rock-solid" compliance with the BSA, in reality, the Bank was violating every "key" BSA requirement it claimed to satisfy. As investors would ultimately learn, these violations were so severe that the FDIC was forced to freeze much of the Bank's prepaid operations—thereby cutting one of its engines of growth and drivers of shareholder value.

**3.   Contrary To The Bank's Public Statements, The FDIC Determines That Bancorp Is Committing Systemic And Severe BSA Violations**

98. The Bank's violations of key BSA requirements were so severe and systemic that, as described further below, on June 10, 2014, the Bank revealed that it had been forced to enter into a Consent Order with the FDIC, captioned *In the Matter of The Bancorp Bank*, FDIC-13-0479b (June 5, 2014). The Consent Order was the result of a rigorous in-person review of the Bank and its compliance system conducted by the FDIC, none of which was ever so much as hinted at publicly prior to the June 10 revelation. The FDIC's examiners were on-site at Bancorp during the Class Period, and had access to the Bank's books and records concerning BSA

compliance, as well as any of the Bank's personnel who were responsible for BSA compliance, including the Executive Defendants. Indeed, as noted above, according to the BSA Manual, Bancorp's board and senior management, which included the Executive Defendants, "is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure including suspicious activity monitoring and reporting."

99. The Consent Order was an extremely significant and highly atypical regulatory action. According to the FDIC's Risk Management Manual of Examination Policies, the FDIC will enter into a consent order only when, after conducting its investigation, it has found facts demonstrating that: (1) "the bank is violating, or has violated, a law, rule or regulation"; (2) the bank "is engaging, or has engaged in unsafe or unsound practices"; or (3) "there is reasonable cause to believe the bank is about to do either of the above." The Risk Management Manual of Examination Policies further provides that an "unsafe or unsound practice" is not merely one that is undesirable or somewhat risky, but includes only an "action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would result in abnormal risk of loss or damage to an institution, its shareholders, or the insurance fund administered by the FDIC." The Risk Management Manual of Examination Policies further explains that "unsafe or unsound practices" do not merely occur at the rank-and-file level of the bank, but rather "result from either action or lack of action by management."

100. Given their seriousness, consent orders are rare. For example, in 2014, the FDIC was responsible for examining and supervising more than 4,500 banks and savings banks—more than half of the institutions in the banking system—for safety and soundness. Of those, only 34 were subject to consent or cease and desist orders for issues relating to the institution's safety and

soundness through October 2014—or less than 1% of all FDIC-regulated banks. Of those 34 consent orders, only 13 related to BSA compliance. In other words, only 0.2% of all FDIC-regulated banks received consent orders related to serious BSA compliance issues that gave rise to safety and soundness concerns. The facts are also striking with respect to 2013: in that year, less than 1% of all FDIC regulated banks received BSA-related consent orders.

101. The terms of the Consent Order in this case demonstrate that Defendants' assurances about the Bank's BSA compliance were false. The FDIC's detailed examination determined that the Bank had engaged in a host of "unsafe or unsound banking practices" and "violations of law or regulation relating to weaknesses in the Bank's Bank Secrecy Act ('BSA') Compliance Program." Contrary to the Bank's representations that it had implemented a comprehensive system for ensuring BSA compliance for its prepaid card business, the Bank had utterly failed to do so—a failure that was all the more astounding given that Defendants had repeatedly touted this business unit as the Bank's key engine of growth. As the FDIC determined, the Bank had failed to "establish adequate BSA policies and procedures, adequately train appropriate staff, establish and implement adequate controls to mitigate both the BSA and safety and soundness risk associated with prepaid card activities …, [and] perform a thorough BSA Risk Assessment relating to these activities." The Bank's specific BSA violations related to its prepaid business are set forth below.

102. First, contrary to the Bank's representations that it had a qualified BSA officer to oversee compliance with the BSA—one of the fundamental aspects of a BSA compliance program—the Bank had no qualified BSA Officer in place during the Class Period. Accordingly, in the Consent Order, the FDIC specifically required the Bank to appoint "a qualified individual

or individuals to be responsible for coordinating and monitoring day-to-day compliance with the BSA ('BSA Officer')."

103. Second, contrary to the Bank's assurances that it had implemented a system of internal controls to ensure that its compliance system was adequate, the Bank's internal controls were riddled with severe, widespread deficiencies that went to the heart of its ability to comply with even basic BSA requirements. As the FDIC determined, the Bank had failed to "develop a system of internal controls designed to ensure full compliance with the BSA." In particular, the FDIC found that:

(a)    The Bank had failed to properly establish a system to monitor and report suspicious activity related to money laundering—one of the "cornerstones" of BSA compliance, as noted above. The FDIC identified a host of severe deficiencies related to the Bank's failure to monitor and report suspicious activity. According to the FDIC, the Bank had not adequately "implement[ed] policies, procedures, processes and systems for monitoring, detecting and reporting suspicious activity being conducted in all areas within or through the Bank"; failed to "ensure the timely, accurate, and complete filing of SARs [suspicious activity reports], with an appropriate level of documentation and support for management's decision to file or not to file a SAR, as required by law"; and failed to "ensure that all relevant areas of the Bank are monitored for suspicious activity, including" in such obvious and critical areas as "cash transactions, international and domestic wire transfers, ATM transactions [and] prepaid cards," among others.

(b)     The Bank failed to conduct adequate due diligence on its customers—another "cornerstone" of BSA compliance.   Again, the Bank's due diligence procedures suffered from a host of severe deficiencies.   As the FDIC determined, the Bank had failed to adequately conduct "a risk assessment of the customer base…to ensure that the risk level of the Bank's customers is accurately identified based on the potential for money laundering or other illicit activity"; failed to engage in "an appropriate level of ongoing monitoring commensurate with the risk level to ensure that the Bank can reasonably detect suspicious activity"; failed to "obtain[] and analyz[e] a sufficient level of customer information at account opening to … support the risk ratings assigned"; failed to "document[] and support[] the [due diligence] analysis"; and "failed to reasonably ensure the timely identification and accurate reporting of known or suspected criminal activity, as required by the suspicious activity reporting provisions of … the FDIC's Rules and Regulations."

(c)     The Bank had no system in place to conduct enhanced due diligence on customers who pose a heightened risk of illicit activity—which, as noted above, was a particular focus of the CDD requirements.   As the FDIC concluded, the Bank had simply failed to "establish [] policies, procedures and processes to conduct [enhanced due diligence] necessary for those categories of customers the Bank has reasons to believe pose a heightened risk of suspicious activity."

104.     Third, contrary to the Bank's statements that it properly trained its employees in BSA compliance, the FDIC determined that the Bank had no effective training program in place. As the FDIC found, the Bank had failed to implement a training program to "ensure that all appropriate personnel are aware of, and can comply with, the requirements of the BSA on an ongoing basis, including as they relate to high risk products and services."  The FDIC found that the Bank's purported training program was so deficient that it specifically directed the Bank to devise a training program that included such basic elements as "an overview of the BSA for new staff along with specific training designed for their specific duties and responsibilities"; "training on the Bank's BSA policies"; "a requirement that the Bank fully document the training of each employee"; and "a requirement that training in these areas be conducted no less frequently than annually"—requirements of which the Bank was unquestionably aware given that they are set forth in the FDIC's publicly available BSA guidance, as set forth above.

105.     Fourth, contrary to the Bank's assurances that it conducted "independent testing" to ensure that it was complying with BSA requirements, the FDIC concluded that the Bank had failed to conduct appropriate independent testing.  As the FDIC determined, the Bank had failed to properly "establish independent testing programs for compliance with BSA rules and regulations, to be performed no less than annually."  As the FDIC explained, the independent testing purportedly done by the Bank, if any, was so deficient that the agency directed the Bank to establish a testing program that examined a litany of basic facts, such as: "the overall integrity and effectiveness of the BSA compliance program"; "BSA risk assessment"; "BSA reporting and recordkeeping requirements"; the "adequacy of [due diligence] policies … and whether they comply with internal requirements"; "personnel adherence to the Bank's BSA policies"; "training adequacy"; "an evaluation of management's efforts to resolve violations and deficiencies noted

in previous tests or audits or regulatory examinations"; and "a review of filed or prepared [suspicious activity reports] to determine their accuracy, timeliness [and] completeness."

106.    Fifth, the FDIC determined that, contrary to the Bank's public representations that it had established a "risk-based compliance program," the Bank had failed to conduct basic risk assessments of its BSA compliance for its prepaid business. As the FDIC concluded, the Bank had failed to properly conduct "an initial and subsequent periodic risk assessment of the Bank's operations, no less than annually…, consistent with the guidance for risk assessments set forth in the BSA Manual," and thus, had failed to analyze the "pertinent risk factors that affect the overall BSA/anti-money laundering risk profile of the Bank."

107.    In sum, far from adhering to the requirements of the BSA, Defendants completely abandoned their obligations under federal law and regulations.

### 4.    Defendants Were Previously Informed Of The Bank's BSA Violations

108.    Long before the Consent Order was publicly disclosed in June 2014, Bancorp and the Executive Defendants were well aware that the Bank was not in compliance with the BSA, notwithstanding their public representations to the contrary. In July 2013, nearly a year before the Consent Order was issued, the FDIC and state banking regulators informed the Executive Defendants of many of the same violations that were the basis of the Consent Order. Specifically, as revealed in the Consent Order, on July 15, 2013, the FDIC and the Office of the State Bank Commissioner of Delaware issued a joint "BSA Report of Examination," or "2013 BSA ROE," to the Bank after conducting a detailed examination of the Bank and its compliance systems. The Executive Defendants received the 2013 BSA ROE, which described numerous BSA compliance violations on which the Consent Order was based.

109. Indeed, the Consent Order repeatedly referenced the 2013 BSA ROE in noting that the FDIC had previously brought many of the Bank's BSA violations to the attention of senior management. For instance, as set forth in the Consent Order, the 2013 BSA ROE had previously "detailed" the Bank's failure to conduct annual risk assessments of the Bank's BSA compliance in accordance with the guidance set forth in the BSA Manual. Even though the Executive Defendants were previously informed of this violation, they allowed it to continue throughout the Class Period. Further, as noted in the Consent Order, the 2013 BSA ROE "described" the Bank's failure to establish a program of enhanced customer due diligence for those customers who posed a heightened risk of illicit activity, and directed the Bank to remedy this deficiency. Yet again, notwithstanding the Executive Defendants' prior knowledge of this serious failure, the Bank continued to tout its BSA compliance as this violation persisted throughout the Class Period. In addition, the Consent Order provided that the 2013 BSA ROE "described" the inadequacies in the Bank's training program, yet the Executive Defendants allowed this violation to continue throughout the Class Period as well. Finally, as stated in the Consent Order, the 2013 BSA ROE "described" the severe deficiencies in the Bank's purported independent testing program, but the Executive Defendants failed to remedy these problems of which they were aware.

110. Moreover, Bancorp had recently entered into a prior consent order with the FDIC that required its Board—including Defendants Cohen and Mastrangelo—to exercise enhanced supervision of its regulatory compliance system, and assume full oversight and responsibility for the compliance systems applicable to its prepaid card business. Specifically, on August 8, 2012, Bancorp announced that it had entered into a consent order with the FDIC based on its failure to properly supervise one of its prepaid card affinity partners called Higher One, Inc. Higher One

was a debit card provider that contracted with colleges to distribute student financial aid payments through prepaid cards, and which was cited by the FDIC for numerous violations of federal consumer law.

111.    As part of the August 2012 Order, Defendants Cohen, Mastrangelo, and the Bank's other Board members were required to "<u>increase [their] oversight of the Bank's compliance management system, including assuming full responsibility for the approval of sound policies and objectives for the Bank's products and services offered to consumers</u> ('Consumer Products'), including any of the Bank's Consumer Products offered in conjunction with a third party"—a category of products that included the prepaid cards, which were offered to consumers through third-party affinity partners, as noted above.  The August 2012 Order also required that Bancorp implement regular reporting to the Board of Directors concerning such compliance. Notwithstanding that Defendants Cohen and Mastrangelo were charged with exercising "increased oversight" and assuming "full responsibility" for the Bank's compliance systems as early as August 2012, they permitted the Bank's pervasive and severe BSA violations to continue unchecked during the remainder of the Class Period.

## IV.    THE TRUTH EMERGES

112.    It was not until April 23, 2014 that investors began to learn the truth about the Bank's financial condition.  Beginning on that date, the Bank made a series of piecemeal surprise disclosures that revealed Defendants had been concealing enormous losses in the Bank's commercial loan portfolio, and the Bank had been violating BSA requirements.

### A.    The Bank Belatedly Discloses Significant Losses In The Loan Portfolio That, In Reality, Were Incurred Years Earlier

113.    On April 23, 2014, the Bank announced financial results for the first quarter of 2014 that badly missed expectations.  Defendants attributed the poor results to the fact that

Bancorp had recorded a $17.3 million provision for losses in its loan portfolio, including $9.1 million in charge-offs, for the first quarter of 2014—an amount 200% larger than the prior quarter's provision. Significantly, as the Bank would later admit in the Restatement, these losses were actually incurred—and were required to be disclosed—years before the first quarter of 2014.

114. This belated, oversized provision was three times larger than analysts expected. The provision nearly wiped out the Bank's net income for the quarter, causing Bancorp to report just $0.01 per share in earnings, which was dramatically below analysts' consensus expectations of $0.28 per share.

115. On an April 24, 2014 conference call to discuss the first quarter results, Defendants also disclosed that Bancorp had been conducting an "internal review" of the credit quality of its commercial loan portfolio, and that as a result of this review, the Bank had disclosed multiple impaired loans for the first time. Bancorp stated that these troubled loans— which had been in its portfolio throughout the Class Period—resulted in its outsized quarterly provision.

116. On the call, Defendant Cohen was specifically asked whether the loans had recently "started to go delinquent in the quarter," or if they had been delinquent previously and were just now being disclosed in connection with the review. In response, she admitted that these loans had deteriorated before the first quarter of 2014, but were just now being disclosed:

> **Analyst**: In terms of provisioning, you talked about the—I think the $12 million in provision for the newly adverse loans. First, is discovery of those loans, is that part of an internal review or are those loans that started to go delinquent in the quarter?

> **Defendant Cohen**: No. It is part of an internal review.

117.     Although the conference call was the first time that Bancorp had publicly disclosed its supposed internal review, Defendant Cohen resisted questions seeking detail about the purported review, including the review's timing, scope, and progress. For instance, when Defendant Cohen was asked by an analyst "how far through the process you have gotten in" the review, she stated, "I don't have that number in front of me. I mean, I really don't have it." When another analyst asked "[w]hat were the issues" that the internal review supposedly "uncovered" with the newly disclosed problem loans, Cohen dodged the question by responding that "I mean, it has the whole range of traditional—very traditional C&I [commercial and industrial] and real estate valuation issues." When Cohen was asked when she expected "the review would be completed," she replied, "I don't have that in front of me." When she was asked "[h]ow long has the review been ongoing," she again replied, "I don't have a date."

118.     Defendant Cohen was also asked if the loans had become delinquent because they were of poor credit quality. She denied the suggestion that the Bank had underwritten poor loans, and claimed that the loans became delinquent only because of the slow recovery in the local real estate market, stating:

> A lot of these are C&I [commercial and industrial] loans, even if they had real estate against them. And I think we have discussed the fact previously that the Philadelphia market, which is where these loans are, has been unrelenting in its [un]willingness to improve. It has not improved throughout the—it took a deeper dive than one might have expected from a relatively stable market, historically.
>
> And the length of the recession and the fact that there really was no—has been no bounce back [] in Philadelphia has added to the pressure on the borrowers. And borrowers who have paid with religious fervor over a 7- to 10-year period, so we have had broad experience with them—are just tired and give up the ghost. Their businesses—these are C&I loans, so businesses, and they often have a greater loss content.

119.     Analysts expressed surprise and dismay at Defendants' unexpected disclosures, and recognized that they contradicted Defendants' prior statements about the health of Bancorp's

commercial loan portfolio. For instance, Sandler O'Neill issued a report entitled "1Q14 First Look; Another Blow to Credit Will Likely Weigh On Shares," in which it commented that:

> [T]he quarterly results were obviously disappointing on this front <u>as we thought that TBBK was over the hump on credit … [T]here seemed to be no warning that this level of adversity was still to come</u> … It continues to be difficult to get our arms around why these issues are showing up so late in the game when credit elsewhere is improving.

120. BTIG reported that "<u>[w]hile investors in The Bancorp may have believed that the credit problems that had emerged in 2Q13 last year had been put to rest following a couple of quarters of declines in loan loss provisions, those problems re-emerged in 1Q14 and were more intense than the last time around.</u>"

121. In an April 30, 2014 report, Sterne Agee also rejected as incredible Defendant Cohen's claim that Philadelphia's slow recovery caused the poor performance of Bancorp's loans, noting that credit quality was steadily improving in all the other regional banks:

> <u>We believe the company underwrote weak credits and do not accept management's view that problems are primarily to blame on the health of the Mid-Atlantic markets</u> where most of the credits are located. <u>Almost all of the community banks that we track in this region have seen a steady improvement in problem assets levels and credit costs over the last several years</u>.

122. Notably, Sterne Agee also conducted an analysis of Bancorp's loan performance, which indicated that, contrary to Bancorp's assurances that it was "proactively" and "aggressively" disclosing its problem loans, it had in fact delayed recognition of delinquent loans during the Class Period. Specifically, Sterne Agee reported that Bancorp had written off more loans than it had designated as non-performing—a fact which indicated that the Bank had failed to properly classify its troubled loans as non-performing when they went sour, and was later forced to charge them off entirely when its "extend-and-pretend" tactics failed:

> [w]hen losses (charge-offs) are viewed as a percentage of prior period NPAs [non-performing assets], the ratios are very high. For example, over the last nine quarters since 2012, the company has charged off $56 million. This is higher than

the total past due (30 days +) stacks of $41.2 million and $52.8 million at the end of 2012 and 2013. Said differently, the loss severity on the 2012 and 2013 past due loan stacks are 136% and 106%, respectively.

123.   As Sterne Agee reported, these facts called into question Defendants' statements that they had timely disclosed problem loans: "[w]e suspect there were poor classification and grading of problem assets in these categories in earlier periods."  Similarly, Sandler O'Neil and Partners reported that management "credibility is a bit of an issue for some following the credit issue in the quarter."  As Sandler O'Neil noted in a later July report, "It has been quite surprising for many that TBBK has faced such large credit issues so late in the cycle."

124.   In response to Defendants' disclosures, Bancorp's stock price fell substantially, falling from $18.60 per share to $15.84 per share on extraordinarily high volume—a decline of 15% in a single trading day.

125.   To stem the decline in the Bank's stock price, following the call, Bancorp management held additional conversations with analysts in which they reassured them that the Bank's "internal review" was nearly complete, and thus, the credit charges would subside.  For instance, on April 25, Sandler O'Neil & Partners reported that, in a subsequent conversation, "[m]anagement noted that the internal loan review which began 18 months ago is now over 90% complete, and 95% complete in the construction portfolio, where much of the losses and provisioning have emanated from.  Following the call, at which time we did not know how far along the process was, the news that the review was over 90% complete was welcome."

126.   Unbeknownst to investors, Defendants' startling April 23, 2014 disclosures caught the attention of the SEC, which began to question whether Defendants had understated the amount of losses in the Bank's loan portfolio and improperly delayed disclosure of the losses. As subsequently revealed by the Restatement, following the April 23, 2014 disclosures, the "staff of the SEC…request[ed] detailed information concerning the amount and timing of our

recognition of impairment losses originally reported in the first quarter of 2014[.]"  As explained further below, the SEC's request for detailed information concerning the Bank's improper reporting of loan losses forced the Bank to investigate its public disclosures, which ultimately caused the Bank to issue the Restatement and admit that its previously issued financial statements were false.

**B.      The Bank Is Forced To Disclose The Consent Order, Revealing That
The Bank's BSA Compliance System Was Woefully Inadequate**

127.    Unfortunately for investors, additional startling revelations were yet to come— this time concerning the host of BSA violations at the heart of the Bank's highly prized prepaid business.  On June 10, 2014, after the close of market, Bancorp surprised investors by disclosing that it had been forced to enter into the Consent Order with the FDIC, which it attached to a Form 8-K filed with the SEC that day.  As detailed above at ¶¶98-107, the Consent Order revealed that, contrary to the Bank's representations that it had a "best in class" system of "rock-solid compliance" and adhered to the "key requirements" of the BSA, in reality, the Bank was violating every one of the requirements it claimed to satisfy.

128.    As the Bank stated in its June 10 Form 8-K, the Consent Order required the Bank to take a multitude of "<u>affirmative actions to comply with its BSA obligations</u>, among them: appoint a qualified BSA/OFAC officer; revise the written BSA Compliance Program; develop and implement additional policies and procedures for suspicious activity monitoring and reporting; review and enhance customer due diligence and risk assessment processes; review past account activity to determine whether suspicious activity was properly identified and reported; strengthen internal controls, including augmenting Board oversight regarding BSA activities; establish an independent testing program and develop policies and procedures to govern staffing and training for BSA compliance."

129.     Significantly, the Consent Order provided that Bancorp's BSA violations were so material that the FDIC prohibited the Bank from doing new business in its most critical prepaid segment, the reloadable segment.  As the Order provided, with respect to re-loadable cards, the Bank "shall not establish any new prepaid card program or issue any new prepaid card product, or establish any new distribution channel for existing prepaid card products," and the Bank "shall not enter into any new contractual relationship with any third-party processor of prepaid cards or third-party program manager of prepaid cards." These severe restrictions hobbled the Bank's fastest growing business segment for the foreseeable future.

130.     The Bank's BSA violations were so significant and widespread that the Consent Order required the Bank to completely redesign its BSA compliance program before the restrictions on the prepaid business would be lifted.  According to the Consent Order, the restrictions would remain in place until the Bank designed and established a new program that would bring it into compliance with the BSA, submitted a written report "detailing how it has accomplished these requirements," and obtained FDIC approval of its new compliance program. Given the pervasive nature of the BSA violations, the Consent Order also required the Bank to engage an "independent third party," approved by the FDIC, to conduct an extensive review of the Bank's due diligence practices concerning its prepaid business partners, and to develop a plan for overhauling those practices to be submitted to the FDIC for approval.  Moreover, the Bank was required to hire a third party to conduct a "look back review" to determine whether the Bank had properly reported suspicious activity.

131.     The requirements that the Bank build a BSA compliance program "from scratch," and hire third parties to do what the Bank was apparently not capable of doing to comply with the BSA, imposed significant additional costs on Bancorp and its shareholders.  As the Bank

acknowledged in its June 10 Form 8-K, these requirements "will increase non-interest expense including significant initial consulting fees"—expenses that would further decrease the Bank's bottom line going forward.

132.     Investors were stunned by these revelations.  Analysts immediately downgraded the Bank, and reported that the Consent Order materially changed their view of the Bank's prospects and value.  For example, on June 11, 2014, BTIG downgraded the Bank because the "FDIC consent order restricts new prepaid programs." As BTIG reported, "insofar as our bullish thesis on TBBK was based in large part on growth generated by the launch of new prepaid card programs, we are moving to the sidelines for now until we gain more clarity on when the restrictions on the company will be lifted."

133.     Similarly, on June 11, 2014, Sandler O'Neill & Partners downgraded the Bank due to "the announced consent order," reporting that: "Following credit issues in the loan book in recent quarters, investors were at least able to say that the core prepaid growth story remained intact.  In our opinion, following yesterday's announcement, that is no longer the case."  As Sandler O'Neill & Partners explained, the Consent Order was "essentially [] a C&D [cease and desist order] that precludes the bank from adding new relationships in the fastest growing area of prepaid, namely, general reloadable," which accounted for about 50% of the Bank's prepaid growth.  Due to the restriction, Bancorp's prepaid business was now expected to perform "below overall prepaid industry growth" rather than maintaining its dominant role in the industry. Sandler O'Neil & Partners further reported that the terms of the Consent Order were far more severe than a typical consent order, stating that "the language of the order… does seem to be a bigger issue for TBBK."

134. This disclosure of Bancorp's severe regulatory violations, and its material negative impact on the Bank's business, obliterated its stock price. On June 11, 2014, the next trading day after Defendants' disclosures, the Bank's stock price plummeted over 28%, declining from $16.20 to $11.54, on the highest trading volume of the year.

C. **The Bank Belatedly Discloses Additional, Massive Loan Losses That, In Reality, Were Incurred Years Earlier**

135. After the close of market on July 23, 2014, Bancorp announced that it had suffered an unexpected loss for the second quarter of 2014. This loss was driven by an outsized $15.5 million provision for loan and lease losses, which the Bank attributed to "the impact of certain relationships in its commercial loan portfolios." As the Bank later admitted in the Restatement, these losses were, in truth, incurred years before the second quarter of 2014. The Bank also reported that its second quarter loss was driven by $9.2 million of "consulting and other expenses" required by the Consent Order.

136. Analysts immediately reported that these results were well below consensus expectations, and signaled that the decay in the Bank's loan portfolio was far worse than expected. For instance, Sterne Agee reported on July 23, 2014 that the loss provision was nearly twice as high as the "consensus expectation of $8.3 million" and signaled that the Bank would likely be forced to sell "the troubled community bank loan portfolio" to stop the bleeding—a transaction that would likely lead to additional losses in the short term.

137. On a July 24, 2014 conference call to discuss the results, Defendant Cohen made a number of admissions concerning the Bank's prior knowledge of its BSA violations, and the status of its purported "internal review" of troubled loans. In particular, Cohen admitted that she and the Bank's other senior officers had known of the Bank's significant BSA violations— indeed, as noted above, they had been informed of them by the 2013 BSA ROE—long before the

Consent Order was issued. As Cohen stated, "[i]t [the issues identified in the Consent Order] probably was something…we were working on and that we had begun to build, but not as quickly as would have been desired. … We have been—as we have said before, we have been addressing these issues, but not at this pace." In other words, Cohen and the Bank's senior management had known of the BSA violations, but had not taken appropriate steps to remedy them.

138. Defendant Cohen further stated that, in addition to the $9.2 million of quarterly expense the Bank had incurred to remedy its BSA violations—which was sufficient by itself to wipe out its quarterly profit—it would incur an additional $3.5 million of expenses per year, further degrading its bottom line. In fact, to bring the Bank into compliance, Cohen stated that it would have to build a new BSA compliance facility in Florida, and staff it with approximately 60 people—nearly triple the Bank's current compliance staffing.

139. With respect to the Bank's internal review of problem loans, an analyst asked whether the review was now complete given that "last quarter, Betsy, you said you were about 90% of the way through, and on the construction book, about 95% of the way through." Defendant Cohen disclosed that, contrary to the Bank's prior assurances that its internal review of troubled loans was nearly complete, the Bank was "starting again from scratch and re-reviewing" because "[w]e are concerned that maybe we missed something." As part of the purported internal review, which was now only half over, Defendant Cohen explained that the Bank had supposedly identified several additional problem loans, which she admitted had been on the Bank's books since "2009" and that the Bank had now finally decided to charge off. The additional quarterly loss provision, she stated, was necessary because "the level of write-off had not been reserved for." In response to additional analyst questions, Defendant Cohen also

confirmed that Bancorp was considering selling its troubled loan portfolio and that it had engaged a third party to review the portfolio in anticipation of a potential sale, which could lead to further write-downs.

140. Analysts again reacted with surprise to the Bank's disclosures, noting that they contradicted the Bank's prior statements. For instance, Sandler O'Neil reported that "the street was surprised by commentary that Bancorp is only about half of the way through their internal loan review…In 1Q there was commentary that the bank was 90-95% of the way through the internal loan review which we thought helped limit tail risk." Sterne Agee reported its dismay that the "long and costly credit clean-up story at The Bancorp is not over yet," noting that the "company now plans to sell a bulk of the troubled community bank loan book which has caused so many problems," which could lead to "additional outsized provisions and losses." Analysts similarly remarked on the poor performance of the prepaid business, with Sandler O'Neil, for example, reporting that the prepaid growth rate of 12% was "well below our expectation of 20% growth."

141. In response to the Bank's disclosures, its stock price fell steeply once again. Bancorp's stock price fell from a closing price of $10.87 per share on July 23 to a closing price of $9.31 per share on July 24, on extremely high volume—a decline of more than 14%.

142. On October 30, 2014, Bancorp announced poor results for the third quarter of 2014, and disclosed that it was discontinuing its commercial lending operations permanently. Significantly, in the announcement, Defendant Cohen stated that the Bank had hired "an independent third party expert" to "provide[] a fair value analysis of the commercial loan portfolio," and that the independent third-party "analysis resulted in a valuation of approximately

$1.2 billion [for the] discontinued portfolio"—an amount that was as much as $220 million less than the value the Bank had reported for the portfolio in its SEC filings during the Class Period.

143. The reduced value of the portfolio also required the Bank to take an approximately $38 million charge against its earnings, which swung the Bank to a loss of approximately $17 million for the quarter. As later revealed in the Restatement, this $38 million charge also represented losses that the Bank had actually incurred and was required to disclose years earlier, but had concealed at the time.

144. This $38 million charge effectively doubled the Bank's allowance for losses embedded in the portfolio, raising it from approximately $46 million in the second quarter of 2014 to approximately $83 million in the third quarter of 2014. The cumulative $83 million in embedded losses represented an approximate 7% fair value writedown from the outstanding principal balance of the portfolio as of September 30, 2014.

145. On December 1, 2014, Bancorp unexpectedly announced that Defendant Cohen was "retiring," and stepping down as Bancorp's CEO and from its Board of Directors, after 14 years with the Bank.

146. Then, on December 30, 2014, the Bank sold a portion of its loan portfolio in a transaction that further confirmed the portfolio was overvalued even at the dramatically reduced valuation recorded in October. Specifically, the Bank announced that it had sold a piece of the portfolio with an outstanding principal balance of $267.6 million for just $209.6 million, reflecting a fair value write down of more than 20% from the loans' principal value, or triple the size of the approximately 7% write down just announced on October 30. Notably, the loans were so toxic that the Bank could not find an independent buyer willing to buy the loans for cash even at this dramatically reduced price. Rather, the Bank "sold" the loans to a newly established

limited liability company called Walnut Street 2014-1 Issuer, LLC—in which the Bank was a 49% partner—for receivables related to "two notes" issued by the LLC.

147.    Analysts recognized that these facts further indicated that the portfolio was rife with toxic loans that were worth less than Defendants had publicly stated during the Class Period.  For example, on January 14, 2015, the financial publication *Seeking Alpha* reported that "the bank was [recently] rocked by a series of surprise accounting and regulatory disclosures [summarized above] resulting in a 50% drop in its stock price," with the latest surprise being the sale announcement:

> Several things about this [] sale caught our eye.  The first thing was the mark-to-market discount associated with this relatively small piece of the portfolio: … 20.2%.  This was way out of line with the overall average discount of 6.5% established just two months earlier [on October 30].  Second, the sale was not for cash nor to an established third-party.  It was for note receivables issued by a newly created LLC with the Bank itself a 49% minority partner.  We ask ourselves, 'How toxic can the full portfolio really be if this is what the bank had to do to sell just a portion of it?'

**D.      In Response To The SEC's Request For Information, The Bank Is Forced To Admit That Its Class Period Financial Statements Were Materially Misstated**

148.    As noted above, after Bancorp belatedly disclosed significant losses in its commercial loan portfolio in the first quarter of 2014, the SEC requested detailed information concerning the amount and timing of the losses disclosed.  As a consequence of the SEC's request, Defendants were forced to investigate the Bank's public disclosures to investors, and ultimately to admit that the Bank's financial statements were materially misstated when issued.

149.    On March 16, 2015, the Bank announced that it could not timely file its 2014 financial statements on Form 10-K because it "need[ed] additional time to complete its assessment" of its "discontinued [] commercial lending operations, which was one of [the

Bank's] principal lines of business."  Under SEC rules, the Bank received until March 31, 2015, to file its 2014 financial statements.

150.    The financial press noted that the delay in Bancorp's 10-K filing was an indication of potentially serious issues with the Bank's financial reporting.  For example, *Seeking Alpha* reported that the Bank's concession that it could not timely file its 2014 financial statements was "a significant event" that raised questions about the accuracy of the Bank's prior financial statements. It stated that the delay "can signal the existence of a major accounting debate between management and its auditors.  It can also signal a last minute capitulation and reversal internally over how a company reported for a prior event."

151.    Sure enough, on April 1, 2015, Bancorp announced that its Audit Committee had determined that it needed to restate its previously issued financial statements because it had failed to disclose losses in its loan portfolio at the time they had actually been incurred.  As the Bank announced, "certain charges related to provisions for loan losses should have been taken in earlier periods than the ones in which they were taken," and thus, the Bank's financial statements for "the fiscal years ended December 31, 2012 and 2013 and the quarterly financial statements within those years and for the first three fiscal quarters of 2014" were misstated, "should no longer be relied upon," and had to be restated.

152.    The Bank, however, was quick to assure investors that the impact of the forthcoming restatement on Bancorp's Class Period financial statements would be limited. Specifically, the Bank stated that "[t]he aggregate amount of provisions relating to loan losses that are subject to restatement in the various periods is approximately $18.5 million"—or just  a fraction of the true amount of losses that had actually been concealed. The Bank further stated

that it expected to file its restated financial statements and its Form 10-K for the year ended 2014 by May 11, 2015.

153.    However, on May 11, 2015, the Bank announced that it could not file its Form 10-K for 2014 as previously stated, and explained, ominously, that "[t]he delay was occasioned by additional testing being performed by the Company's independent public accountants prior to the issuance of their report" on the Bank's restated financial results.  The Bank stated that it now would file its 2014 Form 10-K "by the end of June."

154.    Following the Bank's May 11 announcement, the financial press questioned whether the Bank's continuing delay in filing the restatement—and continued inability to sell down the bulk of its loan portfolio—indicated that it was concealing additional losses in its commercial loan portfolio.  As *Seeking Alpha* reported on May 14, 2015:

> All told, there have been 3 re-sets of projected filing dates (March 31st, May 11th, and June 30th) and the total delay is now projected to be 3 ½ months from March 16th to June 30th.  <u>Do you really believe that it takes TBBK's outside public accountants—specifically Grant Thornton LLC—3 ½ months to re-examine, test and certify the time sequence of $18 million in loan loss provisions?  We do not. We have written two earlier articles for Seeking Alpha presenting our case that TBBK has failed to mark it[s] loan portfolio to market when the bank set it aside for sale on October 31, 2014.</u>  We submit support for this contention by the fact that [the] bank still has not sold 80%, or $1+ Billion of loan principal, 6 ½ months after first putting it up for sale.  As we said in our last article for SA, "fairly marked assets sell fairly quickly."  This is especially true in today's low interest environment where regional banks are hot to acquire quality commercial loan portfolios…

155.    On June 26, 2015, the last day of the Class Period, the Bank belatedly announced that, contrary to Defendant Cohen's assurances that the Bank was "proactively" and "aggressively" disclosing its loan losses, it had suffered $24 million of additional losses during the Class Period that it had never previously disclosed to investors.  After the close of market that day, the Bank announced that it:

[N]o longer expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014…by the end of June, as previously stated[.] The delay resulted because of ongoing work and analysis related to the previously reported errors, which was not completed within the time frame originally estimated… While the additional loan valuation analysis has not been fully completed, in excess of 2,500 individual loans from the discontinued and continuing business lines were evaluated. <u>Based upon the vast majority of the work performed to date, management identified approximately $24 million of additional losses, related to discontinued operations, that were not previously reported and that will be recognized in our restated financial statements</u>.

156. The Bank's stock price suffered another precipitous decline on high trading volume, falling from a closing price of $10.50 on June 26 to a closing price of $9.29 on June 29, the next trading day following the Bank's announcement—a decline of 11.5%.

157. After the close of market on September 25, 2015, the Bank finally issued the Restatement. As noted above at ¶¶57-64, and detailed further below in Section VII, the Bank admitted in the Restatement that it had concealed approximately $112.5 million in losses between 2010 and 2013, and thus, its publicly reported financial statements were materially misstated in numerous respects during the Class Period. Moreover, the Bank admitted that it issued the Restatement "as a result" of the questions raised by the SEC after the issuance of the Bank's first quarter 2014 results:

The staff of the SEC has commented on three of our loan relationships, now included in discontinued operations, requesting detailed information concerning the amount and timing of our recognition of impairment losses originally reported in the first quarter of 2014, with respect to those relationships. <u>As a result of these comments, we analyzed the relationships and on March 29, 2015 our audit committee, as reported in a Form 8-K filed April 1, 2015, determined that certain of our financial statements could not be relied upon</u> as noted in the "Explanatory Note" which precedes Part I above <u>and that such charges should be restated to prior periods. Upon resulting analysis of other unrelated loan charges, losses on other loans were also restated to prior periods including previously unreported losses</u>.

158. In the Restatement, Bancorp also admitted that, contrary to its statements during the Class Period that it engaged in a rigorous analysis to ensure that its loan loss provisions were

accurate, its accounting suffered from material weaknesses in its internal control over financial reporting. A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Bank's financial statements will not be prevented or detected on a timely basis. Specifically, the Bank admitted in the Restatement that its internal controls over financial reporting related to loss reserves and other critical metrics were "ineffective" "for the fiscal years ended December 31, 2012, 2013 and 2014 and prior periods" because they suffered from two material weaknesses. First, the Bank admitted that it had a material weakness in the maintenance and evaluation of its credit files, stating in the Restatement that it "did not properly maintain credit files." According to the Bank, this material weakness impaired the Bank's ability to properly: (i) evaluate loan collateral; (ii) evaluate "industry-specific information, relevant in determining the appropriate risk-ratings of our loans"; (iii) identify "the ultimate occurrence of loss events"; and (iv) calculate impairment of loans under Accounting Standards Codification No. 310, *Receivables* ("ASC 310"), the GAAP provision under which the Bank was required to determine the probability of when a loan has been impaired in order to determine the proper provision for loan losses. Second, the Bank admitted that it had a material weakness related to its discontinued operations, stating that its "controls were not effective in identifying the appropriate classification of items to be included as discontinued operations." As the Bank stated in the Restatement, "[t]hese weaknesses related to the timing of the recognition of loan losses and the recognition of other loan losses and have resulted in a restatement of our financial statements for such periods."

159. The Restatement also revealed a number of material facts regarding the severe continuing impact of the Consent Order and the Company's BSA violations on Bancorp's

business.  First, in an "Amendment to Consent Order" (the "Amendment") issued on August 31, 2015, the FDIC and Bancorp agreed to additional restrictions applicable to the Consent Order. Among other things, the Amendment expanded the requirements that Bancorp's management must satisfy, which the FDIC had clearly found lacking previously.  Specifically, the Amendment mandated that "[t]he Bank shall have and retain qualified management," who had the ability to "comply with applicable laws, rules, and regulations," and "restore all aspects of the Bank to a safe and sound condition, including a sound BSA/AML compliance program and management effectiveness."

160.    Further, the Amendment limited Bancorp's ability to declare a dividend, providing that "[t]he Bank shall not declare or pay any dividend without the prior written consent of the Regional Director and the Commissioner."

161.    In the "Risk Factors" identified in the Restatement, Bancorp discussed the continuing impact of the Consent Order and the Amendment, stating that

> The 2014 Consent Order requires the Bank to take certain affirmative actions to comply with its BSA obligations… Satisfaction of the requirements of the 2014 Consent Order is subject to the review of the FDIC and the Delaware State Bank Commissioner.  The Bank has and expects to continue to expend significant management and financial resources to address the Bank's BSA compliance program which will reduce our net income.
>
> Until the Bank submits to the FDIC a BSA report summarizing the completion of certain corrective action, the 2014 Consent Order restricts the Bank from signing and boarding new independent sales organizations, establishing new non-benefit reloadable prepaid card programs and originating Automated Clearing House transactions for new merchant-related payments.  Until the BSA Report is submitted to and approved by the FDIC and Delaware State Bank Commissioner, those aspects of the growth of our card payment processing and prepaid card operations will be affected…

162.    The Bank further stated that, on May 11, 2015, the Federal Reserve issued a Supervisory Letter "as a result of the 2014 Consent Order" that prevented the Bank from paying

any dividends on its common stock, making any distributions to its prepaid subsidiary company, making any payments on the Bank's trust preferred securities, incurring any debt, or redeeming any shares of stock, without the prior written approval of the Federal Reserve.

163.    Finally, the Restatement further revealed the financial toll that Bancorp's compliance efforts were taking.  In particular, the Restatement provided that the Bank had been forced to pay $14.3 million in the first two quarters of 2015 to attempt to conduct its "look back" review and build an adequate BSA compliance program, which it had not yet achieved.  Indeed, the Bank stated that its review of its inadequate compliance system would not even be completed until the second quarter of 2016.

164.    To date, the restrictions on the Bank's prepaid business remain in place because the Bank still has not developed an adequate BSA compliance program.  Bancorp's stock price has never recovered from the fraud detailed herein.  Currently, the Bank's stock trades at approximately $7.42 per share, or approximately one-third of its Class Period high of $20.05 per share.

## V.    **BANCORP'S GAAP VIOLATIONS**

165.    By concealing $112.5 million of losses in its commercial loan portfolio during the Class Period, Bancorp misstated many of its critical financial metrics.  Each of the financial metrics that Bancorp misstated in its financial statements, for each reporting period during the Class Period, is set forth in detail below in Section VII.  Bancorp's failure to report these losses also violated basic GAAP governing Bancorp's financial reporting.  Bancorp's GAAP violations are described in this Section.

166.    GAAP consists of the conventions, rules, and procedures that define accounting practices.  The SEC requires public companies to prepare their financial statements in accordance with GAAP.  As set forth in SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)),

financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. SEC Regulation S-X (17 C.F.R. § 210.10-01(a)(5)) also requires that interim financial statements comply with GAAP and "shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading."

167. Bancorp's Class Period financial statements represented that the Bank's "accounting and reporting policies conform with accounting principles generally accepted in the United States and general practices within the financial services industry." Contrary to this statement, the Restatement was an admission that Bancorp's Class Period financial statements violated GAAP, as described below.

168. At each quarter during the Class Period, Bancorp reported a "provision" for loan losses and an "allowance" for loan and lease losses. The "allowance" was the total amount of money that the Bank set aside on its balance sheet to cover probable losses in its commercial loan portfolio. The "provision" was the amount of probable loan losses incurred within a particular reporting period and recognized in the Bank's income statement for that reporting period.

169. Both the allowance for loan and lease losses and provisions were critical financial metrics for the Bank and its investors. They reflected the credit quality of the Bank's commercial loan portfolio (*i.e.,* its largest interest earning asset) as of each reporting date and the operating period(s) presented. Further, the provision was charged against the Bank's income, thus directly reducing its profitability.

170. As described in a December 2006 *Interagency Policy Statement on the Allowance for Loan and Lease Losses*:

The Allowance For Loan and Lease Losses [or "ALLL"] represents <u>one of the most significant estimates</u> in an institution's financial statements and regulatory reports. Because of its significance, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the [ALLL] and the provision for loan and lease losses (PLLL).

171. GAAP makes clear in Accounting Standards Codification Topic No. 450, Contingencies ("ASC 450") that losses for impaired loans should be provisioned as a charge to income when two criteria are met: (1) it is "probable" that the loans are impaired at the date of the financial statement; and (2) the amount of the losses can be reasonably estimated. In this regard, GAAP explicitly recognizes that these conditions "are not intended to be so rigid that they require virtual certainty before a loss is accrued."

172. Accounting Standards Codification Topic No. 310, *Receivables* ("ASC 310") clarifies that a loan is impaired when, based on current information and events, it is probable that the entity will be unable to collect all amounts due (including both interest and principal payments) according to the contractual terms of the loan agreement (other than immaterial delays or shortfalls). GAAP provides that these loss conditions may be considered in relation to individual loans or to groups of similar types of loans, and that a charge to income should be recorded even if particular loans that are impaired are not individually identifiable. Additionally, GAAP makes clear that a loss can be reasonably estimated when information available indicates that the estimated amount of loss is within a range of amounts. In other words, banks cannot delay accrual of a loss until only a single amount could be reasonably estimated.

173. Federal banking regulators have also made make clear that a Bank cannot wait until a loan is charged off to recognize a loss. For example, in a January 2007 publication titled *Bank Accounting Advisor Series*, the Office of the Comptroller of the Currency stated the following:

It is inappropriate to wait to charge earnings until the loss is confirmed or realized (*i.e.*, the asset is charged off). A "loss event" is an event that probably has occurred that impairs the value of a loan. If such a loss event occurred, even though it cannot be identified specifically, a charge is made to earnings and a provision to the ALLL. The occurrence of a "confirming event" results in the asset being classified loss and charged off against the ALLL.

174.     Further, when there is at least a reasonable possibility that a loss will be incurred (but one or both of the two conditions of ASC 450 has not yet been met), or if the Bank was exposed to losses in excess of the amount already accrued, ASC 450 requires disclosure of the additional loss contingency. Such disclosure indicates the nature of the contingency and gives an estimate of the possible loss or range of loss, or states that an estimate of loss could not be made.

175.     GAAP provides that all available evidence reflecting past events (*i.e.*, historical losses) and current conditions should be considered when calculating the allowance for loan losses, including (1) credit quality, (2) current trends (*i.e.*, economic or in customer behavior), and (3) existing "environmental" factors such as industry, geographical, economic, and political factors that are relevant to the collectability of loans.

176.     The SEC also provides direct guidance on the proper accounting for loan losses. SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102") states, in pertinent part, that a loan loss allowance methodology generally should "[c]onsider all known relevant internal and external factors that may affect loan collect[i]bility . . . [and] be based on current and reliable data[.]"

177.     GAAP also provides that loan loss reserves are not predictions and are not based on future events. Instead, a bank's loan loss reserves should reflect losses currently embedded in the portfolio based on contemporaneous information. For instance, ASC 310 states that "the concept in GAAP is that impairment of receivables shall be recognized when, based on all

available information, it is probable that a loss has been incurred based on past events and conditions existing at the date of the financial statements." ASC 310 further provides that:

> A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. All amounts due according to the contractual terms means that both the contractual interest payments and the contractual payments of a loan will be collected as scheduled in the loan agreement.

178.    Bancorp recognized that the valuation of its loans and its allowance for loan losses were critical metrics to investors. Accordingly, it made detailed statements about the allowance for loan and lease losses in all its Class Period financial statements. For example, the Bank stated it reviewed the adequacy of its allowance for loan and lease losses at every quarter, and that Bancorp's allowance met the criteria established in ASC 450 and 310:

> *Allowance for loan and lease losses.* We review the adequacy of our allowance for loan and lease losses on at least a quarterly basis to determine a provision for loan losses in an amount necessary to maintain our allowance at a level that is appropriate, based on management's estimate of inherent losses. Our estimates of loan and lease losses are intended to, and, in management's opinion, do, meet the criteria for accrual of loss contingencies in accordance with ASC 450, *Contingencies*, and ASC 310, *Receivables*.

179.    Accounting guidance established under ASC 450 and ASC 310 has been in place for more than 20 years. Bancorp purported to apply this guidance since at least 2001.

180.    Bancorp represented that evaluating the adequacy of the allowance for loan and lease losses was a two-step process. First, Bancorp's "loan review department," which was run by its Chief Risk Officer, James D. Hilty, purportedly identified "problem loans or leases based on current financial information and the fair value of the underlying collateral." More specifically, Bancorp stated that it used its "internal loan risk rating system" to grade loans and divide them into categories based on "credit risk rating indicator[s]." The categories included: (1) pass; (2) special mention; (3) substandard; (4) doubtful; (5) loss; and (6) unrated. Then, for

each loan that was classified as "special mention," "substandard" or "doubtful," Bancorp purportedly established a "specific" reserve. Bancorp's Class Period SEC filings included a table summarizing the loans that Bancorp classified into these categories during the subject period. The filings also stated that the loan review department reviewed "[a]dversely classified loans" on a quarterly basis and that "all loans are subject to ongoing monitoring by portfolio managers and loan officers."

181. Second, Bancorp claimed that it estimated general loss provisions by grouping similar loans together and allocated an allowance to the group based on various factors. In contrast to reserving for specific loans, this second step was intended "to estimate the potential unconfirmed and inherent losses for the remainder of the portfolio." Such factors supposedly included management's experience with similar loan and lease portfolios at other institutions, the historic loss experience of Bancorp's peers and a review of statistical information from various industry reports. Bancorp also purported to take into account factors such as current economic conditions, current loan portfolio performance, loan policy or management changes, loan concentrations, increases in its lending limit, average loan size and "other factors as appropriate."

182. Throughout the Class Period, Defendants knowingly or recklessly failed to disclose that they were deviating significantly from the above accounting requirements by underreporting the Bank's loan loss provisions and related allowances and overstating its corresponding commercial loan portfolio and net income. As detailed above, rather than taking into account the factors articulated in the guidance and in its financial statements related to the probability of loans being repaid—including current financial information, and the borrowers' ability to repay loans—Bancorp engaged in an "extend and pretend" scheme designed to conceal

a massive number of nonperforming loans by making them appear current, and hide material losses.

183.    This practice allowed the Bank to report artificially low loan loss provision. Indeed, in the Restatement, the Bank <u>admitted</u> that it systematically underreported its loss provisions from 2010 through 2013 by concealing $112.5 million in losses during that timeframe.  However, the Bank provided specific restated figures for its loss provisions only for year-end 2012, and each affected reporting period in 2013 and 2014.  The Bank did not provide specific restated figures for 2010 and 2011, apparently taking the position that GAAP did not require it to do so.  In particular, it appears that the Bank took the position that GAAP only requires disclosure of restated annual profit and loss figures for the past 3 years, and restated quarterly figures for the past two years. *See* SEC Rule S-X 3.1 & 3.2; Regulation S-X Article 3.

184.    Nevertheless, the information the Bank has chosen to disclose demonstrates that the Bank understated its reported provisions for loan losses during the Class Period by very substantial amounts.  For example, for 2012, the Bank publicly reported $22.4 million in loan loss provisions, when, as admitted in the Restatement, it actually had incurred approximately $113 million in provisions for loan losses—an understatement of 403%.  Likewise, in 2013, the Bank publicly reported $29.5 million in provisions, when, as admitted in the Restatement, it actually had incurred approximately $58.4 million in provisions for loan losses—an understatement of 98%.

185.    The same is true of the Bank's allowance for loan losses.  In 2012, the Bank reported an allowance of $33 million, when the true figure, as admitted in the Restatement, was almost $59 million—an understatement of 78%.  And in 2013, the Bank publicly reported an allowance of approximately $38.2 million, when, as admitted in the Restatement, the true allowance was $66.4 million—an understatement of 74%.

186.    Since provisions for loan losses are charged against the Bank's income, by artificially understating its provisions, Bancorp artificially inflated its reported net income from 2010 through 2013 to an extraordinary degree, as noted above in ¶¶57-64 and detailed below in Section VII.

187.    Bancorp's understated loss provisions and allowances further resulted in the material overstatement of its net commercial loan balance during the Class Period.  As described above, rather than appropriately considering factors evidencing losses inherent in its commercial loan portfolio, the Bank engaged in an "extend and pretend" scheme that was designed to conceal credit losses and artificially inflate commercial loan values.  Indeed, in the Restatement, the Bank acknowledged that it overstated the value of its commercial loans by as much as approximately 9%—a substantial overstatement given that the commercial loan portfolio was one of the Bank's principal lines of business and its single largest asset.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Additional Scienter Allegations Concerning Misstatements Related To The Bank's Financial Statements And Loan Portfolio

188.    Numerous facts demonstrate that Defendants Cohen, Frenkiel, and Mastrangelo knew, or were severely reckless in not knowing, that the Bank's financial statements were misstated when issued, and Defendant Cohen's other statements concerning the Bank's supposed "proactive" and "aggressive" disclosure of problem loans were materially false and misleading when made.

189.    First, Defendants Cohen and Mastrangelo, as members of the Loan Committee, were intimately involved in the process of approving loans, modifying loans when they became delinquent, and extending new credit to borrows who could not make their payments. Accordingly, they were closely familiar with the value and credit quality of the Bank's loans.  As

the Bank stated in its 2010 Form 10-K, "[a]ll of the commercial loans in our portfolio go through our loan committee for approval. The Bank's Chief Executive Officer, Mrs. Cohen, who has over 30 years [of] experience in banking and real estate lending, chairs our loan committee." Further, multiple former Bank employees with direct responsibility for the Bank's commercial loan portfolio confirmed that Defendants Cohen and Mastrangelo made the decision to modify loans that were delinquent, or extend the borrowers new credit, to make the loans appear current, when in fact they were not. As these former employees stated, "management was involved in every credit meeting, on a weekly basis. Everybody was involved on the commercial side"; Defendant Cohen received a copy of "every single credit approval memo"; decisions about what loans to send to the workout group "all would have been handled by senior management"; and a loan would not be sent to the workout group until "upper management decided it was time." In short, Defendants Cohen and Mastrangelo had first-hand knowledge of the loans that the Bank made, and once those loans became delinquent, they made the decision to modify them, or extend the borrowers new credit, in order to make the soured loans appear current.

190. Second, the magnitude and duration of Defendants' misstatements was extraordinary. Defendants Cohen and Frenkiel signed each of the Bank's financial statements from 2010 through 2013, and certified their accuracy. In those financial statements, they failed to disclose approximately $112.5 million in losses in the Bank's commercial loan portfolio—an amount that was twice as large as the profits the Bank had reported from its inception as a public company in 2004 through the end of 2013. Defendants misstated more than a dozen essential financial metrics during the Class Period to a staggering degree, including overstating the Bank's net income by as much as 360%, and understating its loan loss provisions by more than 400%. Moreover, Defendants issued their misstatements over the course of more than four years. The

extraordinary magnitude and duration of the financial misstatements at issue in this case are powerful evidence that Defendants either knew that the Bank's financial statements were misstated, or—at minimum—acted with severe recklessness.

191. <u>Third</u>, the health and credit quality of the Bank's commercial loan portfolio was critical to the Bank's financial performance during the Class Period. Indeed, the portfolio was the Bank's largest asset, was the focus of intense investor concern, and was the subject of dozens of Defendants' public statements over the course of 4 years—yet Defendants concealed $112.5 million in losses and understated loss reserves by enormous amounts. Having spoken repeatedly and reassuringly on the subject of the commercial loan portfolio, Defendants were obligated to ensure that their disclosures were accurate and complete. Any failure to do so on a subject as important as this one constitutes severely reckless conduct at minimum.

192. <u>Fourth</u>, the fact that the SEC's request for information about the losses disclosed in the first quarter of 2014 triggered the Restatement further supports a strong inference of scienter. In other words, the timing and amount of the losses disclosed by the Bank in the first quarter of 2014 was suspicious enough to invite scrutiny by the SEC, an independent outside party—demonstrating that the true facts were known or recklessly disregarded by Defendants, who possessed intimate knowledge of the loan portfolio. And the fact that a simple request for information about the losses disclosed in the first quarter of 2014 led to the discovery of the misstatements demonstrates that the information concerning the undisclosed losses was readily available to Defendants, showing severe recklessness at a minimum.

193. <u>Fifth</u>, on April 23, 2014, when Bancorp began to disclose the true extent of the losses in its commercial loan portfolio, Defendant Cohen proffered a false excuse for the deterioration in the portfolio. As noted above, Defendant Cohen attempted to blame the troubled

loans on the local economy, stating that they defaulted because "the Philadelphia market, which is where these loans are, has been unrelenting in its [un]willingness to improve." This assertion was completely untrue, as Bancorp's losses were driven by the fact that it held material amounts of toxic loans in its portfolio, which it had attempted to disguise through the "extend-and-pretend" scheme described above. Indeed, analysts flatly rejected this assertion, reporting that "[w]e believe the company underwrote weak credits and do not accept management's view that problems are primarily to blame on the health of the Mid-Atlantic markets where most of the credits are located. Almost all of the community banks that we track in this region have seen a steady improvement in problem assets levels and credit costs over the last several years." As analysts further noted, "[w]e suspect there were poor classification and grading of problem assets in these categories in earlier periods," and Cohen's "credibility is a bit of an issue for some." The fact that Defendant Cohen lied about the cause of the portfolio's deterioration when the Bank was forced to begin disclosing its problem loans is compelling evidence of scienter.

194. <u>Sixth</u>, in its SEC filings, the Bank claimed to review its loan portfolio every quarter in order to identify any delinquent loans and set its reserves accordingly—a process in which the Bank's CFO, Defendant Frenkiel, was closely involved. For instance, at each quarter, the Bank included a chart in its SEC filings that purported to identify the amount of delinquent loans in the commercial portfolio, and the length of any delinquency. The Bank identified its loss provisions as a "critical accounting policy," and stated that "[w]e review the adequacy of our allowance for loan and lease losses on <u>at least a quarterly basis</u>." Frenkiel's quarterly review of the commercial loan portfolio gave him first-hand knowledge of the true quality and value of the loans, and the Bank's loss reserves.

195.   Seventh, during the Class Period, the Bank was conducting a detailed internal review of its commercial loan portfolio, in which Defendant Cohen stated she was involved. Specifically, in April 2014, Defendant Cohen stated that the Bank had been reviewing the credit quality of its commercial loan portfolio since as early as the end of 2012.   Through the internal review, the Bank's senior management added to their already detailed knowledge about the quality and performance of the commercial loan portfolio.   Indeed, Defendant Cohen repeatedly professed to have first-hand knowledge of the loan review and the Bank's problem loans.   As set forth above, Defendant Cohen repeatedly stated that the Bank was "proactively" and "aggressively" identifying, disclosing, and charging off any problem loans.   Either Defendant Cohen possessed the knowledge of the Bank's poor quality loans that she claimed to have, in which case she knew that her statements touting the Bank's purported "aggressive" disclosure of problem loans were false and misleading, or she lacked the knowledge she claimed to have, in which case her conduct was severely reckless.

**B.     Additional Scienter Allegations Concerning Misstatements Related To BSA Compliance And The Bank's Prepaid Business**

196.   Numerous facts also demonstrate that Defendants Cohen, Frenkiel, Mastrangelo, and Kuiper knew or recklessly disregarded that their statements concerning the Bank's BSA compliance and prepaid business were materially false and misleading when made.

197.   First, no later than July 2013, the Executive Defendants were specifically informed that the Bank was committing numerous BSA violations that ultimately formed the basis of the Consent Order.   As noted above at ¶¶108-09, in 2013, the FDIC and State Banking Commissioner conducted a detailed examination of the Bank's BSA compliance program, and found numerous deficiencies.   In July 2013, the Executive Defendants received the 2013 BSA ROE from the FDIC and the State Banking Commissioner, which set forth their findings and

made clear to the Executive Defendants that the Bank was violating multiple BSA requirements. In particular, the 2013 BSA ROE detailed the Bank's failure to: (i) conduct annual risk assessments of the Bank's BSA compliance as required by the guidance set forth in the BSA Manual; (ii) establish a program of enhanced customer due diligence for those customers who posed a heightened risk of illicit activity; (iii) establish the required BSA training program; and (iv) maintain an independent testing program.

198.    Significantly, after being informed of these violations, the Executive Defendants allowed each of them to continue unabated—and these violations led directly to the issuance of the Consent Order in July 2014. Further, the Executive Defendants' knowledge of these significant BSA violations also triggered a duty to further investigate the BSA compliance program to discover the many additional BSA violations that were occurring, as reflected in the Consent Order. Any failure to properly investigate and discover those other violations was severely reckless at a minimum. In short, the fact that Defendants knew about many of the violations underpinning the Consent Order is powerful evidence of scienter.

199.    Second, on the July 25, 2014 conference call, Defendant Cohen acknowledged that she and the Bank's other senior officers were well aware of the Bank's BSA violations long before the Consent Order was issued. Indeed, rather than asserting that the violations described in the Consent Order took them by surprise, Defendant Cohen stated that she and the Bank's senior management knew about the BSA violations, and were supposedly attempting to address the violations, although not "as quickly" as they should have been. As she stated, the BSA violations were "something we were working on…, but not as quickly as would have been desired….We have been—as we have said before, we have been addressing these issues, but not

76

at this pace." The Executive Defendants' admitted knowledge of the Bank's BSA violations prior to the issuance of the Consent Order is further compelling evidence of their scienter.

200. <u>Third</u>, in August 2012, nearly two years before the Consent Order was issued, the Bank's Board, including Defendants Cohen and Mastrangelo, agreed to another consent order that required them to pay heightened scrutiny to the Bank's regulatory compliance with respect to the prepaid card business. Specifically, Defendants Cohen and Mastrangelo were required to "<u>increase [their] oversight of the Bank's compliance management system, including assuming full responsibility for the approval of sound policies and objectives</u> for the Bank's products and services offered to consumers," including its prepaid cards. Either these Defendants discharged their duty to closely supervise the Bank's regulatory compliance with respect to its prepaid business, in which case they knew of the BSA violations, or they shirked this duty while falsely claiming that the Bank satisfied its BSA obligations, which epitomizes severely reckless conduct.

201. <u>Fourth</u>, the Executive Defendants had affirmative obligations to design and monitor the Bank's compliance program, and ensure that it was adequate. For instance, the BSA/AML Manual provided that the Executive Defendants were responsible for ensuring the Bank's BSA compliance, stating, "[t]he board of directors, acting through senior management, is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting. The board of directors and management should create a culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes." In flat violation of their obligations, Defendants permitted the Bank to commit numerous violations of basic BSA requirements, including those that the FDIC has designated as "cornerstones" and "pillars" of compliance, such as having a qualified BSA Officer, an adequate system for reporting suspicious transactions, and

an adequate system for performing customer due diligence.  Defendants' abandonment of their obligations under federal law demonstrates severe recklessness at a minimum.

202.  <u>Fifth</u>, Defendants' statements repeatedly touting the prepaid business as the key driver of the Bank's growth further support scienter.  When Defendants made these statements, they knew BSA compliance was essential to the business's ability to continue growing.  Indeed, as Defendant Mastrangelo stated, the Bank was acutely aware of the fact that its principal prepaid competitor, MetaBank, had its business frozen for compliance violations.  In light of this knowledge, it was reckless at minimum for Defendants to tout the prepaid segment's growth while knowing that the Bank's BSA violations severely jeopardized the business's continued viability.

203.  <u>Sixth</u>, the significance of the violations found by the FDIC further demonstrates scienter.  As detailed above at ¶¶98-107, the FDIC determined that the Bank was violating each and every one of the "key requirements" of the BSA that the Bank claimed to satisfy in its 2013 Form 10-K, including every requirement that the FDIC has emphasized were "cornerstones" and "pillars" of BSA compliance.  As the FDIC found, the Bank's compliance failures in every one of these areas were so serious they rose to the level of "unsafe or unsound banking practices," defined as practices "contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would result <u>in abnormal risk of loss or damage to an institution [or] its shareholders</u>."  These violations were so significant and pervasive that the FDIC essentially halted the Bank's fastest-growing business.  To bring the Bank into compliance, Bancorp had to build a whole new compliance center in Florida and triple the size of its BSA compliance staff.  Violations this severe and widespread did not materialize overnight or fly

beneath the radar—rather, they were obvious to anyone who cared to look, as the Executive Defendants were required to do.

## VII. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

204. Throughout the Class Period, Defendants made numerous materially false and misleading statements concerning Bancorp's financial performance and condition, commercial loan portfolio, BSA compliance, and prepaid card business. To summarize:

      (a)    At each quarterly and annual reporting period during the Class Period, the Bank issued press releases announcing it financial results, which results it also later filed with the SEC on Forms 8-K, 10-K, and 10-Q. In these press releases, the Bank routinely reported large increases in net income, and Defendant Cohen repeatedly emphasized the Bank's "earnings growth" and "significant increases" in profit. As confirmed by the Restatement, Bancorp's Class Period financial statements were materially misstated, in violation of GAAP, and Defendant Cohen's statements praising the Bank's "earnings growth" were false when made. Specifically, by concealing $112.5 million in losses in the commercial loan portfolio, the Bank materially misstated numerous financial metrics, including: (i) Bancorp's net income and earnings per share; (ii) Bancorp's provision and allowance for loan and lease losses; (ii) Bancorp's net interest income after the provision; (iii) the value of the Bank's commercial loan portfolio; (iv) the value of the total loan portfolio; (v) shareholders' equity; (vi) the ratio of the allowance to total loans; and (vii) retained earnings.

(b)     After issuing these results, the Bank held conference calls with analysts to discuss its financial performance.  During these calls, Defendant Cohen made additional materially false statements concerning the Bank's financial results.  Further, Defendant Cohen stated that the Bank was "proactively," "vigorously," and "aggressively" disclosing and writing off delinquent loans in its commercial loan portfolio.  Contrary to these statements, Bancorp concealed approximately $112.5 million of losses in the loan portfolio from 2010 to 2013 and failed to record the corresponding loan loss provisions required by GAAP.

(c)     Defendants also made a number of materially false and misleading statements concerning Bancorp's BSA compliance and prepaid business. In the Bank's SEC filings, during its conference calls, and on its website, Defendants stated that Bancorp had "established" a "risk-based compliance program" in accordance with the BSA, and that the Bank had "best in class" and "rock-solid compliance."  Contrary to these statements, throughout the Class Period, the Bank was committing severe and widespread violations of the BSA, and key aspects of its compliance program were either woefully deficient or non-existent.

(d)     In the Bank's earnings releases, Defendant Cohen also repeatedly touted the purported success of the prepaid business, representing that it was the Bank's "primary vector of growth," and drove substantial increases in non-interest income and overall net income.  The representations were materially misleading because Defendants, while touting the growth and

success of the prepaid business, failed to disclose the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

205. Defendants' particular materially false and misleading statements are set forth below.

A. **Materially False And Misleading Statements And Omissions Concerning The Fiscal Fourth Quarter 2010 And The Fiscal Year 2010**

206. On January 26, 2011, Bancorp issued a press released entitled "The Bancorp, Inc. Reports Fourth Quarter 2010 Results" ("Fourth Quarter 2010 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("Fourth Quarter 2010 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. For fiscal year 2010, the Fourth Quarter 2010 Press Release and the Fourth Quarter 2010 Form 8-K reported net income of $5.22million; a net loss available to shareholders of $1.02 million after dividends paid on preferred securities; a diluted loss per share of $0.04; $198.91 million in total shareholders' equity; and a loss of $18.19 million in retained earnings.

207. The financial results set forth above were materially false and misleading when issued. As Bancorp admitted in the Restatement, its improper accounting caused its fiscal year 2010 net income, net loss available to shareholders, loss per share, total shareholders' equity, and retained earnings to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Fiscal Year 2010**

| | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| **Net Income (Loss)** | $5.2 million | ($3.85 million) | 173.6% |
| **Net Income (Loss) available to shareholders[1]** | ($1.02 million) | ($10.09 million) | 888.9% |
| **Diluted EPS** | ($0.04) | ($0.39) | 875% |
| **Basic EPS** | ($0.04) | ($0.39) | 875% |
| **Total Shareholders' Equity** | $198.91 million | $189.70 million | 4.6% |
| **Retained Earnings (Accumulated Deficit)** | ($18.19 million) | ($27.40 million) | 50.6% |

208.    In the Fourth Quarter 2010 Form 8-K, the Bank also reported for fiscal year 2010, (i) a $24.06 million allowance for loan and lease losses and (ii) a $19.29 million provision for loan and lease losses.

209.    These metrics were false and misleading when issued.   In the Restatement, Bancorp did not provide specific restated amounts for the provision and allowance for the fourth quarter 2010 or the fiscal year 2010.   Nevertheless, Bancorp admitted in the Restatement that it failed to recognize approximately $9.1 million in losses during 2010, which should have been accounted for by increasing its provision and allowance for loan and lease losses.   Accordingly, the loan loss provision and allowance were understated by approximately $9.1 million for fiscal year 2010.

210.    In the Fourth Quarter 2010 Press Release and Form 8-K, Defendant Cohen also made misleading statements underscoring the Bank's purported earnings growth.   Specifically,

---

[1] Net income available to shareholders for fiscal year 2010 differed from net income as a result of dividends paid to preferred shareholders during 2010.

Defendant Cohen stated that "[w]e are pleased to report meaningful increases in non-interest income and net interest income. Although the provision for loan and lease losses remained elevated during the quarter, operating earnings, excluding the provision, amounted to $7.2 million compared to $5.8 million in fourth quarter 2009. Additionally, improvement in several key asset quality indicators is reflected in the decrease in total non-performing assets and loans over 90 days past due still accruing."

211. The statement above was materially false and misleading when issued. It was materially false and misleading for Defendant Cohen to tout the Bank's "meaningful increases" in income, when the Bank's reported income was materially overstated. Specifically, rather than achieving net income of $5.2 million, as the Bank publicly reported, in reality, the Bank had had a net loss for 2010 of $3.85 million. Further, it was materially false and misleading for Defendant Cohen to underscore the purported "decrease in total non-performing assets and loans over 90 days past due still accruing," and assert that "several key asset quality indicators" had improved, when the Bank was concealing approximately $9.1 million of losses in the commercial loan portfolio for fiscal year 2010.

212. On January 27, 2011, the Bank held a conference call with investors to discuss its 2010 fourth quarter and year-end results (the "Fourth Quarter 2010 and Year-End 2010 Conference Call"). On that call, Defendant Cohen made misleading statements designed to assure investors that the credit quality in the Bank's commercial loan portfolio was improving. For example, Defendant Cohen stated in prepared remarks that "There were also important advances in the credit metrics. We call them advances even though they are reflected as increases. Asset quality improved significantly. And I guess one of the major measures is that

over the course of the year we were able to reduce to 1.08% of assets, all loans that are in non-performing category, from 1.66 on a linked quarter basis and higher over the course of the year."

213. This statement was materially misleading. It was materially misleading for Defendant Cohen to state that "[a]sset quality improved significantly," and state that the Bank's non-performing loans had substantially declined, when the Bank was concealing approximately $9.1 million of losses in the commercial loan portfolio for 2010 and failing to take required reserves and charge-offs.

214. On February 23, 2011, Bancorp filed with the SEC its Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K"). The 2010 Form 10-K was signed by Defendants Cohen and Frenkiel, and reported the same financial results, including net income, net income available to shareholders and earnings per share, shareholders' equity, and retained earnings set forth in ¶¶206, 208 above. As set forth above at ¶¶207-209, these financial results were materially false and misleading when issued.

215. The 2010 Form 10-K also contained the following chart purporting to set forth the loans in the commercial portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

Age Analysis of Past Due Loans
As of December 31, 2010 and 2009

| December 31, 2010 | 30-59 Days Past Due | 60-89 Days Past Due | Greater Than 90 Days | Nonaccrual | Total Past Due | Current | Total Loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ - | $ 100 | $ 285 | $ 2,280 | $ 2,665 | $ 439,134 | $ 441,799 |
| Commercial mortgage | 774 | - | 824 | 1,650 | 3,248 | 577,532 | 580,780 |
| Construction | - | 391 | - | 4,881 | 5,272 | 197,848 | 203,120 |
| Direct financing leases, net | 816 | 192 | 49 | - | 1,057 | 102,232 | 103,289 |
| Consumer - other | - | 2 | 12 | - | 14 | 148,715 | 148,729 |
| Consumer - home equity | 330 | - | - | 960 | 1,290 | 44,301 | 45,591 |
| Residential mortgage | - | - | 1,050 | 5,526 | 6,576 | 86,428 | 93,004 |
| Unamortized costs | - | - | - | - | - | 2,883 | 2,883 |
| | $ 1,920 | $ 685 | $ 2,220 | $ 15,297 | $ 20,122 | $ 1,599,073 | $ 1,619,195 |

216.    The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, for fiscal year 2010, the Bank failed to recognize approximately $9.1 million of losses in its commercial loan portfolio.  Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

217.    The 2010 Form 10-K also contained SOX Certifications by Defendants Cohen and Frenkiel. The SOX Certifications affirmed that Bancorp's financial statements were accurate, and that Defendants Cohen and Frenkiel had designed and implemented internal controls over financial reporting that provided reasonable assurance that Bancorp's financial reporting was reliable and complied with GAAP.  Specifically, the SOX Certifications provided, in relevant part:

1.    I have reviewed this annual report on Form 10-K for the fiscal year ended December 31, 2010 of The Bancorp, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, <u>the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of</u>, and for, the periods presented in this report[.]

4. <u>The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures</u> (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) <u>and internal control over financial reporting</u> (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant <u>and have</u>:

    (a) <u>Designed such disclosure controls and procedures</u>, or caused such disclosure controls and procedures to be designed under our supervision, <u>to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared</u>;

    (b) <u>Designed such internal control over financial reporting</u>, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles</u>;

    (c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting.

218. Defendants Cohen and Frenkiel signed substantially similar certifications in Bancorp's Forms 10-K throughout the rest of the Class Period that were filed on March 13, 2012, March 18, 2013, and March 17, 2014, and in its Forms 10-Q through the rest of the Class Period that were filed on May 9, 2011, August 9, 2011, November 9, 2011, May 10, 2012, August 9,

2012, November 9, 2012, May 10, 2013, August 9, 2013, November 6, 2013, May 12, 2014, and August 11, 2014.

219.    Defendants' SOX Certifications were materially false and misleading.  Contrary to the representations that the 2010 Form 10-K did "not contain any untrue statement of a material fact" and "fairly present[ed] in all material respects the financial condition [and] results of operations" of Bancorp, the 2010 Form 10-K materially misstated Bancorp's key financial metrics, as set forth above at ¶214.  In addition, contrary to the statement that Defendants Cohen and Frenkiel had implemented internal controls that "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," as Bancorp admitted in the Restatement, Bancorp's internal controls suffered from material weaknesses relating to (1) the maintenance and evaluation of credit files and (2) its classification of discontinued operations.  In the Restatement, Bancorp disclosed that the identified material weaknesses over financial reporting "affected our financial statements for the fiscal years ended December 31, 2012, 2013 and 2014 and prior periods."

220.    The 2010 Form 10-K contained further assurances that the Bank's senior management had specifically evaluated Bancorp's disclosure controls and procedures, and concluded that they were effective to provide reasonable assurance that Bancorp's reported results were accurate ("Internal Control Certification").  Specifically, the 2010 Form 10-K provided as follows:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including Chief Executive Officer and our Chief Financial Officer,

as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, and provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Under the supervision of our Chief Executive Officer and Chief Financial Officer, we have carried out an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are effective at the reasonable assurance level.

221. Contrary to assurances that Bancorp's internal controls were "effective" "as of the end of the period covered by this report" to assure that its 2010 Form 10-K was accurate and complete, Bancorp has now admitted that its internal controls suffered from the material weaknesses described above that caused its financial results to be materially misstated. Specifically, the Bank admitted in the Restatement that there were material weaknesses in its internal controls over financial reporting during the Class Period as set forth directly above in ¶219, and that its financial statements were materially misstated.

**B.      Materially False And Misleading Statements And Omissions Concerning The First Quarter 2011**

222. On April 26, 2011, Bancorp issued a press release entitled "The Bancorp, Inc. Reports First Quarter 2011 Financial Results" ("First Quarter 2011 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("First Quarter 2011 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. The First Quarter 2011 Press Release and the First Quarter 2011 Form 8-K reported net income of $2.7 million compared to net income of $2.2 million for the prior year period and earnings per share of $0.10 per share compared to $0.08 for the prior year period.

223. The financial results set forth above were materially false and misleading when issued. The Bank did not provide specific restated quarterly figures for the first quarter 2011 net income and earnings per share. Nevertheless, Bancorp admitted in the Restatement that the Bank failed to disclose approximately $4.1 million in losses for 2011 suffered in its commercial loan portfolio. Accordingly, the Bank's net income and earnings per share for the first quarter of 2011 were materially misstated.

224. In the First Quarter 2011 Form 8-K, the Bank also reported (i) a $20.36 million allowance for loan and lease losses and (ii) a $4.67 million provision for loan and lease losses.

225. These metrics were false and misleading when issued. While Bancorp did not provide a specific restated amount for the provision and allowance for the first quarter of 2011, Bancorp admitted in the Restatement that it failed to recognize approximately $4.1 million in losses for 2011, which should have been accounted for by increasing its provision and allowance for loan and lease losses. Accordingly, the provision and allowance for loan losses for the first quarter of 2011 were materially understated.

226. In the First Quarter 2011 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth. Specifically, Defendant Cohen stated that "[o]ur net-interest income totaled $18.2 million in first quarter 2011, an increase of $1.9 million, or 12% over first quarter 2010. Larger loan and security balances and a lower cost of funds were the drivers behind the increase. Our core earnings for the quarter…increased $2.1 million over the prior year same quarter reflecting the increase in net income and the 69% increase in prepaid card income."

227. This statement was materially false and misleading when issued. It was materially false and misleading for Defendant Cohen to tout the Bank's increases in earnings,

including its "increase in net income," when Bank was concealing approximately $4.1 million in losses for fiscal year 2011, as set forth directly above in ¶223.

228. On May 9, 2011, Bancorp filed with the SEC its Form 10-Q for the quarter ended March 31, 2011 ("First Quarter 2011 Form 10-Q"). The First Quarter 2011 Form 10-Q reported the same financial results, including net income, earnings per share, provision for loan and lease losses, and allowance for loan and lease losses, set forth in ¶¶222, 224, above. As set forth above at ¶¶223, 225, these financial results were materially false and misleading when issued.

229. The First Quarter 2011 Form 10-Q also contained the following chart, which purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction:"

Age Analysis of Past Due Loans

| March 31, 2011 | 30-59 Days Past Due | 60-89 Days Past Due | Greater Than 90 Days | Nonaccrual | Total Past Due | Current | Total Loans |
|---|---|---|---|---|---|---|---|
| Commercial | $    594 | $   7,076 | $   1,612 | $   2,544 | $  11,826 | $  418,255 | $    430,081 |
| Commercial mortgage | 2,356 | - | 824 | 2,785 | 5,965 | 595,081 | 601,046 |
| Construction | - | 1,961 | 391 | 1,695 | 4,047 | 198,058 | 202,105 |
| Direct financing leases, net | 2,087 | 188 | 193 | - | 2,468 | 105,156 | 107,624 |
| Consumer - other | 35 | 2 | 8 | - | 45 | 153,554 | 153,599 |
| Consumer - home equity | 330 | - | - | 633 | 963 | 43,314 | 44,277 |
| Residential mortgage | - | 3,360 | - | 6,571 | 9,931 | 84,751 | 94,682 |
| Unamortized costs | - | - | - | - | - | 2,839 | 2,839 |
| | $   5,402 | $  12,587 | $   3,028 | $  14,228 | $  35,245 | $ 1,601,008 | $ 1,636,253 |

230. The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize approximately $13.2 million in losses in its commercial loan portfolio. Further, as detailed

above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

231.    The First Quarter 2011 Form 10-Q also contained the same SOX and Internal Control Certification as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.    Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

C.    **Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2011**

232.    On July 21, 2011, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Second Quarter 2011 Financial Results" ("Second Quarter 2011 Press Release").    That same day, the Bank filed with the SEC a Form 8-K ("Second Quarter 2011 Form 8-K"), which Defendant Frenkiel signed, that included the press release an exhibit.    The Second Quarter 2011 Press Release and the Second Quarter 2011 Form 8-K reported net income of $660,000 compared to net income of $407,000 for the prior-year period and earnings per share of $0.02, which stayed steady from the prior-year period.

233.    The financial results set forth above were materially false and misleading when issued.    While the Bank did not provide specific restated figures for quarterly net income and earnings per share, Bancorp admitted in the Restatement that the Bank failed to disclose approximately $4.1 million in losses for 2011 suffered in its commercial loan portfolio. Accordingly, the Bank's net income and earnings per share for the second quarter of 2011 were materially misstated.

234.    In the Second Quarter 2011 Form 8-K, the Bank also reported (i) a $27.69 million allowance for loan and leases losses, and (ii) a $6.93 million provision for loan and lease losses.

235.    These metrics were false and misleading when issued.   In the Restatement, Bancorp did not provide specific restated amounts for the provision and allowance for the second quarter of 2011 as it was not required to do so under GAAP.   Nevertheless, Bancorp admitted in the Restatement that it failed to recognize approximately $4.1 million in losses for 2011, which should have been accounted for by increasing its provision and allowance for loan and lease losses.   Accordingly, the provision and allowance for loan losses for the second quarter of 2011 were materially understated.

236.    In the Second Quarter 2011 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth.   Specifically, Defendant Cohen stated that "our core operating earnings increased 30% or $1.9 million over the comparable prior year quarter, reflecting a $2.8 million increase in non-interest income and a $1.6 million increase in net interest income.   These results reflect our commitment to fee businesses, especially prepaid cards, in addition to traditional banking, and careful expansion of the loan portfolio which has grown over 7% in 2011 on an annualized basis."

237.    This statement was materially false and misleading when issued.   It was materially false and misleading for Defendant Cohen to tout the Bank's earnings growth, and to identify the growing loan portfolio as a positive driver of that growth, when the Bank was concealing approximately $4.1 million in losses for fiscal year 2011 in the commercial loan portfolio, as set forth directly above in ¶233.

238.    On July 21, 2011, the Bank held a conference call with investors to discuss its second quarter 2011 results (the "Second Quarter 2011 Conference Call").   On that call, Defendant Cohen made materially misleading statements designed to assure investors that the

Bank was carefully managing the credit quality of its commercial loan portfolio. Defendant Cohen stated:

> We were proactive in identifying loans that we thought may be the subject of recoveries at some future time, but certainly where we should [get] out ahead of it and recognize loss. And so we had an increase in our write-offs during this quarter…It was completely a function of the amount that was provided for these loans. However, when you look back to 2010, June of 2010, nonperforming loans were, at that time, 1.82% and they have been reduced even in this quarter to 1.43%. So…if you look across the last four quarters, except for the first quarter of 2011…the number for the second quarter is the lowest it has been in three or four quarters.

239. The statements above were materially false and misleading. It was materially false and misleading for Defendant Cohen to say that Bancorp had been "proactive" in identifying problem loans and disclosing losses when the Bank was, in fact, concealing $9.1 million in losses for 2010 and $4.1 million in losses for 2011 in the commercial loan portfolio, as confirmed by the Restatement. It was also false and misleading for Defendant Cohen to suggest that Bancorp's "non-performing" loans had decreased since June 2010 when in reality, the Bank was concealing significant losses and engaging in the "extend and pretend" scheme detailed above at ¶¶66-81.

240. On August 9, 2011, Bancorp filed with the SEC its Form 10-Q for the quarter ended June 30, 2011 ("Second Quarter 2011 Form 10-Q"). The Second Quarter 2011 Form 10-Q reported the same misstated financial results, including net income, earnings per share, provision for loan and lease losses and allowance for loan and lease losses, set forth above in ¶¶232, 234. As set forth above at ¶¶233, 235, these financial results were false and misleading when issued.

241. The Second Quarter 2011 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

Age Analysis of Past Due Loans

| June 30, 2011 | 30-59 Days past due | 60-89 Days past due | Greater Than 90 days | Nonaccrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 3,351 | $ - | $ 1,133 | $ 5,337 | $ 9,821 | $ 441,095 | $ 450,916 |
| Commercial mortgage | 2,349 | 1,070 | 824 | 2,782 | 7,025 | 586,817 | 593,842 |
| Construction | - | - | 2,366 | 845 | 3,211 | 202,519 | 205,730 |
| Direct financing leases, net | 1,305 | 52 | 69 | - | 1,426 | 125,590 | 127,016 |
| Consumer - other | - | 50 | 5 | - | 55 | 155,800 | 155,855 |
| Consumer - home equity | 330 | 1,012 | - | 633 | 1,975 | 42,302 | 44,277 |
| Residential mortgage | - | - | - | 9,929 | 9,929 | 88,184 | 98,113 |
| Unamortized costs | - | - | - | - | - | 2,911 | 2,911 |
| | $ 7,335 | $ 2,184 | $ 4,397 | $ 19,526 | $ 33,442 | $ 1,645,218 | $ 1,678,660 |

242.     The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize approximately $13.2 million in losses in its commercial loan portfolio.  Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due loans and nonaccruing loans.

243.     The Second Quarter 2011 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.  Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**D.     Materially False And Misleading Statements Concerning The Third Quarter 2011**

244.     On October 20, 2011, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Third Quarter 2011 Financial Results" ("Third Quarter 2011 Press Release").  That same day, the Bank filed with the SEC a Form 8-K ("Third Quarter 2011 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit.  The Third Quarter 2011 Press Release and the Third Quarter 2011 Form 8-K reported another large increase in supposed

profits, reporting net income of $2.3 million, compared to $588,000 for the prior-year period, and earnings per share of $0.07, compared to $0.02 for the prior-year period.

245.    The financial results set forth above were materially false and misleading when issued.  While the Bank did not provide specific restated quarterly figures for net income and earnings per share, Bancorp admitted in the Restatement that the Bank failed to disclose approximately $4.1 million in losses in its commercial loan portfolio for 2011.  Accordingly, the Bank's net income and earnings per share for the third quarter of 2011 were materially misstated.

246.    In the Third Quarter 2011 Form 8-K, the Bank also reported (i) a $27.67 million allowance for loan and lease losses and (ii) a $5.02 million provision for loan and lease losses.

247.    These metrics were false and misleading when issued.  While Bancorp did not provide specific restated amounts for the provision and allowance for the third quarter of 2011, Bancorp admitted in the Restatement that it failed to recognize approximately $4.1 million in losses for 2011, which should have been accounted for by increasing its provision and allowance for loan and lease losses.  Accordingly, the provision and allowance for loan losses for the third quarter 2011 were materially understated.

248.    On November 9, 2011, Bancorp filed its Form 10-Q for the quarter ended September 30, 2011 ("Third Quarter 2011 Form 10-Q").  The Third Quarter 2011 Form 10-Q reported the same financial results, including net income, earnings per share, provision for loan and lease losses and allowance for loan and lease losses, set forth above in ¶¶244, 246.   As set forth above at ¶¶245, 247, these financial results were materially false and misleading when issued.

249.    The Third Quarter 2011 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due,

60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

Age Analysis of Past Due Loans

| September 30, 2011 | 30-59 Days past due | 60-89 Days past due | Greater Than 90 days | Nonaccrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 155 | $ 1,561 | $ 3,657 | $ 4,212 | $ 9,585 | $ 452,094 | $ 461,679 |
| Commercial mortgage | 280 | 165 | 1,436 | 3,848 | 5,729 | 571,508 | 577,237 |
| Construction | - | 1,341 | 391 | 2,321 | 4,053 | 238,753 | 242,806 |
| Direct financing leases, net | 1,044 | 104 | 65 | - | 1,213 | 128,187 | 129,400 |
| Consumer - other | 12 | 23 | 1 | - | 36 | 160,930 | 160,966 |
| Consumer - home equity | - | - | - | 1,560 | 1,560 | 42,717 | 44,277 |
| Residential mortgage | - | - | - | 5,260 | 5,260 | 90,879 | 96,139 |
| Unamortized costs | - | - | - | - | - | 3,144 | 3,144 |
| | $ 1,491 | $ 3,194 | $ 5,550 | $ 17,201 | $ 27,436 | $ 1,688,212 | $ 1,715,648 |

250.    The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize approximately $13.2 million in losses in its commercial loan portfolio.  Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

251.    The Third Quarter 2011 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.  Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**E.    Materially False And Misleading Statements And Omissions Concerning The Fiscal Fourth Quarter 2011 And The Fiscal Year 2011**

252.    On January 23, 2012, Bancorp issued a press released entitled "The Bancorp, Inc. Reports Fourth Quarter and Fiscal 2011 Financial Results" ("Fourth Quarter 2011 Press Release").  That same day, the Bank filed with the SEC a Form 8-K ("Fourth Quarter 2011 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit.  The

Fourth Quarter 2011 Press Release and the Fourth Quarter 2011 Form 8-K reported another large increase in earnings, reporting net income of $8.9 million for the fiscal year, compared to $5.2 million for the prior-year period, and diluted earnings per share of $0.28, compared to a loss per share of $0.04 in the prior year. For the fiscal year 2011, the Bank further reported $271.48 million in total shareholders' equity and a loss of $9.28 million in retained earnings.

253.    The financial results set forth above were materially false and misleading when issued. As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its fiscal year 2011 net income, earnings per share, total shareholders' equity and retained earnings to be overstated by the material amounts set forth in the chart below.

**Overstatement of Key Financial Results for Fiscal Year 2011**

|  | Reported Figure | Actual Figure as Restated | Percent of Overstatement |
|---|---|---|---|
| Net Income (Loss) | $8.92 million | $4.82 million | 46% |
| Diluted EPS | $0.28 | $0.15 | 46.4% |
| Basic EPS | $0.28 | $0.15 | 46.4% |
| Total Shareholders' Equity | $271.48 million | $258.31 million | 4.9% |
| Retained Earnings (Accumulated Deficit) | ($9.28 million) | ($22.45 million) | 141.9% |

254.    The Fourth Quarter 2011 Press Release and the Fourth Quarter 2011 Form 8-K also reported financial results for the fourth quarter of 2011. In particular, the Fourth Quarter 2011 Press Release and the Fourth Quarter 2011 Form 8-K reported net income of $3.3 million for the fourth quarter, compared to $2.0 million for the prior-year period, and fourth quarter diluted earnings per share of $0.10, compared to $0.08 for the prior-year period.

255.    The financial results set forth above were materially false and misleading when issued. While the Bank did not provide restated figures for net income and earnings per share for the fourth quarter of 2011, Bancorp admitted in the Restatement that the Bank failed to disclose

approximately $4.1 million in losses in 2011 suffered in its commercial loan portfolio. Accordingly, the Bank's net income and earnings per share for the fourth quarter of 2011 were materially misstated.

256.    In the Fourth Quarter 2011 Form 8-K, the Bank also reported loss reserve figures for the fourth quarter of 2011 and the full year 2011.  For the fourth quarter of 2011, the Bank reported (i) a $29.57 million allowance for loan and lease losses and (ii) a $4.84 million provision for loan and lease losses.  For the fiscal year 2011, the Bank reported (i) a $29.57 million allowance for loan and lease losses and (ii) a $21.5 million provision for loan and lease losses.

257.    These metrics were false and misleading when issued.  In the Restatement, Bancorp did not provide specific restated amounts for the provision and allowance for the fourth quarter of 2011 or the fiscal year 2011.  Nevertheless, Bancorp admitted in the Restatement that it failed to recognize approximately $4.1 million in losses for 2011, which should have been accounted for by increasing its provision and allowance for loan and lease losses.  Accordingly, the provision and allowance were understated by approximately $4.1 million for fiscal year 2011, and by material amounts for the fourth quarter.

258.    In the Fourth Quarter 2011 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth.  Specifically, Defendant Cohen stated that "[t]he fourth quarter saw a continuation in the growth of adjusted operating earnings, which increased 30% over the prior year fourth quarter resulting in a 61% increase for the quarter in net income.  This was achieved with increasing the provision for loan losses…Our focus on increasing non-interest income is also evident, especially for prepaid cards for which fee income increased 90% compared to the comparable prior year quarter."

259.     This statement was materially false and misleading when issued. It was materially false and misleading for Defendant Cohen to tout the Bank's earnings growth, including its supposed "61% increase for the quarter in net income," when the Bank was artificially inflating its net income by concealing approximately $4.1 million in losses for fiscal year 2011.

260.     On January 24, 2012, the Bank held a conference call with investors to discuss the Bank's fourth quarter 2011 and year-end results ("Fourth Quarter and Year-End 2011 Conference Call"). Addressing the Bank's prepaid business, Defendant Cohen stated: "On the expense side, we've been building what we hope will be a competitive advantage in our compliance group – a best in class compliance group, which is critical in the business in which we are. Some of the expense that is attributable to this department was reflected in the third quarter. But we think that the fourth quarter has captured all of that increased expense, so it's a good quarter to use as a baseline."

261.     This statement was materially misleading. It was materially misleading for Defendant Cohen to say that the Bank was building a "best in class compliance group" that was "critical" and that would give it a "competitive advantage" when the Bank's BSA compliance program was severely inadequate in numerous respects, as set forth in ¶¶98-107.

262.     On March 13, 2012, Bancorp filed with the SEC its Form 10-K for the year-ended December 31, 2011 ("2011 Form 10-K"). The 2011 Form 10-K reported the same financial results, including net income, total shareholders' equity, and retained earnings, set forth in ¶¶252, 254, 256, above, and was signed by Defendants Cohen and Frenkiel. As set forth above at ¶¶253, 255, 257, these financial results were materially false and misleading when issued.

263.     The 2011 Form 10-K also contained the following chart purporting to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," ""commercial mortgage," and "construction":

Age Analysis of Past Due Loans
As of December 31, 2011 and 2010

| December 31, 2011 | 30-59 Days Past Due | 60-89 Days Past Due | Greater Than 90 Days | Nonaccrual | Total Past Due | Current | Total Loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ - | $ 242 | $ 817 | $ 6,450 | $ 7,509 | $ 442,902 | $ 450,411 |
| Commercial mortgage | 278 | 1,763 | 1,597 | 3,672 | 7,310 | 602,177 | 609,487 |
| Construction | - | 825 | 942 | 4,949 | 6,716 | 239,895 | 246,611 |
| Direct lease financing | 1,230 | 606 | 745 | - | 2,581 | 127,101 | 129,682 |
| Consumer - other | - | - | - | 1,252 | 1,252 | 164,145 | 165,397 |
| Consumer - home equity | - | 2 | - | - | 2 | 43,642 | 43,644 |
| Residential mortgage | - | - | - | 1,264 | 1,264 | 94,846 | 96,110 |
| Unamortized costs | - | - | - | - | - | 3,486 | 3,486 |
| | $ 1,508 | $ 3,438 | $ 4,101 | $ 17,587 | $ 26,634 | $ 1,718,194 | $ 1,744,828 |

264.     The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize approximately $13.2 million in losses in its commercial loan portfolio. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

265.     In the 2011 Form 10-K, the Bank enumerated its obligations under the BSA and related regulations, and assured investors that it had "established" a "compliance program" in accordance with these obligations. Specifically, the 2011 Form 10-K stated as follows:

> *Bank Secrecy Act-Anti-Money Laundering and Related Regulations*. The Bank Secrecy Act, which we refer to as BSA, <u>requires the Bank to implement a risk-based compliance program</u> in order to protect the Bank from being used as a conduit for financial or other illicit crimes including but not limited to money laundering and terrorist financing. These rules are administered by the Financial

Crimes Enforcement Network, a bureau of the U.S. Treasury Department, which we refer to as FinCEN. Under the law, the Bank must have a board-approved written BSA-AML [Anti-Money Laundering] program which must contain the following key requirements: (1) appointing responsible persons to manage the program, including a BSA Officer; (2) ongoing training of all appropriate Bank Staff and management on BSA/AML compliance; (3) developing a system of internal controls (including appropriate policies, procedures and processes); and (4) requiring independent testing to ensure effective implementation of the program and appropriate compliance. Under BSA regulations, the Bank is subject to various reporting requirements such as currency transaction reporting (CTR) for all cash transactions initiated by or on behalf of a customer which, when aggregated, exceed $10,000 per day. The Bank is also required to monitor customer activity and transactions and file a suspicious activity report (SAR) when suspicious activity is observed and the applicable dollar threshold for the observed suspicious activity is met. The BSA also contains numerous recordkeeping requirements.

On June 21, 2010, FinCEN proposed new rules as directed by the Credit Card Accountability Responsibility and Disclosure Act of 2009 to expand the reach of BSA-AML related compliance responsibilities to certain defined "prepaid access providers and sellers, a class of money services businesses formerly either outside or lightly regulated under the BSA." On July 26, 2011, FinCEN issued its final rule imposing these affirmative BSA-AML compliance obligations. The Bank has evaluated the impact of these rules on its operations and its third-party relationships, and has established internal processes accordingly.

266. These statements were materially false and misleading. It was materially false and misleading for the Bank to represent that it had "established" a "compliance program" in accordance with its obligations under the BSA when, in reality, it had not. Indeed, as detailed above at ¶¶98-107, at the time the Bank issued the 2011 Form 10-K, the Bank was engaging in numerous BSA violations, and key aspects of its purported compliance program were either non-existent or woefully deficient. In particular:

a. contrary to the representations that the Bank satisfied the "key requirement" that it have "responsible persons to manage the program, including a BSA Officer," the Bank had no qualified BSA Officer during the Class Period, as detailed above at ¶102;

b. contrary to the representation that the Bank satisfied the "key requirement" that it have "ongoing training of all appropriate Bank staff and management on BSA-AML compliance," the Bank had no adequate training program during the Class Period, as detailed above at ¶104;

c. contrary to the representation that the Bank satisfied the "key requirement" that it have a "system of internal controls (including appropriate policies, procedures and processes)," the Bank had no "appropriate" system of internal controls during the Class Period, as detailed above at ¶103;

d. contrary to the representation that the Bank satisfied the "key requirement" that it have "independent testing to ensure effective implementation of the program and appropriate compliance," the Bank had no such independent testing program during the Class Period, as detailed above at ¶105; and

e. contrary to the representation that the Bank "monitor[ed] customer activity and transactions and file[ed] a suspicious activity report (SAR) when suspicious activity is observed," the Bank had no adequate system in place for monitoring suspicious activity or for filing accurate and timely SARs. ¶103.

267. The 2011 Form 10-K also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

F. **Materially False And Misleading Statements And Omissions Concerning The First Quarter of 2012**

268. On April 24, 2012, Bancorp issued a press release entitled "The Bancorp, Inc. Reports First Quarter 2012 Financial Results" ("First Quarter 2012 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("First Quarter 2012 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. The First Quarter 2012 Press Release and the First Quarter 2012 Form 8-K reported net income of $4.0 million compared to net income of $2.7 million for the prior year period and diluted earnings per share of $0.12 per share compared to $0.10 for the prior-year period.

269. The financial results set forth above were materially false and misleading when issued. While the Bank did not provide specific restated quarterly figures for net income and earnings per share, Bancorp admitted in the Restatement that the Bank failed to disclose nearly

$60 million in losses in its commercial loan portfolio for 2012. Accordingly, the Bank's net income and earnings per share for the first quarter of 2012 were materially misstated.

270.    In the First Quarter 2012 Form 8-K, the Bank also reported (i) a $5.22 million provision for loan and lease losses and (ii) a $31.5 million allowance for loan and lease losses.

271.    These metrics were false and misleading when issued. While Bancorp did not provide a specific restated amount for the provision and allowance for the first quarter of 2012, Bancorp admitted in the Restatement that it failed to recognize nearly $60 million in losses in its commercial loan portfolio in 2012, which should have been accounted for by increasing its provision and allowance for loan and lease losses. Accordingly, the provision and allowance for loan losses for the first quarter of 2012 were materially understated.

272.    In the First Quarter 2012 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth. Specifically, Defendant Cohen stated that "[f]irst quarter 2012 saw a continuation in our earnings growth as a result of significant increases in both our non-interest and net-interest income. Quarter net income of $4.0 million was achieved notwithstanding $1.5 million of other real estate owned (OREO charges) and an increase in the loan loss provision. Adjusted operating earnings, a non-GAAP measure, increased to $12.9 million, a $4.0 million, or 44% increase over the prior year period. Our position as a leader in the prepaid card space continues to drive the increase in non-interest income. On the asset side, we grew our loans 7% over the year in a difficult lending environment."

273.    This statement was materially false and misleading when issued. It was materially false and misleading for Defendant Cohen to state that the Bank "saw a continuation in [its] earnings growth as a result of significant increases in both [its] non-interest and net-

interest income," and to identify the expansion of the loan portfolio as a driver of that growth, when the Bank was concealing nearly $60 million in losses for 2012 in its commercial loan portfolio.

274.    On April 25, 2012, the Bank held a conference call with investors to discuss the 2012 first quarter results (the "First Quarter 2012 Conference Call").  On that call, Defendant Cohen made misleading statements designed to assure investors that the Bank was continuing to disclose problem loans in the commercial loan portfolio, and downplayed the Bank's credit problems.  Defendant Cohen told investors: "We had an increase in nonperforming assets, but I would remind you that it was a small increase and it was off a relatively low base for our peers for this time in the economy.  We remain at a low level in terms of loans, both 90 days past due, which were around the $4.5 million level, and loans 30 to 89 days, which were at about $4 million.  Those numbers have remained constant over several quarters."

275.    This statement was materially false and misleading.  It was materially false and misleading for Defendant Cohen to represent that the Bank had low levels of delinquent and nonperforming loans, when the Bank was concealing approximately $13.2 million in losses suffered in its commercial loan portfolio from 2010 through 2011, and was in the process of concealing nearly $60 million in additional loan losses suffered in 2012, and failing to take required reserves and charge-offs.

276.    On May 10, 2012, Bancorp filed with the SEC its Form 10-Q for the quarter ended March 31, 2012 ("First Quarter 2012 Form 10-Q").  The First Quarter 2012 Form-10-Q reported the same misstated financial results, including net income and earnings per share, set forth in ¶¶268, 270, above.  As set forth above at ¶¶269, 271, these financial results were materially false and misleading when issued.

277. The First Quarter 2012 Form 10-Q also contained the following chart, which purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

Age Analysis of Past Due Loans

| March 31, 2012 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ - | $ 241 | $ 955 | $ 6,018 | $ 7,214 | $ 438,698 | $ 445,912 |
| Commercial mortgage | - | - | 1,900 | 3,609 | 5,509 | 612,362 | 617,871 |
| Construction | 3,009 | - | 667 | 10,375 | 14,051 | 234,181 | 248,232 |
| Direct lease financing | 1,260 | 54 | 392 | - | 1,706 | 128,615 | 130,321 |
| Consumer - other | - | - | - | 927 | 927 | 163,380 | 164,307 |
| Consumer - home equity | - | 20 | - | - | 20 | 44,257 | 44,277 |
| Residential mortgage | - | - | - | - | - | 94,438 | 94,438 |
| Unamortized costs | - | - | - | - | - | 3,509 | 3,509 |
| | $ 4,269 | $ 315 | $ 3,914 | $ 20,929 | $ 29,427 | $ 1,719,440 | $ 1,748,867 |

278. The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize approximately $13.2 million in losses in its commercial loan portfolio, and for fiscal year 2012, the Bank failed to recognize nearly $60 million in losses in its commercial loan portfolio. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

279. The First Quarter 2012 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

280.    On July 23, 2012, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Second Quarter 2012 Financial Results" ("Second Quarter 2012 Press Release").  That same day, the Bank filed with the SEC a Form 8-K ("Second Quarter 2012 Form 8-K"), which Defendant Frenkiel signed, that included the press release an exhibit.  The Second Quarter 2012 Press Release and the Second Quarter 2012 Form 8-K reported another large increase in profits, reporting net income of $3.9 million, compared to net income of $666,000 for the prior-year period, and diluted earnings per share of $0.12, compared to $0.02 for the prior-year period.

281.    The financial results set forth above were materially false and misleading when issued.  While the Bank did not provide specific restated quarterly figures for net income and earnings per share, Bancorp admitted in the Restatement that the Bank failed to disclose nearly $60 million in losses suffered in its commercial loan portfolio in 2012.  Accordingly, the Bank's net income and earnings per share for the second quarter of 2012 were materially misstated.

282.    In the Second Quarter 2012 Form 8-K, the Bank also reported (i) a $31.17 million allowance for loan and leases losses, and (ii) a $4.29 million provision for loan and lease losses.

283.    These metrics were false and misleading when issued.  While Bancorp did not provide a specific restated amount for the provision and allowance for the second quarter of 2012, Bancorp admitted in the Restatement that it failed to recognize nearly $60 million in losses in its commercial loan portfolio in 2012, which should have been accounted for by increasing its provision and allowance for loan and lease losses.  Accordingly, the provision and allowance for loan losses for the second quarter 2012 were materially understated.

284.    In the Second Quarter 2012 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth.  Specifically, Defendant

Cohen stated that "[s]econd quarter 2012 saw a continuation in our earnings growth as a result of significant increases in both our non-interest and net interest income. Adjusted operating earnings, a non-GAAP measure, increased to $10.8 million, a $3.1 million, or 40% increase over the comparable year period. Our position as a leader in the prepaid card space continues to drive the increase in non-interest income. On the asset side, we grew our loans 7% over the year in a difficult lending environment."

285. This statement was materially false and misleading when issued. It was materially false and misleading for Defendant Cohen to state that the Bank had achieved "a continuation in [its] earnings growth as a result of significant increases in both [its] non-interest and net interest income," and to identify the loan portfolio as a driver of that growth, when the Bank was concealing losses of nearly $60 million for fiscal year 2012 in its commercial loan portfolio.

286. On August 9, 2012, Bancorp filed with the SEC its Form 10-Q for the quarter ended June 30, 2012 ("Second Quarter 2012 Form 10-Q"). The Second Quarter 2012 Form 10-Q reported the same misstated financial results, including net income, earnings per share, provision for loan and lease losses and allowance for loan and lease losses, set forth above in ¶¶280, 282. As set forth above ¶¶281, 283, these financial results were materially false and misleading when issued.

287. The Second Quarter 2012 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

Age Analysis of Past Due Loans

| June 30, 2012 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 670 | $ - | $ 540 | $ 9,536 | $ 10,746 | $ 430,421 | $ 441,167 |
| Commercial mortgage | - | 5,628 | 1,632 | 5,559 | 12,819 | 583,820 | 596,639 |
| Construction | 1,823 | 2,690 | 667 | 8,698 | 13,878 | 255,758 | 269,636 |
| Direct lease financing | - | 99 | 266 | - | 365 | 139,647 | 140,012 |
| Consumer - other | 75 | 2 | - | - | 77 | 211,415 | 211,492 |
| Consumer - home equity | - | - | - | 927 | 927 | 43,350 | 44,277 |
| Residential mortgage | - | - | - | 95 | 95 | 97,131 | 97,226 |
| Unamortized costs | - | - | - | - | - | 3,863 | 3,863 |
| | $ 2,568 | $ 8,419 | $ 3,105 | $ 24,815 | $ 38,907 | $ 1,765,405 | $ 1,804,312 |

288.   The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize over $13 million in losses in its commercial loan portfolio, and for fiscal year 2012, the Bank failed to recognize nearly $60 million in losses in its commercial loan portfolio. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

289.   The Second Quarter 2012 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants' SOX Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

### H.    Materially False And Misleading Statements Concerning The Third Quarter 2012

290.   On October 23, 2012, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Third Quarter 2012 Financial Results" ("Third Quarter 2012 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("Third Quarter 2012 Form 8-K"), which

Defendant Frenkiel signed, that included the press release as an exhibit. The Third Quarter 2012 Press Release and the Third Quarter Form 8-K reported net income of $3.6 million compared to $2.3 million for the prior-year period and earnings per share of $0.11, compared to $0.07 for the prior-year period.

291.    The financial results set forth above were materially false and misleading when issued. While the Bank did not provide specific quarterly restated figures for net income and earnings per share, Bancorp admitted in the Restatement that the Bank failed to disclose nearly $60 million in losses for 2012 suffered in its commercial loan portfolio. Accordingly, the Bank's reported net income and earnings per share for the third quarter of 2012 were materially misstated.

292.    In the Third Quarter 2012 Form 8-K, the Bank also reported (i) a $33.07 million allowance for loan and lease losses and (ii) a $5.54 million provision for loan and lease losses.

293.    These metrics were false and misleading when issued. Although Bancorp did not provide a specific restated amount for the provision and allowance for the third quarter of 2012, Bancorp admitted in the Restatement that it failed to recognize nearly $60 million in losses in its commercial loan portfolio for 2012, which should have been accounted for by increasing its provision and allowance for loan and lease losses. Accordingly, the provision and allowance for loan losses for the third quarter of 2012 were materially understated.

294.    In the Third Quarter 2012 Press Release and Form 8-K, Defendant Cohen also made statements concerning the Bank's purported earnings growth. Specifically, Defendant Cohen stated that "[t]hird quarter 2012 saw a continuation in our earnings growth as a result of significant increases in both our non-interest and net interest income. Adjusted operating earnings, a non-GAAP measure, increased to $11.3 million, a $2.8 million, or 32% increase over

the comparable prior year period.  Our position as a leader in the prepaid card space continues to drive the increase in non-interest income.  On the asset side, we grew our loans 9% over the year in a difficult lending environment."

295.    This statement was materially false and misleading when issued.  It was materially false and misleading for Defendant Cohen to state that the Bank saw a "continuation in [its] earnings growth as a result of significant increases in both [its] non-interest and net interest income," and to identify the loan portfolio as a driver of that growth, when the Bank was concealing losses of nearly $60 million for fiscal year 2012 in the commercial loan portfolio.

296.    On October 24, 2012, the Bank held a conference call with investors to discuss its 2012 third quarter results (the "Third Quarter 2012 Conference Call").  On that call, Defendant Cohen addressed the Bank's increase in credit costs, saying that "[o]ur credit costs remain high and—or higher than we would wish.  We think that it is a result of the economy and we are working our way through the legacy portfolio…We do think that it will peter out during 2013."

297.    On the same Third Quarter 2012 Conference Call, in response to an analyst's credit regarding the Bank's "credit challenges," Defendant Cohen stated that:

> [O]ne of the things that occurs in this marketplace and in a very prolonged downturn in the economy is that borrowers lose heart, that they get discouraged and that the normal responses of these very seasoned borrowers and in many cases people to whom we have been lending over many credit cycles over a 25 or 30-year period, this has been such a prolonged credit cycle downturn that they really have not – they really just get discouraged I guess would be the best way to put it. And that can come relatively suddenly and in an unpredictable way.

298.    The statements above were materially misleading.  It was materially misleading for Defendant Cohen to state that the Bank's credit problems were the "result of the economy" and borrowers losing heart and getting "discouraged," and that that the credit issues "would peter out during 2013" when, in reality, the Bank was concealing nearly $60 million in loan losses in

its commercial loan portfolio during 2012, and was engaged in the "extend and pretend" scheme to conceal material amounts of past due loans, as set forth above ¶66-81.

299.    On November 9, 2012, Bancorp filed its Form 10-Q for the quarter ended September 30, 2012 ("Third Quarter 2012 Form 10-Q").  The Third Quarter 2012 Form 10-Q reported the same financial results, including net income, earnings per share, provision for loan and lease losses and allowance for loan and lease losses, as set forth above in ¶¶290, 292.  As set forth above at ¶¶291, 293, these financial results were materially false and misleading when issued.

300.    The Third Quarter 2012 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

| September 30, 2012 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 1,357 | $ 1,500 | $ 107 | $ 7,654 | $ 10,618 | $ 442,826 | $ 453,444 |
| Commercial mortgage | 1,042 | - | 3,077 | 8,894 | 13,013 | 601,397 | 614,410 |
| Construction | - | - | 667 | 8,886 | 9,553 | 254,173 | 263,726 |
| Direct lease financing | 788 | 1,026 | 8 | - | 1,822 | 144,906 | 146,728 |
| Consumer - other | 1,091 | - | 2 | - | 1,093 | 231,057 | 232,150 |
| Consumer - home equity | - | 420 | - | 927 | 1,347 | 42,930 | 44,277 |
| Residential mortgage | - | - | - | 93 | 93 | 97,496 | 97,589 |
| Unamortized costs | - | - | - | - | - | 4,668 | 4,668 |
| | $ 4,278 | $ 2,946 | $ 3,861 | $ 26,454 | $ 37,539 | $ 1,819,453 | $ 1,856,992 |

301.    The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, for fiscal years 2010 and 2011, the Bank failed to recognize approximately $13.2 million in losses in its commercial loan portfolio, and for fiscal year 2012, the Bank failed to recognize nearly $60 million in losses in its commercial loan portfolio.

Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

302.    The Third Quarter 2012 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.   Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

## I.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter 2012 And Year End 2012

303.    On January 23, 2013, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Fourth Quarter and Fiscal 2012 Financial Results" ("Fourth Quarter 2012 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("Fourth Quarter 2012 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit.   In the Fourth Quarter 2012 Press Release and the Fourth Quarter 2012 Form 8-K, the Bank reported supposedly large increases in profit for the fiscal year 2012.   Specifically, the Bank reported $16.62 million in net income for 2012, compared to $8.98 million for the prior-year period, and diluted earnings per share of $0.50 for the year, compared to $0.28 in the prior year. The Bank also reported net interest income of $63.0 million after the provision for loan and lease losses for fiscal year 2012.   The Bank further reported (i) a $33.04 million allowance for loan and lease losses and (ii) a $22.44 million provision for loan and lease losses for the year ended December 31, 2012.   For fiscal year 2012, the Bank further reported total loans of $1.87 billion, total commercial loans of $1.35 billion, a ratio of allowance to total loans of 1.74%, total shareholders' equity of $336.68 million, and retained earnings of $7.35 million.

304.    The financial results set forth above were materially false and misleading when issued.   As Bancorp admitted in the Restatement, its improper accounting caused its fiscal year

2012 net income, earnings per share, provision and allowance for loan and lease losses, total

loans, total commercial loans, the ratio of the allowance to total loans, total shareholders' equity

and retained earnings to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Fiscal Year 2012**

| | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| **Net Income (Loss)** | $16.62 million | ($43.15 million) | 359.6% |
| **Diluted EPS** | $0.50 | ($1.30) | 360% |
| **Basic EPS** | $0.50 | ($1.30) | 360% |
| **Provision for Loan and Lease Losses** | $22.44 million | $112.93 million | 403.3% |
| **Allowance for Loan and Lease Losses** | $33.04 million | $58.89 million | 78.2% |
| **Net Interest Income After Provision for Loan and Lease Losses** | $63.0 million | ($28.23 million) | 144.8% |
| **Total Loans** | $1.87 billion | $1.76 billion | 6% |
| **Total Commercial Loans** | $1.35 billion | $1.16 billion | 6.4% |
| **Ratio of the Allowance to Total Loans** | 1.74% | 3.24% | 86.6% |
| **Total Shareholders' Equity** | $336.68 million | $263.73 million | 21.7% |
| **Retained Earnings (Accumulated Deficit)** | $7.35 million | ($65.59 million) | 992.9% |

305.    The Fourth Quarter 2012 Press Release and the Fourth Quarter 2012 Form 8-K

also reported financial results for the fourth quarter of 2012.  Specifically, for the fourth quarter

2012, the Bank reported net income of $5.2 million compared to $3.3 million for the prior-year

period, and diluted earnings per share of $0.15 for the quarter, compared to $0.10 for the prior

year period.

306. The financial results set forth above were materially false and misleading when issued. The Bank did not provide restated figures for net income and earnings per share for the fourth quarter of 2012, but Bancorp admitted in the Restatement that the Bank failed to disclose nearly $60 million in losses in 2012 suffered in its commercial loan portfolio. Accordingly, the Bank's net income and earnings per share for the fourth quarter of 2012 were materially misstated.

307. In the Fourth Quarter 2012 Form 8-K, the Bank further reported for the fourth quarter of 2012 (i) a $33.04 million allowance for loan and lease losses and (ii) a $7.39 million provision for loan and lease losses for the fourth quarter.

308. These metrics were false and misleading when issued. Bancorp did not provide specific restated quarterly figures for the provision and allowance for the fourth quarter of 2012, but Bancorp admitted in the Restatement that it failed to recognize nearly $60 million in losses in the commercial loan portfolio in 2012, which should have been reflected in the provision and allowance for loan and lease losses. Accordingly, the provision and allowance for loan losses for the fourth quarter of 2012 were materially understated.

309. In the Fourth Quarter 2012 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth. Specifically, Defendant Cohen stated that "[f]ourth quarter 2012 saw a significant earnings increase as a result of increases in both our non-interest and net interest income. Adjusted operating earnings, a non-GAAP measure, increased to $13.9 million, a $4.5 million, or 48% increase over the comparable year period. Notwithstanding increased loan loss provisions, our net income and earnings per share increased 59% and 50%, respectively…Our leadership position in the prepaid card space

continues as the major driver of the increase in non-interest income. On the asset side, we grew our loans 10% over the year in a difficult lending environment."

310. The statements above were materially false and misleading. It was materially false and misleading for Defendant Cohen to state that the Bank experienced "significant earnings increase," and that its net income had increased 59%, when the Bank's reported net income for 2012 was materially overstated by 360%, as set forth directly above in ¶304. Indeed, rather than achieving net income of $16.6 million, as the Bank publicly reported, in reality, the Bank had experienced a net loss of $43.1 million for 2012. It was also materially false and misleading for Defendant Cohen to identify the loan portfolio as a driver of the Bank's purported earnings growth when the Bank was concealing approximately $60 million in losses for 2012 in the commercial loan portfolio.

311. On January 24, 2013, the Bank held a conference call with investors to discuss the 2012 fourth quarter and year-end results (the "Fourth Quarter and Year-End 2012 Conference Call"). On that call, Defendant Cohen made misleading statements designed to assure investors that the credit quality in the Bank's commercial loan portfolio was steady, and that problem loans were actually declining. Specifically, Defendant Cohen stated: "loan quality remains steady. Nonperforming assets as a percentage of assets actually decreased to 92 basis points of assets at the end of 2012 from 97 basis points as a percentage of assets in the fourth quarter of 2011."

312. The statements above in ¶311 were materially false and misleading. It was false and misleading for Defendant Cohen to say that "loan quality remained steady" and the amount of nonperforming loans was decreasing when, in reality, the Bank was concealing nearly $60 million in losses in the commercial loan portfolio for 2012 alone.

313.     On March 18, 2013, Bancorp filed with the SEC its Form 10-K for the year ended December 31, 2012 ("2012 Form 10-K").  The 2012 Form 10-K was signed by Defendants Cohen and Frenkiel, and reported the same financial results, including net income, earnings per share, provision for loan and lease losses, allowance for loan and lease losses, net interest income after provision for loan and lease losses, total loans, total commercial loans, ratio of the allowance to total loans, total shareholders' equity and retained earnings, set forth in ¶¶303, 305, 307.  As set forth above at ¶¶304, 306, 308, these financial results were materially false and misleading when issued.

314.     The 2012 Form 10-K also contained the following chart purporting to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

| December 31, 2012 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Nonaccrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $        - | $   5,750 | $   1,350 | $  10,459 | $  17,559 | $  452,550 | $  470,109 |
| Commercial mortgage | 686 | 300 | 2,412 | 9,175 | 12,573 | 604,496 | 617,069 |
| Construction | - | - | 667 | 4,538 | 5,205 | 253,479 | 258,684 |
| Direct lease financing | 1,313 | 1,168 | 6 | - | 2,487 | 154,210 | 156,697 |
| Consumer - other | 330 | 99 | - | 927 | 1,356 | 251,915 | 253,271 |
| Consumer - home equity | 2 | 6 | - | - | 8 | 43,636 | 43,644 |
| Residential mortgage | 749 | 1,175 | - | 91 | 2,015 | 95,702 | 97,717 |
| Unamortized costs | - | - | - | - | - | 5,663 | 5,663 |
| | $   3,080 | $   8,498 | $   4,435 | $  25,190 | $  41,203 | $ 1,861,651 | $ 1,902,854 |

315.     The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, from 2010 through 2012, the Bank failed to recognize approximately $73.2 million in losses in its commercial loan portfolio, including nearly $60

million in losses in fiscal year 2012 alone. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

316. The 2012 Form 10-K also contained the same statements regarding the Bank's BSA compliance as described above at ¶265. These statements were materially false and misleading for the reasons set forth above at ¶266.

317. The Form 10-K also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

J.     **Materially False And Misleading Statements**
       **And Omissions Concerning The First Quarter 2013**

318. On April 24, 2013, Bancorp issued a press release entitled "The Bancorp, Inc. Reports First Quarter 2013 Financial Results" ("First Quarter 2013 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("First Quarter 2013 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. The First Quarter 2013 Press Release and the First Quarter Form 8-K reported net income of $7.41 million, an increase of nearly 100% compared to net income of $4.0 million for the prior-year period. Bancorp further reported net interest income after provision for loan and lease losses of $17.18 million. The Bank also reported (i) a $5.5 million provision for loan and lease losses, and (ii) a $34.83 million allowance for loan and lease losses. For the first quarter of 2012, the Bank further reported total loans of $1.93 billion, total commercial loans of $1.42 billion, ratio of allowance to total loans of 1.77%, total shareholders' equity of $346.08 million and retained earnings of $14.75 million.

319. Bancorp's financial results reported for the first quarter of 2013 were materially false and misleading when issued. As Bancorp admitted in the Restatement, Bancorp's improper

accounting practices caused its first quarter 2013 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for First Quarter 2013**

|  | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| **Net Income (Loss)** | $7.41 million | ($10.82 million) | 246.2% |
| **Diluted EPS** | $0.20 | ($0.29) | 245% |
| **Basic EPS** | $0.20 | ($0.29) | 245% |
| **Provision for Loan and Lease Losses** | $5.5 million | $17.84 million | 224.3% |
| **Allowance for Loan and Lease Losses** | $34.88 million | $63.87 million | 83.1% |
| **Net Interest Income After Provision for Loan and Lease Losses** | $17.18 million | $4.44 million | 74.1% |
| **Total Loans** | $1.93 billion | $1.81 billion | 6.4% |
| **Total Commercial Loans** | $1.42 billion | $1.32 billion | 6.7% |
| **Ratio of the Allowance to Total Loans** | 1.77% | 3.41% | 92.4% |
| **Total Shareholders' Equity** | $346.08 million | $254.90 million | 26.3% |
| **Retained Earnings (Accumulated Deficit)** | $14.75 million | ($76.42 million) | 618% |

320.     In the First Quarter 2013 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth.  Specifically, Defendant Cohen stated that "[f]or the quarter ending March 31, 2013, Bancorp experienced increased operating earnings of $17.3 million, an increase of $4.5 million or 25% from the quarter ending March 31, 2012.  This growth was propelled by increases both in net interest and non-interest

income. These drivers resulted in growth of 86% in net income, 67% in earnings per diluted share and an efficiency ratio of 59% (down from 66% a year ago)."

321. This statement was materially false and misleading when issued. It was materially false and misleading for Defendant Cohen to state that the Bank had experienced growth in net income of 86% when the Bank's reported net income for the first quarter of 2013 was materially overstated by over 246%, as set forth directly above in ¶319. Indeed, rather than achieving net income of $7.4 million, as the Bank publicly reported, in reality, the Bank had actually experienced a net income loss of $10.8 million. Similarly, it was materially false and misleading for Defendant Cohen to state that the Bank had experienced growth of 67% in diluted earnings per share when the Bank's reported diluted earnings per share was materially overstated by 245%, as set forth directly above in ¶319. Indeed, rather than achieving diluted earnings per share of $0.20, as the Bank publicly reported, in reality, the Bank had actually experienced a loss per diluted share of $0.29.

322. On April 25, 2013, the Bank held a conference call with investors to discuss its 2013 first quarter results (the "First Quarter 2013 Conference Call"). On that call, Defendant Cohen made misleading statements designed to assure investors that the credit quality in the Bank's commercial loan portfolio was improving. Specifically, Defendant Cohen reassured investors that "although non-accruing loans, plus 90 days, the nonperforming category was up, it is also important to look at the fact that total past dues were down and that net charge-offs were also down … anything 30 days and greater past due has been very stable and continues to go down."

323. This statement was materially false and misleading. It was materially false and misleading for Defendant Cohen to represent that total past due loans and charge offs "were

down," and that past due loans were "very stable and continue[] to go down," when the Bank was concealing approximately $18.2 million in losses in the commercial loan portfolio in the first quarter of 2013, as set forth above at ¶319.

324.    On May 10, 2013, Bancorp filed with the SEC its Form 10-Q for the quarter ended March 31, 2013 ("First Quarter 2013 Form 10-Q").  The First Quarter 2013 Form 10-Q reported the same misstated financial results, including earnings per share, provision and allowance for loan and lease losses, net interest income after the provision, total loans, total commercial loans, the ratio of the allowance to total loans, total shareholders' equity and retained earnings, as set forth in ¶318, above.  As set forth above at ¶319, these financial results were materially false and misleading.

325.    The First Quarter 2013 Form 10-Q also contained the following chart, which purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

| March 31, 2013 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $    570 | $         - | $          - | $   16,242 | $   16,812 | $   460,878 | $   477,690 |
| Commercial mortgage | - | 681 | - | 14,059 | 14,740 | 659,176 | 673,916 |
| Construction | 1,069 | - | - | 2,745 | 3,814 | 259,765 | 263,579 |
| Direct lease financing | 1,338 | 93 | 116 | - | 1,547 | 155,961 | 157,508 |
| Consumer - other | 519 | - | - | 927 | 1,446 | 250,647 | 252,093 |
| Consumer - home equity | - | - | - | - | - | 44,277 | 44,277 |
| Residential mortgage | - | - | 1,175 | 90 | 1,265 | 92,973 | 94,238 |
| Unamortized costs | - | - | - | - | - | 5,589 | 5,589 |
| | $   3,496 | $    774 | $   1,291 | $   34,063 | $   39,624 | $ 1,929,266 | $ 1,968,890 |

326.    The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank

admitted in the Restatement, from 2010 through the first quarter of 2013, the Bank failed to recognize approximately $91.4 million in losses in its commercial loan portfolio, including approximately $18.2 million in losses in its commercial loan portfolio for the first quarter of 2013 alone. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

327. In the First Quarter 2013 Press Release and during the First Quarter 2013 Conference Call, Defendants made additional false and misleading statements concerning the Bank's prepaid business. For instance, in the First Quarter 2013 Press Release, Defendant Cohen reported growth in net income of 86% year-over-year, growth in noninterest income of 35% year-over-year, and attributed this growth to the Bank's prepaid business, stating that "[o]ur leadership position in the prepaid card industry is the primary vector of growth."

328. This statement was materially misleading. It was materially misleading for Defendant Cohen to emphasize that the prepaid business was the "primary" driver of the Bank's "growth" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

329. Defendants made additional materially misleading statements about the prepaid business during the First Quarter 2013 Conference Call. For instance, in response to a question from an analyst about the Bank's new business in the prepaid segment, Defendant Mastrangelo underscored the success and "very strong" growth of the Bank's prepaid business, stating that:

> <u>New business prospects continue to be very strong.</u> I think we talked a little bit about this last quarter. We continue to see new entrants into our pipeline for varying reasons, including Durbin-related conversions, still conversions from other institutions and new entrants into the space so the industry—the overall industry growth rate continues to look very healthy. <u>And our prospects in pipeline are very strong. We added a number of new clients during the quarter none of which have been publicly announced yet, all of which are nice adds to the book of business.</u>

330.     This statement was materially misleading.  It was materially misleading for Defendant Mastrangelo to state that the growth and "new business" in the prepaid segment was "very strong" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

331.     The First Quarter 2013 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.  Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**K.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2013**

332.     On July 24, 2013, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Second Quarter 2013 Financial Results" ("Second Quarter 2013 Press Release").  That same day, the Bank filed with the SEC a Form 8-K ("Second Quarter 2013 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit.  The Second Quarter 2013 Press Release and the Second Quarter Form 8-K reported a $40.27 million allowance for loan and lease losses.  For the Second Quarter of 2013, the Bank also reported $1.93 billion in total loans, $1.39 billion in total commercial loans, ratio of allowance to total loans of 2.05%, total shareholders' equity of $344.19 million, and retained earnings of $19.99 million.

333.     Bancorp's financial results reported for the second quarter of 2013 were materially false and misleading when issued.  As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its second quarter 2013 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Second Quarter 2013**

| | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| **Allowance for Loan and Lease Losses** | $40.27 million | $65.67 million | 63.1% |
| **Total Loans** | $1.93 billion | $1.80 billion | 6.4% |
| **Total Commercial Loans** | $1.39 billion | $1.30 billion | 7% |
| **Ratio of the Allowance to Total Loans** | 2.05% | 3.51% | 71.6% |
| **Total Shareholders' Equity** | $344.19 million | $260.15 million | 24.4% |
| **Retained Earnings (Accumulated Deficit)** | $19.99 million | ($64.05 million) | 420.4% |

334.     On July 25, 2013, the Bank held a conference call with investors to discuss its second quarter 2013 results (the "Second Quarter 2013 Conference Call").    On that call, Defendant Cohen made misleading statements designed to assure investors that any credit issues the Bank was experiencing, including an increase in nonaccruing loans, were minimal, and the Bank was proactively identifying its problem loans.   Defendant Cohen specifically stated that that the "increase in nonaccrual loans [was] a result of a single relationship, not a single credit, which we consider to be secured.   We have decided as you can see from the decrease in loans in the 90-day plus still accruing category, that we are tending to put loans directly into nonaccrual … even if it were to be our conclusion that they were well secured and could continue to pay interest…we are tending to put them into non-accrual as a result of our desire to get through those issues that we have spoken about before, which are expense drags on earnings in the Community Bank portfolio."

335.     On the same conference call, responding to an analyst's question regarding whether credit was improving, Defendant Cohen stated that "I think we have identified a

significant percentage of our issues…So could there be more loss, or could there be more issues in it?  Of course, there could be.  But we think we have been very diligent in identifying and identifying early."

336.    The statements above in ¶¶334-35 were materially false and misleading.  It was materially false and misleading for Defendant Cohen to state that the Bank was "put[ting] loans directly into nonaccrual" even if they were not at risk, and that the Bank had  been "very diligent in identifying [problem loans] and identifying [them] early," when the Bank had concealed approximately $60 million in losses in its commercial loan portfolio for 2012, and was in the process of concealing nearly $40 million in losses in its commercial loan portfolio in fiscal year 2013.

337.    On August 9, 2013, Bancorp filed with the SEC its Form 10-Q for the quarter ended June 30, 2013 ("Second Quarter 2013 Form 10-Q").  The Second Quarter 2013 Form 10-Q reported the same misstated financial results, including allowance for loan and lease losses, total loans, total commercial loans, ratio of the allowance to total loans, total shareholders' equity, and retained earnings, set forth in ¶332, above.  As set forth above at ¶333, these financial results were materially false and misleading.

338.    The Second Quarter 2013 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," commercial mortgage," and  "construction":

| June 30, 2013 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 3,921 | $ 3,005 | $ - | $ 26,935 | $ 33,861 | $ 447,676 | $ 481,537 |
| Commercial mortgage | - | 7,171 | - | 9,324 | 16,495 | 634,539 | 651,034 |
| Construction | - | - | - | 2,352 | 2,352 | 264,559 | 266,911 |
| Direct lease financing | 3,436 | 505 | 63 | - | 4,004 | 168,246 | 172,250 |
| Consumer - other | 330 | 51 | 692 | 1,116 | 2,189 | 249,110 | 251,299 |
| Consumer - home equity | 106 | 61 | - | - | 167 | 44,110 | 44,277 |
| Residential mortgage | - | - | - | 2,016 | 2,016 | 91,944 | 93,960 |
| Unamortized costs | - | - | - | - | - | 6,114 | 6,114 |
| | $ 7,793 | $ 10,793 | $ 755 | $ 41,743 | $ 61,084 | $ 1,906,298 | $ 1,967,382 |

339. The past due and non accrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, from 2010 through the second quarter of 2013, the Bank failed to recognize approximately $84 million in losses in its commercial loan portfolio. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

340. In the Second Quarter 2013 Press Release and during the Second Quarter 2013 Conference Call, Defendants made additional false and misleading statements concerning the Bank's prepaid business. For instance, in the Second Quarter 2013 Press Release, Defendant Cohen reported growth in net income of 45% year-over-year and growth in noninterest income of 107% year-over-year, and attributed this growth to the Bank's prepaid business, stating that "Our leadership position in the prepaid card industry is a primary vector of growth."

341. This statement was materially misleading. It was materially misleading for Defendant Cohen to state that the prepaid business was a "primary" driver of the Bank's "growth" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

342. Defendants made additional materially misleading statements about the prepaid business during the Second Quarter 2013 Conference Call. For example, Defendant Mastrangelo stated that he was "confident in saying that we'll continue to outpace the growth of the industry."

343. This statement was materially misleading. It was materially misleading for Defendant Mastrangelo to state that he was "confident" that the Bank would "continue to outpace the growth of the [prepaid] industry" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

344. The Second Quarter 2013 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**L.    Materially False And Misleading Statements
And Omissions Concerning The Third Quarter 2013**

345. On October 24, 2013, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Third Quarter 2013 Financial Results" ("Third Quarter 2013 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("Third Quarter 2013 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. The Third Quarter 2013 Press Release and the Third Quarter Form 8-K reported net income of $4.79 million, compared to net income of $3.6 million for the prior-year period. Bancorp further reported net interest income after provision for loan and lease losses of $16.12 million. The Bank also reported (i) a $39.15 million allowance for loan and lease losses and (ii) a $8.0 million provision for loan and lease losses. For the third quarter of 2013, the Bank further reported total loans of $1.95 billion,

total commercial loans of $1.38 billion, ratio of allowance to total loans of 1.97%, total shareholders' equity of $353.33 million, and retained earnings of $20.29 million.

346.    Bancorp's financial results reported for the third quarter of 2013 were materially false and misleading when issued.  As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its third quarter 2013 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Third Quarter 2013**

|  | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| Net Income (Loss) | $4.79 million | $1.2 million | 74.9% |
| Diluted EPS | $0.13 | $0.03 | 76.9% |
| Basic EPS | $0.13 | $0.03 | 76.9% |
| Provision for Loan and Lease Losses | $8.0 million | $11.86 million | 48.3% |
| Allowance for Loan and Lease Losses | $39.15 million | $66.10 million | 68.8% |
| Net Interest Income After Provision for Loan and Lease Losses | $16.12 million | $11.91 | 26.1% |
| Total Loans | $1.95 billion | $1.82 billion | 6.5% |
| Total Commercial Loans | $1.38 billion | $1.28 billion | 7.3% |
| Ratio of the Allowance to Total Loans | 1.97% | 3.50% | 77.8% |
| Total Shareholders' Equity | $353.33 million | $265.70 million | 24.8% |
| Retained Earnings (Accumulated Deficit) | $20.29 million | ($67.34 million) | 431.9% |

347.    In the Third Quarter 2013 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth.  Specifically, Defendant Cohen stated that "[o]ur earnings growth in the third quarter reflected increases both in net

interest and non-interest income.  These drivers resulted in growth of 35% in net income, 34% in adjusted operating earnings and 18% in earnings per diluted share.  Our leadership position in the prepaid card industry is the primary vector of growth and related fee income increased 36% to $10.2 million for the quarter, compared to the prior year quarter."

348.    This statement was materially false and misleading when issued.  It was materially false and misleading for Defendant Cohen to state that the Bank had achieved 35% growth in net income when the Bank's reported net income for the third quarter of 2013 was materially overstated by almost 75%, as set forth directly above in ¶346.  Indeed, rather than achieving net income of $4.79 million, as the Bank publicly reported, in reality, the Bank actually had net income of $1.2 million. Similarly, it was materially false and misleading for Defendant Cohen to state that the Bank had experienced growth of 18% in diluted earnings per share when the Bank's reported diluted earnings per share was materially overstated by 76.9%, as set forth directly above in ¶346.  Indeed, rather than achieving diluted earnings per share of $0.13, as the Bank publicly reported, in reality, the Bank had actually experienced a loss per diluted share of $0.03.

349.    On October 25, 2013, the Bank held a conference call with investors to discuss its 2013 third quarter results (the "Third Quarter 2013 Conference Call").  On that call, Defendant Cohen made misleading statements designed to assure investors that the credit quality in the Bank's commercial loan portfolio was improving, and Bancorp had been "aggressive" and "proactive" in disclosing its "troubled loans."  Specifically, Defendant Cohen stated that:

> I suppose the good news in terms of credit is that the inbound indicator of troubled loans, which is the 30-to 89-day category, was reduced from $18.5 million at the end of the second quarter to $5.4 million at the end of the third quarter.  We've been very aggressive in trying to move these troubled loan situations through the system on a very proactive way.  And that has resulted in

90 days plus of being only roughly $200,000…essentially cleaned that category out.

350.    This statement was materially false and misleading.  It was materially false and misleading for Defendant Cohen to represent that Bancorp was "very aggressive" and "very proactive" in disclosing and accounting for "troubled loans," when the Bank was concealing approximately $87.6 million in losses suffered from 2010 through the third quarter of 2013, including approximately $3.6 million in the third quarter of 2013 alone, and failing to take required reserves and charge-offs, as set forth above at ¶¶66-81, 346 .

351.    Further, it was materially misleading for Defendant Cohen to claim that the "inbound indicator of troubled loans, which is the 30-to 89-day category, was reduced" materially, and the loans more than 90 days delinquent were "essentially cleaned … out," when the Bank was concealing significant losses and material amounts of past due loans, as set forth above at ¶¶66-81.

352.    On the Third Quarter 2013 Conference Call, Defendant Cohen also addressed an analyst's question related to whether the provision Bancorp took for the third quarter was a "kitchen sink" provision that could help Bancorp put the credit issues behind it.  Defendant Cohen responded, stating that "[w]e're trying to proactively, vigorously, and aggressively approach these issues, as you've seen in the last two quarters.  We're very hopeful that we'll have our arms around them very shortly."

353.    This statement was materially false and misleading.  It was materially false and misleading for Defendant Cohen to represent that Bancorp was "proactively, vigorously, and aggressively" addressing its credit issues when the Bank was concealing approximately $87.6 million in losses suffered from 2010 through the third quarter of 2013, including approximately

$3.6 million in the third quarter of 2013 alone, and failing to take required reserves and charge-offs, as set forth above at ¶¶66-81, 346.

354. Also on the Third Quarter 2013 Conference Call, an analyst questioned whether the increase in Bancorp's nonperforming asset balance was the result of a regulatory review of Bancorp's portfolio. Defendant Cohen emphatically responded that this was not the case: "No, absolutely not. This is our decision. We've been very proactive in this area."

355. This statement was materially false and misleading. It was materially false and misleading for Defendant Cohen to represent that Bancorp was "proactive" in identifying necessary increases to its nonperforming asset balance when the Bank was concealing approximately $87.6 million in losses suffered from 2010 through the third quarter of 2013, including approximately $3.6 million in the third quarter of 2013 alone, and failing to take required reserves and charge-offs, as set forth above at ¶¶66-81, 346.

356. Later on during the Third Quarter 2013 Conference Call, an analyst asked Defendant Cohen about the adequacy of the Bank's loss reserves. The analyst noted that the Bank's nonperforming loans had increased, but that the loss reserve had not kept pace, and asked whether the Bank's reserve was sufficient. In response, Defendant Cohen stated that the reserve was sufficient because the Bank had already aggressively charged off troubled loans, thus leaving a small amount of embedded losses for the reserve to cover, stating: "Yes, remember that we've been very aggressive in the charge-offs and additions, so the balance of the difference, the delta there, is partly absorbed by that. So we've moved everything through that through the mark-to-market, in essence, issue. So I do think so."

357. This statement was materially false and misleading. It was materially false and misleading for Defendant Cohen to represent that Bancorp had been "very aggressive in the

charge-offs and additions," and that its reserve was sufficient to cover probable losses in the loan portfolio, when the Bank was concealing approximately $87.6 million in losses suffered from 2010 through the third quarter of 2013, including approximately $3.6 million in the third quarter of 2013 alone, and failing to take required reserves and charge-offs, as set forth above at ¶¶66-81, 346.

358. On November 6, 2013, Bancorp filed with the SEC its Form 10-Q for the quarter ended September 30, 2013 ("Third Quarter 2013 Form 10-Q"). The Third Quarter 2013 Form 10-Q reported the same financial results, including net income, earnings per share, provision for loan and lease losses, allowance for loan and lease losses, net interest after the provision for loan and lease losses, total loans, total commercial loans, ratio of the allowance to total loans, total shareholders' equity, and retained earnings, set forth in ¶345, above. As set forth above at ¶346, these financial results were materially false and misleading.

359. The Third Quarter 2013 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," commercial mortgage," and "construction":

| September 30, 2013 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 739 | $ - | $ - | $ 29,755 | $ 30,494 | $ 439,578 | $ 470,072 |
| Commercial mortgage | - | - | - | 7,580 | 7,580 | 646,876 | 654,456 |
| Construction | - | - | - | 8,142 | 8,142 | 247,130 | 255,272 |
| Direct lease financing | 3,390 | 757 | 204 | - | 4,351 | 173,446 | 177,797 |
| Consumer - other | 425 | - | - | 1,257 | 1,682 | 286,468 | 288,150 |
| Consumer - home equity | 2 | 52 | - | - | 54 | 44,223 | 44,277 |
| Residential mortgage | - | - | - | 2,016 | 2,016 | 92,548 | 94,564 |
| Unamortized loan fees and costs | - | - | - | - | - | 6,867 | 6,867 |
| | $ 4,556 | $ 809 | $ 204 | $ 48,750 | $ 54,319 | $ 1,937,136 | $ 1,991,455 |

360.     The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, the Bank failed to recognize approximately $87.6 million in losses suffered from 2010 through the third quarter of 2013, including approximately $3.6 million in the third quarter of 2013 alone.  Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

361.     In the Third Quarter 2013 Press Release and during the Third Quarter 2013 Conference Call, Defendants made additional false and misleading statements concerning the Bank's prepaid business.  For instance, in the Third Quarter 2013 Press Release, Defendant Cohen reported growth in net income of 35% year-over-year, growth in noninterest income of 76% year-over-year, and attributed this growth to Bancorp's prepaid business, stating that "Our leadership position in the prepaid card industry is a primary vector and growth."

362.     This statement was materially misleading.  It was materially misleading for Defendant Cohen to emphasize that the prepaid business was a "primary" driver of the Bank's "growth" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

363.     Defendants made additional materially misleading statements about the prepaid business during the Third Quarter Conference Call.  For instance, touting the Bank's 76% increase in quarterly noninterest income, Defendant Cohen stated that "[p]repaid, which has always driven the institution very strongly within the noninterest income category, increased what we consider on our current base an impressive 36%."  Further, commenting on the continued growth of the prepaid business, Defendant Mastrangelo stated that "[a]ll I'd say is, Q4

is traditionally a strong quarter for us and the prepaid business. And we would expect to continue to outperform market growth."

364.    The statements above were materially misleading. It was misleading for Defendant Cohen to emphasize the prepaid business' contribution to the significant increase in quarterly noninterest income, and for Defendant Mastrangelo to indicate that the Bank's prepaid business would "continue to outperform market growth," without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

365.    The Third Quarter 2013 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**M.    Materially False And Misleading Statements And Omissions Concerning The Fiscal Fourth Quarter 2013 And The Fiscal Year 2013**

366.    On January 23, 2014, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Fourth Quarter and Fiscal 2013 Financial Results" ("Fourth Quarter 2013 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("Fourth Quarter Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. For fiscal year 2013, the Fourth Quarter 2013 Press Release and the Fourth Quarter Form 8-K reported net income of $25.11 million, earnings per share of $0.67, as well as a provision for loan and lease losses of $29.50 million and an allowance of $38.18. The Bank further reported (i) net interest income after the provision of $66.28 million; (ii) total loans of $1.92 billion; (iii) total commercial loans of $1.33 billion; (iv) ratio of allowance to total loans of 1.95%; (v) total shareholders' equity of $359.6 million; and (vi) retained earnings of $27.62 million.

367.     Bancorp's financial results reported for the fiscal year 2013 were materially false and misleading when issued.  As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its fiscal year 2013 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Fiscal Year 2013**

| Year End 2013 | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| Net Income (Loss) | $25.11 million | ($14.42 million) | 157.4% |
| Diluted and Basic EPS | $0.67 | ($0.39) | 158.2% |
| Provision for Loan and Lease Losses | $29.50 million | $58.39 million | 97.9% |
| Allowance for Loan and Lease Losses | $38.18 million | $66.43 million | 74% |
| Net Interest Income After Provision for Loan and Lease Losses | $66.28 million | $35.96 million | 45.7% |
| Total Loans | $1.92 billion | $1.79 billion | 7.4% |
| Total Commercial Loans | $1.33 billion | $1.22 billion | 8.5% |
| Ratio of the Allowance to Total Loans | 1.95% | 3.60% | 84.7% |
| Total Shareholders' Equity | $359.60 million | $247.13 million | 31.3% |
| Retained Earnings (Accumulated Deficit) | $27.62 million | ($84.86 million) | 407.3% |

368.     The Fourth Quarter 2013 Press Release and the Fourth Quarter Form 8-K also reported financial results for the fourth quarter of 2013, including net income of $7.3 million, compared to net income of $5.2 million for the prior-year period, and earnings per share of $0.19.  The Bank also reported: (i) a $38.18 million allowance for loan and lease losses; and (ii)

a $6.5 million provision for loan and lease losses. For the fourth quarter 2013, the Bank further reported net interest income after the provision of $18.90 million.

369.     Bancorp's financial results reported for the fourth quarter 2013 were materially false and misleading when issued.  As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its fourth quarter 2013 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Fourth Quarter 2013**

| Fourth Quarter 2013 | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| Net Income (Loss) | $7.33 million | ($17.52 million) | 339.1% |
| Diluted EPS | $0.19 | ($0.47) | 347.4% |
| Basic EPS | $0.19 | ($0.47) | 347.4% |
| Provision for Loan and Lease Losses | $6.5 million | $20.33 million | 211.3% |
| Allowance for Loan and Lease Losses | $38.18 million | $66.43 million | 74% |
| Net Interest Income After Provision for Loan and Lease Losses | $18.90 million | $4.83 million | 74.5% |

370.     In the Fourth Quarter 2013 Press Release and Form 8-K, Defendant Cohen also made statements underscoring the Bank's purported earnings growth. Specifically, Defendant Cohen stated that "[o]ur earnings growth in the fourth quarter reflected increases both in net interest and non-interest income.  These drivers resulted in growth of 40% in net income, 21% in adjusted operating earnings and 27% in earnings per diluted share.  Our leadership position in the prepaid card industry is a primary vector of growth and related fee income increased 20% to $11.7 million for the quarter, compared to fourth quarter 2012."

371.     This statement was materially false and misleading when issued.  It was materially false and misleading for Defendant Cohen to state that the Bank had achieved net

income growth of 40% when the Bank's reported net income for the fourth quarter of 2013 was materially overstated by 339%. Indeed, rather than achieving net income for the fourth quarter of $7.3 million, as the Bank publicly reported, in reality, the Bank actually had a net loss of $17.5 million. Similarly, it was materially false and misleading for Defendant Cohen to state that the Bank had experienced growth of 27% in diluted earnings per share when the Bank's reported diluted earnings per share was materially overstated by 347%, as set forth directly above in ¶369. Indeed, rather than achieving diluted earnings per share of $0.19, as the Bank publicly reported, in reality, the Bank had actually experienced a loss per diluted share of $0.47.

372.    On January 24, 2014, the Bank held a conference call with investors to discuss its 2013 fourth quarter and year-end results (the "Fourth Quarter and Year-End 2013 Conference Call"). On that call, Defendant Cohen made misleading statements designed to assure investors that the credit quality in the Bank's commercial loan portfolio was improving. For instance, in response to a question regarding whether the recent decrease in loss provisions was the turning point in credit that the Bank had been waiting for, Defendant Cohen stated that "[w]e believe that we have been aggressive in identifying credit issues, and so we think that we are getting ahead of the game. And so, that's as much as I will say on that."

373.    This statement was materially false and misleading. It was materially false and misleading for Defendant Cohen to represent that Bancorp had "been aggressive in identifying credit issues" and that it was "getting ahead of the game" when the Bank was concealing approximately $112.5 million in losses suffered from 2010 through 2013 in its commercial loan portfolio, including nearly $40 million of losses for fiscal year 2013 alone, and failing to take required reserves and charge-offs, as set forth above at ¶¶66-81, 367.

374.    On March 17, 2014, Bancorp filed with the SEC its Form 10-K for the quarter ended December 31, 2013 ("2013 Form 10-K"). The 2013 Form 10-K reported the same financial results, including net income, earnings per share, provision for loan and lease losses, allowance for loan and lease losses, net interest after the provision for loan and lease losses, total loans, total commercial loans, ratio of the allowance to total loans, total shareholders' equity, and retained earnings, set forth above in ¶¶366, 368, and was signed by Defendants Cohen and Frenkiel. As set forth above at ¶¶367, 369, these financial results were materially false and misleading when made.

375.    The 2013 Form 10-K also contained the following chart purporting to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

| December 31, 2013 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Nonaccrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ - | $ - | $ - | $ 29,651 | $ 29,651 | $ 420,462 | $ 450,113 |
| Commercial mortgage | 998 | 5,999 | - | 5,861 | 12,858 | 612,952 | 625,810 |
| Construction | - | - | - | 1,667 | 1,667 | 257,222 | 258,889 |
| Direct lease financing | 3,427 | 1,293 | 110 | - | 4,830 | 170,780 | 175,610 |
| Consumer - other | 425 | - | - | 1,356 | 1,781 | 300,909 | 302,690 |
| Consumer - home equity | 18 | - | - | - | 18 | 43,626 | 43,644 |
| Residential mortgage | - | - | - | 2,016 | 2,016 | 92,834 | 94,850 |
| Unamortized loan fees and costs | - | - | - | - | - | 6,839 | 6,839 |
| | $ 4,868 | $ 7,292 | $ 110 | $ 40,551 | $ 52,821 | $ 1,905,624 | $ 1,958,445 |

376.    The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, the Bank failed to recognize approximately $112.5 million in losses suffered from 2010 through 2013 in its commercial loan portfolio, including nearly $40 million

of losses for fiscal year 2013 alone. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

377. In the 2013 Form 10-K the Bank also stated that as of December 31, 2013, the Bank had a Tier 1 capital-to-average-assets ratio of 6.72%, Tier 1 capital-to-risk-adjusted-assets ratio of 11.40%, and a total capital-to-risk-adjusted-assets ratio of 12.66%.

378. The statements above were materially false and misleading when made. Indeed, the Bank admitted in the Restatement that as of December 31, 2013, the Bank's Tier 1 capital-to-average-assets ratio was 4.17%, which was below the required 5.0% threshold under federal banking regulations, its Tier 1 capital-to-risk-adjusted-assets ratio was 7.22%, and its total capital-to-risk-adjusted-assets ratio was 8.53%.

379. During the fourth quarter of 2013, Defendants also made materially false and misleading statements about the Bank's BSA compliance. Bancorp's website during this period contained the following statement attributed to Defendant Kuiper, managing director of Bancorp's prepaid business, highlighting the Bank's purported "rock-solid compliance" in its prepaid business: "The Bancorp's unique ability to balance the creativity of new product development and the rigor of rock-solid compliance serves as a major competitive advantage for our partners."

380. This statement was materially false and misleading. It was materially false and misleading for Bancorp to state that it maintained "the rigor of rock-solid compliance" as to its prepaid business when, contrary to this assertion, the Bank was engaging in numerous BSA violations in that business line, and key aspects of its compliance program were either non-existent or severely deficient, as set forth above at ¶¶98-107. Indeed, contrary to the statement

that the Bank maintained "the rigor of rock-solid compliance" in its prepaid business, it was violating numerous "cornerstone" BSA requirements, including that:

a. the Bank had no qualified BSA Officer during the Class Period, as detailed above at ¶102;

b. the Bank had no adequate customer due diligence program during the Class Period, as detailed above at ¶103;

c. the Bank had no adequate system of BSA internal controls during the Class Period, as detailed above at ¶103;

d. the Bank had no adequate system in place for monitoring suspicious activity or filing accurate and timely SARs during the Class Period, as detailed above at ¶103;

e. the Bank had no adequate training program during the Class Period, as detailed above at ¶104; and

f. the Bank had no adequate independent testing program during the Class Period, as detailed above at ¶105;

381. In the Fourth Quarter 2013 Press Release and Fourth Quarter and Year-End 2013 Conference Call, Defendants made additional false and misleading statements concerning the Bank's prepaid business. For example, in the Fourth Quarter 2013 Press Release, Defendant Cohen reported growth in net income of 40% year-over-year, growth in noninterest income of 20% year-over-year, and attributed this growth to the Bank's prepaid business, stating that "[o]ur leadership position in the prepaid card industry is a primary vector of growth."

382. This statement was materially misleading. It was materially misleading for Defendant Cohen to emphasize that the prepaid business was a "primary" driver of the Bank's "growth" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

383.    The 2013 Form 10-K also contained the same statements regarding the Bank's BSA compliance as described above at ¶265.    These statements were materially false and misleading for the reasons set forth above at ¶266.

384.    The 2013 Form 10-K also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.    Defendants' SOX and Internal Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**N.    Materially False And Misleading Statements And Omissions Concerning The Fiscal First Quarter 2014**

385.    On April 23, 2014, Bancorp issued a press release entitled "The Bancorp, Inc. Reports First Quarter 2014 Financial Results" ("First Quarter 2014 Press Release").    That same day, the Bank filed with the SEC a Form 8-K ("First Quarter 2014 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit.    The First Quarter 2014 Press Release and First Quarter 2014 Form 8-K reported a $46.41 million allowance for loan and lease losses.    The Bank further reported $1.997 billion in total loans, $1.38 billion in total commercial loans, a 2.27% ratio of the allowance to total loans, shareholders' equity of $366.17 million and retained earnings of $27.42 million.

386.    Bancorp's financial results reported for the first quarter of 2014 were materially false and misleading when issued.    As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its first quarter 2014 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for First Quarter 2014**

| First Quarter 2014 | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| Allowance for Loan and Lease Losses | $46.41 million | $74.04 million | 59.5% |
| Total Loans | $1.997 billion | $1.86 billion | 6.9% |
| Total Commercial Loans | $1.38 billion | $1.27 billion | 8% |
| Ratio of the Allowance to Total Loans | 2.27% | 3.83% | 68.7% |
| Total Shareholders' Equity | $366.17 million | $255.02 million | 30.4% |
| Retained Earnings (Accumulated Deficit) | $27.42 million | ($83.72 million) | 405.3% |

387. As noted above, beginning in mid-2014, the Bank made a series of disclosures that revealed the truth to investors regarding the Bank's toxic commercial loan portfolio and inadequate BSA compliance. At the same time, the Bank was making these partial disclosures, it also made false and misleading reassuring statements to investors that continued to conceal the truth about its practices.

388. For example, on April 24, 2014, the Bank held a conference call with investors to discuss its 2014 first quarter results (the "First Quarter 2014 Conference Call"). On that call, where the Bank disclosed a $17.3 million provision for losses in its loan portfolio, Defendant Cohen reassured investors that the Bank had been conducting an "internal review" of the credit quality of its commercial loan portfolio and that the Bank continued to proactively disclose any problem loans. Specifically, Defendant Cohen stated that the Bank "continued to be enormously aggressive…in terms of trying to, shall we say, clean out the stable, I will give you one example, which was a loan that went 90 days for the first time at the end of 2013. By the end of this quarter, we had sold the underlying property. Maybe if we had held it a little bit longer, we

would have gotten more for it. There was just a loss associated with it, but we felt that was the right thing to do. And that, I think, is emblematic of the way in which we are approaching the portfolio."

389. This statement was materially false and misleading. It was materially false and misleading for Defendant Cohen to continue to represent that the Bank was being "enormously aggressive" in disclosing problem loans when the Bank had concealed approximately $112.5 million in losses that its commercial loan portfolio suffered between 2010 and 2013.

390. Defendant Cohen was also questioned on the First Quarter 2014 Conference Call as to why the quarter's loss provision had been substantial. Defendant Cohen stated in response, "[a] lot of these are C&I loans, even if they had real estate against them. And I think we have discussed the fact previously that the Philadelphia market, which is where these loans are, has been unrelenting in its [un]willingness to improve. It has not improved throughout the—it took a deeper dive than one might have expected from a relatively stable market, historically."

391. This statement was materially false and misleading. It was materially false and misleading for Defendant Cohen to represent that the increased provision was due to a depressed real estate market in the Philadelphia area when, in reality, the Bank's increased loss provision was due to the Bank's $112.5 million in losses concealed in the Bank's commercial loan portfolio.

392. On May 12, 2014, Bancorp filed with the SEC its Form 10-Q for the quarter ended March 31, 2014 ("First Quarter 2014 Form 10-Q"). The First Quarter 2014 Form 10-Q reported the same materially misstated financial results, including the allowance for loan and lease losses, total loans, total commercial loans, the ratio of the allowance to total loans,

shareholders' equity, and accumulated earnings, set forth above in ¶385. As set forth above at ¶386, these financial results were materially false and misleading when made.

393. The First Quarter 2014 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," commercial mortgage" and "construction":

| March 31, 2014 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial $ | 401 $ | - $ | - $ | 21,901 $ | 22,302 $ | 467,272 $ | 489,574 |
| Commercial mortgage | - | - | - | 5,250 | 5,250 | 605,740 | 610,990 |
| Construction | 912 | - | - | 13,770 | 14,682 | 269,246 | 283,928 |
| Direct lease financing | 2,637 | 405 | 189 | - | 3,231 | 177,776 | 181,007 |
| Consumer - other | 1 | - | - | 923 | 924 | 330,617 | 331,541 |
| Consumer - home equity | - | - | - | 1,682 | 1,682 | 42,595 | 44,277 |
| Residential mortgage | - | - | - | 1,175 | 1,175 | 94,222 | 95,397 |
| Unamortized loan fees and costs | - | - | - | - | - | 7,290 | 7,290 |
| | $ 3,951 $ | 405 $ | 189 $ | 44,701 $ | 49,246 $ | 1,994,758 $ | 2,044,004 |

394. The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio. As the Bank admitted in the Restatement, the Bank failed to recognize over $112.5 million in losses in its commercial loan portfolio from 2010 to 2013. Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

395. During the first quarter of 2014 Defendants also made materially false and misleading statements about the Bank's BSA compliance. During the first quarter of 2014, the Bank continued to publish on its website Defendant Kuiper's statement that the Bank's purported "rigor of rock-solid compliance serves as a major competitive advantage for our partners." This statement was materially misleading for the reasons set forth above at ¶380.

396. In the First Quarter 2014 Press Release and First Quarter 2014 Conference Call, Defendants made additional false and misleading statements concerning the Bank's prepaid business. For example, in the First Quarter 2014 Press Release, Defendant Cohen reported growth in noninterest income of 26% year-over-year and attributed growth to the Bank's prepaid business, stating that "[o]ur leadership position in the prepaid card industry is a primary vector of growth."

397. This statement was materially misleading. It was materially misleading for Defendant Cohen to emphasize that the prepaid business was the "primary" driver of the Bank's "growth" without disclosing the fact that the Bank was committing numerous BSA violations that severely jeopardized the prepaid business and its ability to grow.

398. The First Quarter 2014 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel. Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

**O.  Materially False And Misleading Statements And Omissions Concerning The Fiscal Second Quarter 2014**

399. On July 23, 2014, Bancorp issued a press release entitled "The Bancorp, Inc. Reports Second Quarter 2014 Financial Results" ("Second Quarter 2014 Press Release"). That same day, the Bank filed with the SEC a Form 8-K ("Second Quarter 2014 Form 8-K"), which Defendant Frenkiel signed, that included the press release as an exhibit. The Second Quarter 2014 Press Release and Second Quarter 2014 Form 8-K reported a $46.95 million allowance for loan and lease losses. The Bank further reported $2.0 billion in total loans, $1.34 billion in total commercial loans, a 2.29% ratio of the allowance to total loans, shareholders' equity of $372.49 million, and retained earnings of $27.76 million.

400.    Bancorp's financial results reported for the second quarter of 2014 were materially false and misleading when issued.    As Bancorp admitted in the Restatement, Bancorp's improper accounting practices caused its second quarter 2014 key financial metrics to be misstated by the material amounts set forth in the chart below:

**Misstatement of Key Financial Results for Second Quarter 2014**

|  | Reported Figure | Actual Figure as Restated | Percent of Misstatement |
|---|---|---|---|
| Allowance for Loan and Lease Losses | $46.95 million | $69.91 million | 48.9% |
| Total Loans | $2.0 billion | $1.88 billion | 6.2% |
| Total Commercial Loans | $1.34 billion | $1.23 billion | 7.6% |
| Ratio of the Allowance to Total Loans | 2.29% | 3.59% | 56.6% |
| Total Shareholders' Equity | $372.49 million | $271.33 million | 27.2% |
| Retained Earnings (Accumulated Deficit) | $27.76 million | ($73.40 million) | 364.4% |

401.    On August 11, 2014, Bancorp filed with the SEC its Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 2014 Form 10-Q").    The Second Quarter 2014 Form 10-Q reported the same materially misstated financial results, including the allowance for loan and lease losses, total loans, total commercial loans, the ratio of the allowance to total loans, shareholders' equity, and accumulated earnings, set forth above in ¶399.    As set forth above at ¶400, these financial results were materially false and misleading when made.

402.    The Second Quarter 2014 Form 10-Q also contained the following chart that purported to set forth the loans in the commercial loan portfolio that were 30-59 days past due, 60-89 days past due, more than 90 days past due, and nonaccruing, under the categories "commercial," "commercial mortgage," and "construction":

A detail of the Company's delinquent loans by loan category is as follows (in thousands):

| June 30, 2014 | 30-59 Days past due | 60-89 Days past due | Greater than 90 days | Non-accrual | Total past due | Current | Total loans |
|---|---|---|---|---|---|---|---|
| Commercial | $ 785 | $ - | $ - | 12,269 | $ 13,054 | $ 463,745 | $ 476,799 |
| Commercial mortgage | 665 | - | - | 10,790 | 11,455 | 582,167 | 593,622 |
| Construction | - | - | 913 | 12,300 | 13,213 | 251,454 | 264,667 |
| Direct lease financing | 3,598 | 2,328 | 118 | - | 6,044 | 179,834 | 185,878 |
| Consumer - other | 750 | - | - | 1,257 | 2,007 | 376,551 | 378,558 |
| Consumer - home equity | 9 | - | - | 923 | 932 | 43,345 | 44,277 |
| Residential mortgage | - | - | - | 1,175 | 1,175 | 94,834 | 96,009 |
| Unamortized loan fees and costs | - | - | - | - | - | 9,751 | 9,751 |
| | $ 5,807 | $ 2,328 | $ 1,031 | $ 38,714 | $ 47,880 | $ 2,001,681 | $ 2,049,561 |

403.   The past due and nonaccrual metrics set forth above for the commercial loan portfolio were materially false and misleading because they materially understated the amount of delinquent and non-performing loans in the Bank's commercial loan portfolio.  As the Bank admitted in the Restatement, the Bank failed to recognize over $112.5 million in losses in its commercial loan portfolio from 2010 to 2013.  Further, as detailed above, the Bank engaged in "extend and pretend" tactics that concealed material amounts of past due and nonaccruing loans.

404.   The Second Quarter 2014 Form 10-Q also contained the same SOX and Internal Control Certifications as described above at ¶¶217, 220 and was signed by Defendants Cohen and Frenkiel.  Defendants' SOX and Internal Control Certifications were materially false and misleading for the reasons set forth above at ¶¶219, 221.

P.   **Materially False And Misleading Statements And Omissions Concerning The Second Quarter of 2015**

405.   On April 1, 2015, Bancorp filed with the SEC a Form 8-K ("April 1 Form 8-K"), which Defendant Frenkiel signed, pursuant to Item 4.02, Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.  In the April 1 Form 8-K, the Bank stated that its Audit Committee had "concluded that certain provisions for

loan losses in prior periods relating to operations that were discontinued in the third quarter of 2014 were taken in incorrect periods, and accordingly, that the Company's previously issued financial statements for the fiscal years ended December 21, 2012 and 2013 and the quarterly financial statements within those years and for the first three fiscal quarters of 2014…should no longer be relied upon." The Bank, however, assured investors that the impact of the accounting errors was limited, stating that the "aggregate amount of provisions relating to loan losses that are subject to restatement in the various periods is approximately $18.5 million."

406. This statement was materially misleading. It was misleading to state that the errors in Bancorp's financial statements were limited to the belated recording of $18.5 million in provisions. In reality, and as the Bank subsequently revealed in the Restatement, (i) it had failed to disclose $28.5 million in additional losses that it had never previously disclosed, and (ii) it had failed to recognize approximately $84 million in provisions and related loan losses and charge-offs that should have been recognized between 2010 and 2013.

## VIII. LOSS CAUSATION

407. The market price of Bancorp's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions about the credit quality and value of Bancorp's commercial loan portfolio and its compliance with the BSA.

408. The artificial inflation in Bancorp's stock price was removed when the facts, conditions, and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through partial disclosures on April 23, 2014, June 10, 2014, July 23, 2014, and June 26, 2015, which revealed on a piecemeal basis the nature and true extent of the poor quality of Bancorp's commercial loan portfolio, Bancorp's misstated financial statements, its failure to comply with the BSA, and their material negative impacts on Bancorp.

These disclosures, more particularly described below, reduced the amount of inflation in the price of Bancorp's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

409. On April 23, 2014, the Bank announced that it had taken a $17.3 million provision for loan and lease losses, including $9.1 million in charge-offs, for the first quarter of 2014. According to the Bank, the increased provision was the result of an internal review of the credit quality of the Bank's commercial loan portfolio, through which the Bank had discovered multiple "adversely classified loans." In response to this news, the Bank's stock price declined from $18.60 per share on April 23 to close at $15.84 per share on April 24, declining approximately 15%, on extraordinarily high volume. On the April 24, 2014 earnings conference call, Defendant Cohen resisted answering questions seeking detail about the Bank's purported "internal review" and denied the suggestion that the loans had become delinquent because they were of poor credit quality. Following the April 24 call, Bancorp management held additional conversations with analysts and reassured them that the Bank's "internal review" was nearly complete, indicating that the credit charges would subside.

410. The Bank's April 23 and April 24, 2014 disclosures partially corrected, *inter alia*, Defendants' prior materially misleading statements and omissions concerning the Bank's commercial loan portfolio. These disclosures also partially revealed the risks associated with the Bank's inadequate reserving processes that had been partially concealed from investors. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the April 23 and April 24, 2014 disclosures failed to disclose that: (a) the Bank had issued materially misstated financial statements, including by understating its provision and allowance for loan and lease losses, and

overstating its net income and earnings per share by failing to properly reserve for delinquent loans; (b) the Bank concealed material amounts of past due loans and failed to take required reserves and charge-offs through its "extend and pretend" scheme; and (c) the Bank was committing numerous BSA violations with respect to its prepaid card business, which severely jeopardized the prepaid business and its ability to grow.

411. Then, after the close of markets on June 10, 2014, the Bank disclosed that it had entered into a Consent Order with the FDIC, revealing that, contrary to the Bank's prior representations that its prepaid card business was in "rock-solid compliance" with the BSA, in reality the Bank was engaged in numerous BSA violations with respect to its key prepaid business. The Consent Order also prohibited the Bank from doing new business in much of its prepaid segment. In response to this news, Bancorp's stock fell over 28% from a close of $16.20 per share on June 10, 2014, to close at $11.54 per share on June 11, on the highest trading volume of the year.

412. The Bank's June 10, 2014 disclosure corrected, *inter alia*, Defendants' prior materially misleading statements and omissions concerning the Bank's BSA compliance. These disclosures also partially revealed the risks to the Bank's prepaid business associated with its failure to properly comply with the BSA. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the June 10, 2014 disclosures failed to disclose: (a) that the Bank had issued materially misstated financial statements, including by understating its provision and allowance for loan and lease losses, and overstating its net income and earnings per share by failing to properly reserve for delinquent loans; (b) that the Bank concealed material amounts of past due loans and failed to take required reserves and charge-offs through its "extend and pretend" scheme; and

(c) the full extent of the serious, long-lasting repercussions of the Bank's failure to comply with the BSA.

413.    On July 23, 2014, the Bank announced that it had taken another $15.5 million provision for loan and lease losses, attributable to "the impact of certain relationships in its commercial loan portfolios," and had also incurred $9.2 million of "consulting and other expenses" that were required by the Consent Order.   On the July 24, 2014 conference call, Defendant Cohen admitted that the Bank's senior management had known of the significant BSA violations long before the Consent Order was issued, that the issues identified in the Consent Order were "something we were working on," and that in addition to the $9.2 million of quarterly expenses the Bank had incurred to remedy BSA violations, it would incur an additional $3.5 million of expenses per year, further degrading its bottom line.

414.    On the July 24 conference call, Defendant Cohen also addressed the Bank's commercial loan portfolio and stated that, contrary to prior assurances that the Bank's "internal review" was nearly complete, in fact the Bank was "starting again from scratch and re-reviewing" because "[w]e are concerned that maybe we missed something."   Defendant Cohen also explained that the Bank had supposedly identified additional problem loans, which admittedly had been on its books since 2009, and which the Bank had now finally decided to charge off.   Further, Defendant Cohen noted that the additional quarterly loss provision was necessary because "the level of write-off had not been reserved for." Responding to additional analysts' questions, Defendant Cohen also acknowledged that Bancorp was considering a sale of its troubled loan portfolio and that it had engaged a third party to review the portfolio in anticipation of a potential sale, which could lead to further write-downs.   Following the Bank's

disclosure, Bancorp's stock price fell more than 14% from a closing price of $10.87 per share on July 23 to close at $9.31 per share on July 24 on high volume.

415.     Notwithstanding the dissemination of partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the July 23 and 24, 2014 disclosures failed to disclose that: (a) the Bank had issued materially misstated financial statements, including by understating its provision and allowance for loan and lease losses, and overstating its net income and earnings per share by failing to properly reserve for delinquent loans, and (b) the Bank concealed material amounts of past due loans and failed to take required reserves and charge-offs through its "extend and pretend" scheme.

416.     On June 26, 2015, the Bank surprised investors when it announced that it had suffered "$24 million of additional losses, related to discontinued operations, that were not previously reported and that will be recognized in our restated financial statements." In response to this news, the Bank's stock price fell again on high trading volume, falling from a closing price of $10.50 on June 26 to a closing price of $9.29 on June 29, the next trading day following the Bank's announcement—a decline of 11.5%.

417.     None of these disclosures was sufficient on its own to fully remove the inflation from Bancorp's stock price, because each only partially revealed the risks and conditions that had been concealed from investors. The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Bancorp's purported success in managing the quality of its commercial loan portfolio and its compliance with BSA regulations. These misrepresentations and omissions continued to maintain the prices of Bancorp's publicly traded stock at levels that were artificially inflated, inducing members of the

Class to continue purchasing Bancorp's stock even after the truth began to partially enter into the market. The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' material misstatements and omissions are detailed below.

418. Accordingly, the decline in Bancorp's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Bancorp's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Bank-specific facts unrelated to the Bancorp Defendants' fraudulent conduct.

## IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

419. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

420. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Bancorp who knew that the statement was materially false or misleading when made.

## X.    THE PRESUMPTION OF RELIANCE

421.    Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

422.    Lead Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

> (a)    Bancorp's common stock was actively traded in an efficient market on the NASDAQ;
>
> (b)    Bancorp's common stock traded at high weekly volumes;
>
> (c)    As a regulated issuer, Bancorp filed periodic public reports with the SEC;
>
> (d)    Bancorp was eligible to file registration statements with the SEC on Form S-3;
>
> (e)    Bancorp regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;
>
> (f)    The market reacted promptly to public information disseminated by Bancorp;
>
> (g)    Bancorp securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;
>
> (h)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Bancorp securities; and
>
> (i)    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Bancorp securities between the time Defendants misrepresented

or failed to disclose material facts and the time the true facts were disclosed.

423. Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Bancorp's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI. CLASS ACTION ALLEGATIONS

424. Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired securities issued by Bancorp during the period from January 26, 2011 through June 26, 2015, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Bancorp's affiliates and subsidiaries; the officers and directors of Bancorp and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

425. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bancorp common shares were actively traded on the NASDAQ. As of March 6, 2014, Bancorp had approximately 37.6 million shares of common stock issued and outstanding. Although the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by Bancorp or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

426. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

427. Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

    (a)    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

    (b)    whether the Bank's publicly issued financial statements were materially misstated;

    (c)    whether Defendants' other misrepresentations and omissions as alleged herein misrepresented material facts about the quality of Bancorp's commercial loan portfolio and compliance with BSA regulations during the Class Period;

    (d)    whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    (e)    whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

    (f)    whether the members of the Class have sustained damages, and the proper measure of damages.

428. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiffs have no interest that conflicts with the interests of the Class.

429. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

430.     The names and addresses of those persons and entities that purchased or acquired Bancorp's common stock during the Class Period are available from Bancorp's transfer agent(s). Notice may be provided to such purchasers and record owners via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XII.     CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendant Bancorp And The Executive Defendants)

431.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

432.     During the Class Period, Defendants Bancorp, Cohen, Mastrangelo, Frenkiel, and Kuiper carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding Bancorp's business, operations, management and the intrinsic value of Bancorp securities; (ii) enabled Defendants to artificially inflate the price of Bancorp securities; and (iii) caused Lead Plaintiffs and other members of the Class to purchase Bancorp securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

433.     The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Bank's securities during the Class Period in an effort to maintain artificially high market prices for Bancorp securities in violation of

Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein. The Executive Defendants are also sued as controlling persons as alleged below.

434. These Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Bancorp as specified herein.

435. These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bancorp's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Bancorp and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Bancorp securities during the Class Period.

436. These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section VII:

> (a)  Defendant Bancorp: Defendant Bancorp is liable for the false and misleading statements and omissions made by any Defendant, which are set forth above in Section VII.

(b)     Defendant Cohen: Defendant Cohen is liable for the false and misleading statements and omissions made in the Bank's Forms 10-Q dated May 9, 2011, August 9, 2011, November 9, 2011, May 10, 2012, August 9, 2012, November 9, 2012, May 10, 2013, August 9, 2013, November 6, 2013, May 12, 2014, and August 11, 2014; and Forms 10-K dated February 23, 2011, March 23, 2012, March 18, 2013 and March 17, 2014; statements she made on conference calls that the Bank held on January 27, 2011, July 21, 2011, January 24, 2012, April 25, 2012, October 24, 2012, January 24, 2013, April 25, 2013, July 25, 2013, October 25, 2013, January 24, 2014, and April 24, 2014; and statements made on the Bank's website regarding its BSA compliance;

(c)     Defendant Frenkiel: Defendant Frenkiel is liable for the false and misleading statements and omissions made in the Bank's Forms 8-K dated January 26, 2011, April 26, 2011, July 21, 2011, October 20, 2011, January 23, 2012, April 24, 2012, July 23, 2012, October 23, 2012, January 23, 2013, April 24, 2013, July 24, 2013, October 24, 2013, January 23, 2014, April 23, 2014, July 23, 2014, and April 1, 2015; Forms 10-Q dated May 9, 2011, August 9, 2011, November 9, 2011, May 10, 2012, August 9, 2012, November 9, 2012, May 10, 2013, August 9, 2013, November 6, 2013, May 12, 2014, and August 11, 2014; Forms 10-K dated February 23, 2011, March 23, 2012, March 18, 2013, and March 17, 2014; and conference calls that the Bank held on January 27, 2011, July 21, 2011, January 24, 2012, April 25, 2012, October 24, 2012, January 24,

2013, April 25, 2013, July 25, 2013, October 25, 2013, January 24, 2014, and April 24, 2014;

(d) Defendant Mastrangelo: Defendant Mastrangelo is liable for the false and misleading statements and omissions he made in the Bank's conference calls held on April 25, 2013, July 25, 2013, and October 25, 2013;

(e) Defendant Kuiper: Defendant Kuiper is liable for the false and misleading statements he made on the Bank's website regarding its BSA compliance.

(f) In addition, Defendants Cohen, Frenkiel, and Mastrangelo are liable for all false statements made by other Defendants in conference calls that they participated in during the Class Period.

437. Defendants Cohen, Frenkiel, Mastrangelo, and Kuiper, as the most senior officers of the Bank, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of the Bank, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by Bancorp. Defendants Cohen, Frenkiel, Mastrangelo, and Kuiper had direct involvement in the daily business of the Bank and participated in the preparation and dissemination of Bancorp's materially false and misleading statements set forth above.

438. The allegations in this Complaint establish a strong inference that Defendants Bancorp, Cohen, Frenkiel, Mastrangelo, and Kuiper acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the

misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them. Specifically, Defendants knew or recklessly disregarded that the quality of Bancorp's commercial loan portfolio was rapidly declining and that it was woefully out of compliance with the BSA, as described more fully above.

439. Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for Bancorp common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Bancorp common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

440. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

441. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Bancorp securities during the Class Period.

<u>**COUNT II**</u>

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against Defendants Cohen, Frenkiel, Mastrangelo, And Kuiper)**

442. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

443. Defendants Cohen, Mastrangelo, Frenkiel, and Kuiper acted as controlling persons of Bancorp within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

444. By reason of their high-level positions of control and authority as the Bank's most senior officers and, in the case of Defendants Cohen and Mastrangelo, also as Bancorp Directors, the Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Bank and its employees, and to cause the Bank to engage in the wrongful conduct complained of herein. The Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Bancorp during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with or had unlimited access to copies of the Bank's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

445. In their capacities as Bancorp's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Bank and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Cohen and Frenkiel signed Bancorp's SEC filings and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Bancorp during the Class Period.

446. Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Cohen, Frenkiel, Mastrangelo, and Kuiper each acted with scienter, as set forth more fully in Section VI.

447. By virtue of their positions as controlling persons of Bancorp and as a result of their own aforementioned conduct, Defendants Cohen, Frenkiel, Mastrangelo, and Kuiper together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XIII. **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a) Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XIV. **JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

Dated: October 26, 2015

/s/ Joel Friedlander
_____

Joel Friedlander (Bar No. 3163)
**FRIEDLANDER & GORRIS, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Lead Plaintiffs' Liaison Counsel*

John Rizio-Hamilton
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Lead Counsel for Lead Plaintiffs Arkansas Teacher
Retirement System and Arkansas Public Employees
Retirement System*

Robert M. Roseman
**SPECTOR ROSEMAN KODROFF & WILLIS,
P.C.**
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Telephone: (215) 496-0300

*Lead Counsel for Lead Plaintiffs Arkansas Teacher
Retirement System and Arkansas Public Employees
Retirement System*